IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FILENE'S BASEMENT, INC., et al., [1] | ) | Case No. 09-11525 (___) |
| | ) | |
| Debtors. | ) | |

## DECLARATION OF MARK SHULMAN, PRESIDENT OF FILENE'S BASEMENT, INC., IN SUPPORT OF FIRST DAY MOTIONS

I, Mark Shulman, hereby declare and state that the following is true to the best of my knowledge, information, and belief:

1.      I am the President and Chairman of the Board of Directors of debtor Filene's Basement, Inc. ("Filene's Basement" or "FBI"), which is the sole member of debtor FB Services LLC ("FB Services"), which in turn is the sole member of debtor FB Leasing Services LLC ("FB Leasing," and, collectively, the "Debtors"). I was appointed President of Filene's Basement effective as of November 2004, and I was appointed the Manager and President of FB Services and the Manger of FB Leasing effective as of April 2009.

2.      I have more than thirty years of experience in the retail industry. Prior to my tenure at the Debtors, I served as Chief Operating Officer of Retail Brand Alliance, which owned Brooks Brothers, Casual Corner Group, Carolee Designs, and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Filene's Basement, Inc. (8237); FB Services LLC (7224); and FB Leasing Services LLC (7226). The address for all Debtors is 25 Corporate Drive, Burlington, MA 01803.

Adrienne Vittadini. I have also served as Chief Merchandising Officer for Stage Stores, as President and Chief Executive Officer of Henri Bendel, and President and Chief Executive Officer of Ann Taylor.

3.    In my capacity as President of Filene's Basement, President and Manager of FB Services LLC, and Manager of FB Leasing Services LLC, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

4.    To minimize the adverse effects of filing for chapter 11 protection on the date of filing (the "Petition Date") and to enhance the Debtors' prospects of the success of the Chapter 11 cases, the Debtors are filing a number of motions requesting various types of "first day" relief (collectively, the "First Day Motions"). I am familiar with the contents of each First Day Motion (including any exhibits and other attachments thereto), and I believe that the relief sought in each First Day Motion: (i) is necessary to enable the Debtors to operate in Chapter 11 with minimum disruption or loss of productivity or value; (ii) will enhance the Debtors' prospects for achieving successful Chapter 11 cases; and (iii) best serves the Debtors' estate and the interests of the Debtors' creditors.

5.    I submit this declaration in support of the First Day Motions.[2] Except as otherwise indicated, all statements set forth in this declaration are based upon: (i) my personal knowledge, including my knowledge of the retail industry, (ii) information supplied to me by other members of the Debtors' management or their

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

professionals in the ordinary course of business, (iii) my review of relevant documents, or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration.

6. Part I of this declaration describes the Debtors' business, their capital structure, and the circumstances surrounding the commencement of these Chapter 11 cases. Part II sets forth the relevant facts in support of each First Day Motion.

## PART I

## OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

### A. Summary of the Debtors' History and Business

7. The Debtors operate a value-price fashion retailer carrying men's and women's apparel, accessories, jewelry, shoes, and home fashions, with fine jewelry, shoes, and cosmetics operating as leased departments. The Debtors' stores—which are located primarily in major metropolitan areas of the Eastern and Midwestern United States—have traditionally operated to provide the best selection of stylish, high-end designer, and famous-brand-name merchandise at affordable prices. The Debtors' stores have a selection of upscale designer and better-branded merchandise, including couture items imported directly from the fashion capitals of Europe.

8. The Debtors' main corporate operations are conducted out of their leased headquarters in Burlington, Massachusetts, with financial operations conducted in Columbus, Ohio. The Debtors currently operate 26 stores, which are located primarily in

3

the metropolitan markets of Boston, New York, Baltimore/Washington, Chicago, Atlanta, Cleveland, Columbus, and Miami. The Debtors also operate a leased 457,000 sq. ft. distribution center in Auburn, Massachusetts. In addition, while the Debtors operate a web site (www.filenesbasement.com), they do not presently sell any merchandise via that site.

9.    The Debtors currently employ approximately 1,900 full and part-time U.S. employees in hourly, salaried, supervisory, management, sales, retail, and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' business.

10.    For the year ending January 31, 2009, the Debtors recorded net sales of approximately $422,098,758 and incurred operating losses (before interest and taxes) of $53,095,433.

**B.    Company History**

11.    The first Filene's Basement store was opened in Boston in 1909 by Edward A. Filene as a mechanism for selling excess merchandise from his father's full-price department store, Filene's Department Store, located upstairs. Filene developed the revolutionary "Automatic Mark Down System," pursuant to which the price tag on each item was marked with the date that the item was made available for sale. The longer an item remained unsold, the more the price would automatically be reduced, first 25%, then 50%, and finally 75%. Before long, other retailers and manufacturers were bringing their unsold goods to the store for sale, and the concept of the "off-price" store was born.

4

12. In 1978, Filene's Basement first began to expand beyond the original flagship by building a branch location in the Boston suburb of Saugus. More locations followed, and by 1984 Filene's Basement included 22 retail locations.

13. Over the years, Filene's Basement has become known for its major selling events. The first men's suit sale event began in 1937, and the first bridal gown sales event was held in 1947. Today these events, especially the bridal event, now known as "The Running of the Brides,"™ regularly draw large crowds and significant media attention.

14. The business has changed ownership several times since its founding. In 1929, Filene's Basement and Filene's Department Store were both purchased by Federated Department Stores, Inc. In 1988, the Filene's Basement business was spun-off from its association with Filene's Department Store and Federated Department Stores and became a privately-held venture, incorporated as Filene's Basement, Inc.

15. In 1991, the owners of Filene's Basement took the company public, and a period of rapid expansion followed. By the mid-1990's, there were 56 Filene's Basement stores located from New England to Philadelphia and as far west as Minneapolis. However, this rapid expansion into markets where the Filene's Basement brand was unknown, combined with increased competitive pressure and increased debt, created a period of financial difficulty.

5

16.     To revitalize the firm, the company in 1999 experimented with a new weekend warehouse store concept, called Aisle 3. The Aisle 3 stores, averaging 60,000 square feet, operated only Friday through Sunday and were located near major metropolitan areas. The Aisle 3 experiment had disappointing results, which contributed to a Chapter 11 bankruptcy filing for Filene's Basement, Inc., on August 28, 1999. At the time of the bankruptcy filing, there were 51 Filene's Basement Stores and four Aisle 3 stores.

17.     In March 2000, Value City Department Stores, Inc. ("Value City"), acquired substantially all of the assets and assumed certain liabilities of Filene's Basement Corp. and Filene's Basement, Inc.,. from their pending bankruptcy cases. In October 2003, Value City reorganized its corporate structure and Value City became a wholly-owned subsidiary of Retail Ventures, Inc. ("RVI"). Filene's Basement, Inc., was a wholly owned subsidiary of RVI from that time until it was sold to FB II Acquisition Corp., as described more fully below, on April 21, 2009.

C.     **Capital Structure**

18.     Filene's Basement is 100% owned by FB II Acquisition Corp. Filene's Basement owns 100% of the limited liability company interests of FB Services LLC, and FB Services LLC owns 100% of the limited liability company interests of FB Leasing Services LLC.

19.     Effective January 23, 2008, Filene's Basement entered into a $100 million secured revolving credit facility (the "Revolving Loan") through an amendment

6

and restatement of its indebtedness and obligations as a co-borrower under a revolving loan as to which Value City Department Stores LLC was also a party. This action was taken in order to create a separate loan agreement for Filene's Basement, necessitated by the disposition of 81% ownership in Value City Department Stores LLC by Retail Ventures, Inc. Under the Revolving Loan, Filene's Basement is the borrower, National City Business Credit, Inc. ("National City") is the administrative and collateral agent, and Wells Fargo Retail Finance, LLC, and Wachovia Capital Finance Corporation (Central) are co-documentation agents and revolving credit lenders (the "Lenders"). The payment and performance of the Revolving Loan is the subject of a primary guarantee by RVI and certain of its wholly-owned subsidiaries; FB Services and FB Leasing joined and guaranteed the Revolving Loan on or about April 21, 2009, in connection with the sale transaction described more fully below.

20.     The Revolving Loan has borrowing base restrictions and provides for borrowings at variable interest rates based on LIBOR, the prime rate, or the Federal Funds effective rate, at the option of Filene's Basement, plus a margin. In addition to the borrowing base restrictions, 10% of the facility is deemed an "excess reserve" and is not available for borrowing. Obligations under the Revolving Loan are secured by a lien on substantially all of the assets of Filene's Basement, and the guarantees are secured by the assets of each of the guarantors with the exception of certain excluded assets. The maturity date of the Revolving Loan is January 23, 2013.

7

21.     As of the Petition Date, the balance owed on the Revolving Loan was approximately $16.9 million, including approximately $1.7 million face amount of issued and outstanding letters of credit and banker's acceptances, and the borrowing availability was approximately $7 million.

22.     In addition, the Debtors owe RVI approximately $52.6 million pursuant to two unsecured Subordinated Promissory Notes.

23.     Furthermore, as of the Petition Date, the Debtors estimate that they owe approximately $30 million in accounts payable to trade vendors, approximately $35.3 million in accrued expenses (including accrued legal and litigation expense, accrued merchandise credits and gift cards, accrued workers compensation expense, accrued licensee payments, accrued advertising, accrued severance, accrued warehouse expenses, accrued utilities, and accrued closed store expenses), approximately $9.7 million in intercompany expenses, approximately $2.4 million in accrued interest expenses, approximately $4 million in accrued taxes (including real estate, sales, and business taxes), approximately $4.8 million in accrued pension obligations. In total, the Debtors estimate the book value of their assets to be approximately $83.8 million and the book value of their liabilities to be approximately $182 million (which figure includes accounting entries for approximately $9 million in accrued step rent, and approximately $22 million in deferred revenue).

**D.      Events Leading to Bankruptcy**

8

24. The Debtors operate in an increasingly competitive discount retail market that includes intense competition from both value-oriented retailers such as Loehmann's, TJ Maxx, and Century 21, as well as traditional department store chains, like Macy's. The retail reaction to the recent economic downturn has narrowed the price differential between department stores and the value retailers and has substantially reduced consumer buying.

25. More specifically, the Debtors' current liquidity problem is occasioned by a number of factors.

    a. First, many of the stores that were opened in recent years have had disappointing sales. In retrospect, the Debtors have determined that certain suburban locations, particularly in areas away from the historical core markets, do not work well for the Debtors' retail concept. The Debtors' retail appeal has narrowed to a niche, which seems to require a high density of urban shoppers working where highly fashionable apparel is an important part of the dress code.

    b. Second, in September 2007, the downtown Boston flagship store (the second biggest tourist attraction in Boston) was temporarily closed as part of a major redevelopment of the site. It is unknown at this time if or when that store will reopen. The loss of the flagship location eliminates some volume

9

efficiencies and takes away an efficient location for clearing out older inventory. The Debtors had been receiving $500,000 per month from the redevelopers to compensate for the closing, but payments were halted without notice on January 1, 2009.

c.  Third, RVI divested itself of 81% ownership of the Value City Department Stores LLC in January 2008, and Filene's Basement, in the absence of any other entity with which to share fixed corporate overhead, ended up paying an increased amount for such fixed costs. In addition, the divestiture of Value City Department Stores LLC by RVI meant that Filene's Basement could no longer share the same revolving credit agreement with Value City Department Stores LLC. By placing Filene's Basement on its own revolving credit agreement, there was less flexibility in how that line of credit could be managed. This smaller, less flexible line of credit made Filene's Basement more vulnerable to default; and

d.  Fourth, the current economic recession has been particularly severe in the fashion retail sector. The loss of sales and margin due to the recession has put significant negative pressure on cash flow, making a difficult situation much worse.

10

26.     On January 29, 2009, the Debtors made a final determination to close 11 underperforming stores. The determination to close these underperforming stores was due to decreased sales and operating profit during the fourth fiscal quarter of 2008 as well as the continued negative economic outlook for the United States retail segment generally and Filene's Basement in particular. The Debtors also commenced an effort to aggressively renegotiate certain of the remaining 26 operating store leases as well as the leases for their corporate office and warehouse.

27.     Recently, the Lenders for the Revolving Loan have increased reserves under the borrowing base formula and have placed the Debtors in a cash control operating status. Due to the limited availability to borrow additional operating funds under the Revolving Loan, merchandise vendors became more reluctant to ship goods, and many have required cash payment before shipping merchandise. The inability to purchase inventory places additional pressure on cash availability, since the borrowing base under the Revolving Loan is predominantly dependent on inventory as collateral.

28.     On March 28, 2009, Filene's Basement retained Alan Cohen of Abacus Advisors as its Chief Restructuring Officer to assist it in the Chapter 11 cases, including with respect to organizing the Debtors' resources and activities so as to effectively and efficiently plan, coordinate, and manage the restructuring process and communicate with vendors, employees, lenders, landlords and other parties in interest.

11

29.     As of early April 2009, an *ad hoc* committee of unsecured creditors (the "Ad Hoc Committee") was formed and has been active. The Ad Hoc Committee has retained Cooley Godward Kronish LLP as its counsel.

30.     With the consent of National City and the Lenders, on or about April 21, 2009, RVI and and FB II Acquisition Corp. (the "Purchaser"), a newly formed affiliate of Buxbaum Holdings, Inc. (the "Sponsor"), completed a sale (the "Stock Sale") by RVI to the Purchaser of 100% of the issued and outstanding shares of capital stock of Filene's Basement and all of the limited liability company interests of FB Services. Shortly prior to the Stock Sale, RVI formed FB Services as a wholly owned direct subsidiary of RVI, and FB Services formed FB Leasing as a wholly owned direct subsidiary of FB Services. Filene's Basement assigned certain leases to FB Leasing. After the Stock Sale, the Purchaser transferred its interest in FB Services to Filene's Basement.

31.     Filene's Basement receives, among other things, general corporate and financial services support from its former affiliate, DSW Inc. ("DSW"). Prior to the Petition Date, and under the terms of that certain Amended and Restated Shared Services Agreement, dated as of October 26, 2008, as amended (the "SSA"), by and between DSW and RVI, DSW provided, among other things, corporate administrative services to Filene's Basement, including intellectual technology services, payroll administration and processing services, payroll financial reporting services, accounts payable, sales audit,

tax, and human resources services (collectively, the "Shared Services"). Prepetition, FBI paid approximately $475,000 per month to DSW in consideration of the Shared Services.

32.     Upon the Stock Sale, Filene's Basement and DSW entered into a Transitional Services Agreement (the "TSA"), dated as of April 21, 2009 (the "TSA Effective Date"), pursuant to which DSW will continue to provide the Shared Services previously provided under the SSA (at a substantially reduced cost) for a period of ninety days from the TSA Effective Date. In addition, RVI entered into a letter agreement, dated April 21, 2009, with Filene's Basement regarding certain employee benefits (the "Post-Closing Benefits Agreement"). The Transition Services Agreement and the Post-Closing Benefits Agreement are calculated to ensure orderly transition of services previously provided under the Servicing Agreement.

33.     During the difficult times leading up to the commencement of the Chapter 11 cases, the Debtors looked at several strategic options. One of these options was to sell the company. Tightness in the credit markets, current economic conditions, and the current condition of Filene's Basement made finding a suitor difficult. However, on or about May 1, 2009, the Debtors entered into an Asset Purchase Agreement (the "APA") with Crown FB Acquisition LLC ("Crown") for Crown's acquisition of 16 of the Debtors' real property leases and for certain other contracts, fixtures and equipment, intellectual property, and related assets (the "Assets") for the base purchase price of $22 million. Pursuant to the APA, the Debtors' intention is to seek approval of Crown as a stalking horse for an auction of the Assets and to seek approval of procedures for the

13

auction and sale of the Assets and for certain other of the Debtors' assets not included in the APA.

34.     As a result of these conditions, and to help ensure that day to day operations can continue and that an orderly process can be put in place to create an ongoing path for the remaining 26 stores, the Debtors determined that it was in the best interest of the Debtors, their estate, and their creditors commence the Chapter 11 cases.

## PART II

## FIRST DAY MOTIONS

**A.     Debtors' Motion for Order Authorizing
Joint Administration of Related Chapter 11 Cases**

35.     By this Motion, the Debtors seek entry of an order directing the joint administration of their Chapter 11 cases and the consolidation thereof for procedural purposes only.

36.     Joint administration of these chapter 11 cases (a) is warranted because the Debtors' financial affairs and business operations are closely related, (b) will ease the administrative burden on the Court and the parties, and (c) protects creditors of different estates against potential conflicts of interest.

37.     Joint administration of these cases is appropriate because each of the Debtors operate as part of a larger enterprise.  The Debtors are under common ownership and common management; they have many creditors and other parties in interest in common.  Jointly administering these related cases would prevent duplication of effort and unnecessary fees both on the part of the Debtors and on the part of the

14

Trustee, any creditors' committee, and other parties in interest who would have to monitor only one docket. The Debtors submit that jointly administering their cases under these circumstances would be to the benefit of their estates and all parties in interest and would not prejudice any party.

38.    The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect all of the Debtors. With three affiliated debtors, each with its own case docket, the failure to administer these cases jointly would result in numerous duplicative pleadings filed for each issue and served upon separate service lists. Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Clerk of this Court (the "Clerk") with the volume of paper.

39.    Joint administration will permit the Clerk to use a single general docket for each of the Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates. Joint administration also will protect parties in interest by ensuring that such parties in interest in each of the Debtors' respective Chapter 11 cases will be apprised of the various matters before the Court in all of these cases.

40.    The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights. Each creditor and party in interest will maintain whatever rights it has against the particular

15

estate in which it allegedly has a claim or right. Indeed, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration. The Court also will be relieved of the burden of entering duplicative orders and keeping duplicative files. Supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee also will be simplified.

**B.     Application of the Debtors to Employ and Retain Epiq Bankruptcy Solutions, LLC as Notice, <u>Claims and Solicitation Agent to the Debtors and Debtors in Possession</u>**

41.     By this Application, the Debtors seek the authority to employ and retain Epiq Bankruptcy Solutions, LLC ("Epiq"), to act as noticing, claims and solicitation agent (the "Claims Agent") in these chapter 11 cases *nun pro tunc* to the Petition Date.

42.     The Debtors believe that it is necessary and in the best interests of their creditors and estates to engage Epiq to act as their Claims Agent in order to assume full responsibility for, among other things, the distribution of notices and proof of claim forms and the maintenance, secondary processing, and docketing of all proofs of claim filed in the Debtors' Chapter 11 cases. In addition, in connection with any plan proposed by the Debtors, the Debtors have determined that they likely will require the services of Epiq to act as Claims Agent with respect to, *inter alia*, the mailing of the Debtors' disclosure statement, the plan and ballots, and maintaining and tallying ballots in connection with the voting on such plan.

43.     Although the Debtors have not yet filed their schedules of assets and liabilities (the "Schedules"), they anticipate that there will be several hundred potential creditors and parties in interest that the Debtors will be required to serve with the various notices, pleadings, and other documents filed in these Chapter 11 cases. In consideration of the number of anticipated claimants and other parties in interest and the nature of the Debtors' business, the Debtors respectfully submit that the appointment of Epiq will expedite the distribution of notices and relieve the Clerk's office of the administrative burden of processing such notices. Accordingly, the Debtors' estates and creditors will benefit as a result of Epiq's experience and cost-effective methods.

44.     While the Debtors do not propose to retain Epiq under section 327 of the Bankruptcy Code, the McElhinney Declaration submitted with the Application represents that Epiq does not, by reason of any direct or indirect relationship to, connection with or interest in the Debtors, hold or represent any interest adverse to the Debtors, their estates or any class of creditors or equity interest holders with respect to the matters upon which it is to be engaged.

45.     Epiq's compensation is set forth in the Services Agreement attached as Exhibit A to the Application. The compensation provided for in the Services Agreement is reasonable in light of the services to be performed by Epiq as Claims Agent.

46.     In the 90 days prior to the Petition Date, Epiq was paid a retainer (the "Retainer") in the amount of $50,000.00. There are no amounts owed to Epiq as of

17

the Petition Date. Epiq is currently holding the balance of the Retainer, which will be applied immediately in satisfaction of obligations incurred in connection with postpetition services rendered by Epiq pursuant to the Agreement. The Debtors' funds were the source of the Retainer.

47.     Epiq is one of the country's leading Chapter 11 administrators with experience in noticing, claims processing, and assisting with claims reconciliation and distribution. Accordingly, Epiq is well qualified to provide the Debtors with experienced noticing, claims and balloting services in connection with these cases.

18

**C.      Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 1107,**
**and 1108 Authorizing (I) Maintenance of Certain Existing Bank**
**Accounts, (II) Continued Use of Existing Business Forms,**
**(III) Continued Use of Existing Cash Management System,**
**and (IV) Waiver of Section 345(b) Deposit and Investment Requirements**

48.      By this Motion, the Debtors seek authorization (a) to maintain their

existing bank accounts as described on Exhibit A to the Motion (the "Accounts") and to

pay any prepetition routine banking fees imposed by the financial institutions of the

Accounts, (b) to continue to use their existing check stock and business forms until

existing check stocks are exhausted and until business forms can be modified, (c) to

continue to use their existing cash management system, and (d) for a limited waiver of

the deposit and investment guidelines imposed under section 345(b) of the Bankruptcy

Code.

49.      The Debtors' principal financing is provided by a revolving credit

line under the Second Amended and Restated Loan and Security Agreement, dated

January 23, 2008 (the "Credit Agreement"), pursuant to which with Filene's Basement,

Inc., is borrower and National City Business Credit, Inc., is agent (the "Agent"). The

Debtors' cash management system (the "Cash Management System") is a network of

bank accounts that facilitates the timely and efficient collection, management, and

disbursement of funds used in the Debtors' business. Because of the nature of the

Debtors' business and the disruption to the business that would result if they were forced

to close the Accounts, it is critical that the Cash Management System remain in place.

19

50.     The Cash Management System consists of an integrated network of bank accounts maintained at National City Bank ("National"), Bank of America ("B of A"), Citizens Bank ("Citizens"), M&T Bank ("M&T"), Wells Fargo ("Wells"), and PNC Bank ("PNC") (collectively, the "Banks"). Due to the Debtors' extensive retail operations, the Accounts include both the individual store bank accounts (the "Store Bank Accounts") shown on Exhibit A to the Motion, which are depository accounts associated with each of the Debtors' twenty-five operating retail locations, and the corporate accounts (the "Corporate Bank Accounts") also shown on Exhibit A, through which other collections and all disbursements are made. A diagram summarizing the role of each of the Accounts in the Cash Management System is attached to the Motion as Exhibit B.

51.     The Debtors derive substantially all of their revenue from the sale of goods to their customers. Revenues associated with the Debtors' twenty-five retail locations, other than credit-card payments, are directly deposited into the Store Bank Accounts and then swept daily into the Debtors' master depository account at National (the "Master Depository Account"). Similarly, credit-card payments from Certegy, Discover, and American Express[3] are swept from the applicable Corporate Bank Accounts at National and into the Master Depository Account; MasterCard and Visa payments are received directly into the Master Depository Account. Funds from the Master Depository Account then flow through a cash collateral account (the "Cash

---

[3] A "Private Label" account remains open at National, but the Debtor has discontinued its acceptance of those credit cards, and no funds currently flow through that account.

DOCS_DE:146578.9

Collateral Account")[4] and into a business credit concentration account (the "Business Credit Account.") also at National.

52.     The Agent sweeps the Business Credit Account daily to reduce the outstanding revolver balance in accordance with the Credit Agreement. Additionally, once daily cash needs are determined, the Debtors make a request and the Agent deposits proceeds of the Debtors' daily borrowing under the Credit Agreement into a separate concentration account (the "Concentration Account") for use for operating purposes in accordance with the disbursement mechanisms described below. In addition, de minimis corporate deposits, including miscellaneous reimbursements, credit checks from any vendors, and tenant allowance money from any landlords flow directly into the Concentration Account.

53.     The Debtors' main operating account is the Concentration Account. The balance of the Concentration Account fluctuates and, most recently, was approximately $200,000. The Debtors use the Concentration Account to fund operating items such as product and inventory purchases and payroll from disbursement accounts that draw upon the Concentration Account, as shown in Exhibit B to the Motion. In particular, the Concentration Account funds:

(i)     a zero-balance general liability account, from which disbursements are made on account of general liability claims to be satisfied;

---

[4] The Cash Collateral Account is maintained for control purposes only by National and is not otherwise an operational account of the Debtor.

(ii)     a zero-balance workers' compensation account, from which disbursements are made on account of allowed workers' compensation claims;

(iii)     zero-balance accounts payable expense check and wire accounts, from which the Debtors satisfy accounts payable by check or wire, as applicable;

(iv)     a zero-balance payroll account;

(v)     zero-balance merchandise expense check and wire accounts, from which the Debtors satisfy expenses associated with the purchase of merchandise by check or wire, as applicable;

(vi)     a zero-balance account for disbursements related to expenses incurred in connection with imports, to the extent that the Debtors handle those directly; and

(vii)     a zero-balance dedicated account with respect to disbursements on account of returns made upon Certegy credit-card purchases.

54.     In addition, the Debtors maintain or have maintained certain other accounts that remain in existence, including (a) an account at Citizens from which the Debtors receive and makes charitable contributions, which presently contains minimal amounts arising from disbursements by check that may not have cleared as of the Petition Date, (b) a business savings account at Wells Fargo that is effectively inactive at this time, with no further deposits being made, which contains minimal deposits of approximately $6,000, (c) an inactive "operating" account at National that was closed in

22

early April 2009, and (d) an inactive overnight investment (the "preferred investment sweep") account at National.

55.    The Debtors seek a waiver of the United States Trustee's requirement that the Accounts be closed and new postpetition bank accounts be opened at depositories authorized by the United States Trustee. If strictly enforced in these cases, the United States Trustee's requirement would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under Chapter 11. Additionally, the Debtors presently intend to expeditiously pursue a sale of assets for the benefit of creditors. Therefore, this relief may only be required for a relatively short time with respect to certain of the Accounts.

56.    Maintenance of the Accounts will greatly facilitate the Debtors' operations in Chapter 11. As noted on Exhibit B to the Motion, principally all payments from the Debtors' customers are deposited into the Master Depository Account, either from the twenty-five Store Accounts or the accounts associated with credit-card transactions, which deposits are then swept by National to satisfy loan amounts. If the Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for each of their retail locations and with customers and vendors, which would completely disrupt the flow of the Debtors' receipt of sales revenues and the Debtors' payment of debts incurred after the Petition Date. In addition, closing the Accounts would require the Debtors to cancel and reinstitute wire transfer instructions for various entities, all of which would be

difficult to modify under these exigent circumstances. These disruptions would severely impact and could irreparably harm the Debtors' ability to operate their business and effectuate a sale of their assets for the benefit of creditors.

57. To avoid disruptions and delays in the operation of the Debtors' business, the Debtors should be permitted to continue to maintain the Accounts and, if necessary, to open new accounts or close unnecessary existing accounts; the Debtors will promptly advise the United States Trustee of any Accounts that are closed or new accounts that are opened.

58. For the reasons set forth above, the Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of its business judgment. The use of the Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) allow a mechanism for deposits from sales revenues; (c) ensure cash availability; (d) control and monitor corporate funds; and (e) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System will facilitate and enhance the Debtors' efforts to continue to operate postpetition.

24

59. In addition, to minimize expense to their estate, the Debtors also request authority (i) to continue to use all correspondence and business forms (including, but not limited to letterhead, purchase orders, invoices, etc.) until such time as the Debtors can effectuate the necessary changes to such forms in order to add the "debtor in possession" label, and (ii) to continue using their existing check stock without reference to the "debtor in possession" status until such time as the Debtors can effectuate the necessary changes to such forms in order to add the "debtor in possession" label. While the Debtors' checks and business and correspondence forms are not pre-printed, the Debtors estimate that it may take some time to insure that new forms are properly generated with the "debtor in possession" label. The Debtors will require approximately one week to make the changes to checks and most forms, and the Debtors will require approximately three weeks to replace all hard-copy purchase orders that the Debtors' buyers travel with in the market.

60. In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System. The Debtors seek authority, in their sole discretion, to pay any such routine prepetition banking fees owed to the Banks in an amount not to exceed $20,000.

61. Finally, by the Motion, the Debtors seek an interim waiver of section 11 U.S.C. § 345(b) of the Bankruptcy Code subject to final approval. The waiver would permit the Debtors to maintain the Accounts without posting a bond or other

security, as would otherwise be required under section 345(b) whenever the funds on deposit exceed the amount permitted under section 345(b). Daily deposits at many of the Store Bank Accounts do not exceed FDIC coverage, and accounts in which balances are currently held (the Concentration Account, the balance of which averages approximately $200,000, the account at Citizens from which the Debtors make and receives charitable contributions that presently contains minimal deposits, and the business savings account at Wells Fargo that contains minimal deposits of approximately $6,000) do not exceed FDIC coverage. Moreover, while daily deposits in certain other accounts—specifically, the Store Bank Accounts at B of A, the depository account into which American Express credit card purchase are made, the Master Depository Account, and the Concentration Account—may temporarily exceed FDIC coverage, those accounts are swept daily for the benefit of National. In this case, therefore, because most of the Accounts do not hold a substantial amount for an extended period, the risk of loss, which section 345 protects against, is minimal. Finally, all of the Accounts are maintained at the Banks, all of which are federally insured institutions.

**D.     Motion of the Debtors Pursuant to Bankruptcy Code Sections 105(a), 363 and 507(a) for an Order Authorizing the Debtors to: (I) Pay Prepetition Wages and Salaries; (II) Remit Withholding Obligations; (III) Maintain Certain Employee Benefits Programs and Pay Related Administrative Obligations; and (IV) Authorize Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests**

62.     Filene's Basement currently employs 1,894 full and part-time U.S. employees in hourly, salaried, supervisory, management, sales, retail, and administrative

26

positions to perform the functions necessary to effectively and efficiently operate the

Debtors' business (collectively, the "Employees"). FBI employs both salaried and hourly

Employees. 1,648 Employees are paid hourly and 246 Employees are salaried. 933

Employees are employed full-time and 961 Employees work part time.[5]

63.     To minimize the personal hardships that the Employees will suffer

if their prepetition employee-related obligations are not paid, and to maintain the morale

of the Employees during this critical time, the Debtors, by the Motion, seek authority, in

their sole discretion, to: (i) pay unpaid prepetition claims for wages and salaries to the

Employees (the "Wages"); (ii) remit applicable withholding obligations to the proper

third parties; (iii) honor certain benefits (as more fully set forth below) offered by

Filene's Basement (the "Benefits"); (iv) reimburse certain unpaid business expenses

incurred prepetition by the Employees (the "Reimbursement Obligations"); and (v) pay

all costs incident to the foregoing as set forth in detail below. The amounts requested

herein have been budgeted in the Debtors' proposed cash collateral budget and, if

approved by the Court, will be paid in conformity therewith.

### The Shared Services Agreement

64.     Filene's Basement receives, among other things, general corporate

and financial services support from its former affiliate, DSW. Prior to the Petition Date,

---

[5] Filene's Basement is a party to a collective bargaining agreement by and between Filene's Basement and United Food and Commercial Workers Union Local 1445, AFL-C10, dated as of February 4, 2007 (the "CBA") with respect to Filene's Basement's prior store at Downtown Crossing, Boston, Massachusetts (the "Downtown Crossing Store"). Prepetition, Filene's Basement closed the Downtown Crossing Store and terminated the employment of all former employees who were previously the subject of the CBA. Therefore, Filene's Basement does not have any Employees who are the subject of the CBA or any other collective bargaining agreement with any union.

and under the terms of that certain *Amended and Restated Shared Services Agreement*, dated as of October 26, 2008, as amended (the "SSA"), by and between DSW and Filene's Basement's former parent, RVI, DSW provided, among other things, corporate administrative services to Filene's Basement, including intellectual technology services, payroll administration and processing services, payroll financial reporting services, accounts payable, sales audit, tax, and human resources services (collectively, the "Shared Services"). Prepetition, FBI paid approximately $475,000 per month to DSW in consideration of the Shared Services.

65.     FBI and DSW entered into that certain *Transitional Services Agreement* (the "TSA"), dated as of April 21, 2009 (the "TSA Effective Date"), pursuant to which DSW will continue to provide the Shared Services previously provided under the SSA (at a substantially reduced cost) for a period of ninety days from the TSA Effective Date. Under the TSA, effective May 1, 2009, FBI will pay DSW $133,333.33 per month in consideration of the Shared Services provided under the TSA.[6] Some of the Shared Services under the TSA relate to the processing, administration and calculation of the FBI's payroll, as discussed below.

### Wages, Salary and Other Compensation

66.     <u>Wages and Salaries</u>.     Employees are paid on either a bi-weekly or weekly basis, depending on whether they are salaried or hourly Employees. 246 salaried

---

[6] TSA fees payable on July 1, 2009 shall be prorated and paid as of July 1, 2009, through the date on which the TSA Agreement terminates. To the extent that FBI still requires any Shared Services following the termination of the TSA Agreement, the parties will negotiate such additional required Shared Services and the consideration to be provided in connection therewith.

Employees are paid on a bi-weekly basis (the "Salaried Employees") every other Friday and are brought current on unpaid wages on the date on which they are paid (the "Salaried Employees Pay Date"). Thus, Salaried Employees are not owed any unpaid Wages upon payment of their Wages on the Salaried Employees Pay Date. The last pay date on which Salaried Employees were paid was April 24, 2009. FBI's aggregate gross payroll to Salaried Employees was approximately $750,000 per bi-weekly period ending as of the last Salaried Employees Pay Date.

67.     1,648 full and part time Employees are paid hourly and are paid one week in arrears on a weekly basis every Friday (the "Hourly Employees"). Thus, Hourly Employees are still owed one week of unpaid Wages after they are paid on the Hourly Employees Pay Date. The last pay date on which the Hourly Employees were paid was also May 1, 2009 (the "Hourly Employees Pay Date"). FBI's aggregate gross payroll to Hourly Employees was approximately $400,000 per weekly pay period ending as of the Last Hourly Employees Pay Date.

68.     For each of the last two pay periods prior to the Petition Date, FBI funded the amounts required to make payroll for Hourly and Salaried Employees on the Wednesday prior to the applicable Hourly Employees Pay Date and Salaried Employees Pay Date to an account maintained by one of FBI's former affiliates, Retail Ventures Services, Inc. ("RVSI"), which account was used to fund and make payroll disbursements. RVSI then issued checks drawn from its own account to Employees paid via live check, and transmitted electronic payments to Employees who are paid via direct

deposit.[7] Effective May 1, 2009, FBI directly remits Withholding Obligations to applicable third parties and makes payroll distributions through direct deposit or live checks to Employees on the applicable pay date from FBI's concentration account in lieu of prefunding such distributions to RVSI.[8]

69. As of the Petition Date, FBI owes an estimated $833,000 for the gross amount of earned but unpaid Wages broken down as follows: $375,000 in unpaid Wages owed to Salaried Employees and $458,000 in unpaid Wages owed to Hourly Employees (together, the "Unpaid Wages").[9] No single Employee is owed more than $10,950 in Unpaid Wages earned within 180 days prior to the Petition Date. The Debtors therefore seek authority to pay the Unpaid Wages up to a total and aggregate amount of $950,000.

---

[7] In connection with remitting prepetition withholding obligations DSW used third party payroll processors (the "Third Party Administrators") to issue checks from RVSI's account to pay and administer Employee withholding obligations to taxing authorities and other third parties. Effective May 1, 2009, FBI may, in its discretion, continue to use the Third Party Administrators to process and remit payments to applicable taxing authorities and third parties and pay such Third Party Administrators directly in accordance with the proposed terms of the *Motion of the Debtors Pursuant to Sections 105(a),327, 328 and 330 of the Bankruptcy Code for an Order Authorizing the Debtors to Retain, Employ and Compensate Certain Professionals Utilized by The Debtors in the Ordinary Course of Business*, filed concurrently with this Motion.

[8] Prepetition, Withholding Obligations (as defined below) were funded by FBI to RVSI and remitted by RVSI to applicable third parties. As of May 1, 2009, Employees are paid directly by FBI and Withholding Obligations are directly remitted by FBI to applicable third parties. Notwithstanding the foregoing, DSW will continue to provide the same Shared Services with respect to the administration of FBI's payroll and Withholding Obligations under the terms of TSA.

[9] Not included in these amounts are Wages and vacation pay paid to former Employees of FBI terminated prior to the Petition Date who were paid by live check and who may, for whatever reason, not have cashed their final checks as of the Petition Date (the "Terminated Employees"). None of the Terminated Employees were owed more than $10,950 with respect to their unpaid wages and accrued vacation time. FBI seeks authority to honor checks issued to the former Employees to the extent that they are presented for payment postpetition.

30

70.     In addition to the Unpaid Wages, FBI estimates that as of the Petition Date, approximately $116,000 of FBI's contributions to tax and insurance withholdings were incurred and unpaid in connection with the Unpaid Wages (the "Employer Tax Obligations"). The Debtors also request authority to pay the Employer Tax Obligations, up to $140,000 in connection with the payment of the Unpaid Wages.

## Withholding Obligations

71.     In the ordinary course of business, FBI routinely withholds from Employees certain amounts of their wages or salaries that FBI is required to transmit to third parties for purposes such as Social Security and Medicare, federal and state or local income taxes, contributions to FBI's health and welfare benefits plans included in Employee Medical Plan Contributions (as defined and described below), contributions to flexible spending accounts, garnishment, child support, (and other similar obligations pursuant to court order), and certain other withheld amounts (collectively, the "Withholding Obligations"). As discussed above, DSW processes and administers FBI's tax Withholding Obligations under the TSA while all other Withholding Obligations are administered by RVSI. The Withholding Obligations for income and trust fund taxes are generally transferred to the appropriate recipients by the applicable date when such withholding obligations are required to be received by such recipients. The Debtors believe that the above-noted withheld funds, to the extent that they remain in the Debtors' possession, are not property of the Debtors' estates. Including amounts due on account of the Unpaid Wages described above, the Debtors' total Withholding Obligations are

31

included in the Unpaid Wages amounts and are estimated to be $116,000. Accordingly, the Debtors seek authority to transfer any and all Withholding Obligations and amounts that may still be in their possession to the appropriate third party recipients in the ordinary course of business.

<u>**Business Expense Reimbursements**</u>

72.     FBI customarily reimburses Employees who incur business expenses in the ordinary course of performing their duties on behalf of FBI pursuant to FBI's expense reimbursement policy. Such expenses typically include, but are not limited to, business-related travel expenses, including hotel and meal charges, airplane travel, car rental expenses, and business telephone calls (including cell phone charges) and other expenses (collectively, the "Reimbursement Obligations"). It is difficult for FBI to determine the exact amounts of Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of FBI throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing. FBI anticipates that, as of the Petition Date, it owed approximately $102,000 in prepetition Reimbursement Obligations to Employees. The Debtors seek authority to pay the Prepetition Reimbursement Obligations up to $115,000 and to continue to pay Postpetition Reimbursement Obligations in the ordinary course of business.

32

## Health and Welfare Benefits

        a.     The Medical Plan and Medical Plan Contributions

73. Prepetition, FBI's former parent, RVI, sponsored a benefit plan that provided certain health and related benefit plans to the FBI's Employees, including medical insurance, prescription drug coverage, and vision insurance (collectively, the "Medical Plan"). The Medical Plan provides Employees with three separate PPO plans, each administered by Anthem, Blue Cross and Blue Shield ("Anthem"). Included in the benefits provided under the Medical Plan, FBI provides eligible employees with a prescription drug plan administered by CareMark/CVS (the "Prescription Drug Plan") and vision benefits provided under a plan administered by Vision Service Plan Insurance company ("VSP"). Under the Prescription Drug Plan, Employees can purchase generic, preferred, or name brand prescription drugs at discounted rates. Employees pay additional drug costs to the extent they select a name brand drug when a generic version of the drug is available. Under the Vision Plan, Employees may choose between an in-network and out-of-network plan and are responsible for all co-payments, in addition to the Employee's portion of Medical Plan contributions. RVSI maintains stop-loss coverage for medical claims in excess of $250,000 over the lifetime per covered individual under the Medical Plan. Claim amounts in excess of the $250,000 stop loss amount are paid by Anthem.

74. Postpetition, and pursuant to that certain letter dated April 21, 2009, by and between RVI and FBI (the "Health Services Agreement"), RVI will

33

continue to provide the benefits under the Medical Plan to Employees employed as of April 21, 2009, until the earlier to occur of (i) the commencement of employment of an Employee employed as of April 21, 2009, by or in connection with a third party purchasing leaseholds and/or continuing store operations from FBI following the termination of such Employee's employment with FBI, or (ii) July 31, 2009 (the "Benefits Transition Period").

75.     Under the Medical Plan, FBI makes fixed monthly premium contributions to a voluntary employee benefit associate trust (the "VEBA Trust") which premium amounts constitute approximately 65% of medical claims incurred and paid under the Medical Plan (the "FBI Medical Plan Contributions"). Prior to the Petition Date, FBI paid the FBI Medical Plan Contribution amounts through April 30, 2009. The Health Benefits Agreement requires FBI to prefund the FBI Medical Plan Contributions under the Medical Plan to RVI on the fifth day of each calendar month, which contributions will be promptly deposited by RVI into the VEBA Trust. Postpetition, FBI will remit the Employee Medical Plan Contributions that are withheld from Employees' pay checks on the respective Hourly or Salaried Employees Pay Date to RVI, who will promptly deposit such contributions.

76.     Actual claims under the Medical Plan are paid by Anthem from funds on deposit in the VEBA Trust. The actual amount of the FBI Medical Plan Contributions varies from month to month depending on the number of Employees participating under the Medical Plan at a given time. In general, the monthly FBI

34

Medical Plan Contributions range between approximately $210 and $241 per month for Employee alone, $354 and $409 per month for Employee and children, $426 and $493 per month for Employee and spouse, and $609 and $704 per month for family coverage. For the month prior to the Petition Date, the FBI Medical Plan Contributions totaled approximately $205,000. As noted above, as of the Petition Date, no FBI Medical Plan Contributions were due or outstanding.

77. Employees participating under the Medical Plan make premium contributions through deductions made from their Wages as Withholding Obligations each applicable pay period (the "Employee Medical Plan Contributions" and together with the FBI Medical Plan Contributions, the "Medical Plan Contributions"). Employee Medical Plan Contributions are fixed and, depending on the PPO coverage selected by the Employee, vary between approximately $77 and $103 per month for Employee alone, $162 and $210 per month for Employee and children, $178 and $232 per month for Employee and spouse, and $255 and $332 per month for family coverage. Each pay period, Employees pay their share of contributions to the Medical Plan for themselves and their eligible dependents depending upon which option they select through payroll withholdings. The aggregate amount of the Employee Medical Plan Contributions depend on the total number of Employees participating in the Medical Plan during a given pay period and roughly constitute 35% of the Medical Plan Contributions. Prepetition, the Employee Medical Plan Contributions totaled approximately $89,000 for the month of April 2009. As of the Petition Date, up to approximately $10,000 of the

35

expected May Employee Medical Plan Contributions may have accrued, but have not been paid because such contributions are withheld and remitted on the actual Salaried Employees and Hourly Employees Pay Date. The Debtors seek authority to remit any prepetition Employee Medical Contributions up to a maximum amount of $12,000 and to continue to remit Employee Medical Plan Contributions postpetition in the ordinary course of business.

78.     As noted above, the FBI Medical Plan Contributions will be deposited in advance on a monthly basis into the VEBA Trust and the Employee Medical Plan Contributions will be deposited into the VEBA Trust after they are deducted from the Employees' pay checks following the applicable Hourly or Salaried Employees Pay Date. Each week, the various administrators of FBI's medical benefits under the Medical Plan (i.e., Anthem, CareMark/CVS, VSP and CIGNA) will pay incurred and processed medical claims directly from funds on deposit in the VEBA Trust.

b.     Dental Plan

79.     Prepetition, and separate from the Medical Plan, FBI also provided eligible Employees with a single dental insurance under a PPO plan administered by CIGNA Dental ("Cigna") in two tiers, an in-network and out-of-network plan(the "Dental Plan"). Employee contributions to the Dental Plan premiums are fixed as follows: $18.50 per month for Employee alone, $38.00 per month for Employee and child, $42.99 per month for Employee and spouse, and $69.98 per month for family coverage. All premium costs under the Dental Plan are paid by participating Employees. Each month,

36

Employees make contributions through payroll withholdings to the Dental Plan for themselves and their eligible dependents depending upon which option they select, and contributions are remitted to the VEBA Trust (the "Dental Plan Contributions"). Claims payable under the Dental Plan are then paid by CIGNA, who debits the required amounts to pay such claims from the VEBA Trust. Because the costs associated with the Dental Plan are paid entirely by Employees, the Debtors believe that any such unpaid Dental Plan Contributions are Withholding Obligations and are not estate property. Out of an abundance of caution, however, the Debtors seek authority to remit any accrued, but unremitted, Dental Plan Contributions to the VEBA Trust and to continue to remit Dental Plan Contributions incurred postpetition in the ordinary course of business. For the pay periods ending April 24, 2009 for Salaried Employees and May 1, 2009 for Hourly Employees, total unremitted Dental Plan Contributions will be approximately $16,000. FBI seeks authority to remit accrued but unremitted Dental Plan Contributions for the period commencing on April 24, 2009 for Salaried Employees and May 1, 2009 for Hourly Employees will be payable on the next Hourly and Salaried Employee Pay Dates, respectively, up to a maximum amount of $20,000 (the "Prepetition Dental Plan Contributions"), and to continue to remit postpetition Dental Plan Contributions in the ordinary course of business.

### Terminated FSA Accounts

80.     Prepetition, FBI also offered their Employees access to flexible spending accounts ("FSAs") pursuant to a plan administered by Employee Benefits

37

Corporation ("EBC") to set aside pre-tax dollars to pay for eligible medical and dependent care costs. An eligible Employee's FSA deduction was taken out of his or her paycheck each pay period and put in an account to be used for eligible expenses throughout the plan year, which ended on April 30, 2009. The FSAs for the prior year have already been remitted to EBC by May 1, 2009, and the FSAs will not be offered for the current plan year which commenced on May 1, 2009. However, the Debtors request authority to pay any administration fees owed for the plan year ending on April 30, 2009 (the "FSA Administration Fees") up to a maximum amount of $1,000.

### Terminated Life, Disability Insurance and Accidental Death and Dismemberment Policies

81.     Prepetition, FBI provided eligible Employees with life insurance, long-term disability insurance and accidental death and dismemberment insurance, all through the Hartford Life Insurance Company. As of Petition Date, FBI no longer offers any life insurance, long-term disability insurance and accidental death and dismemberment insurance and, consequently, does not at this time intend to offer these programs postpetition.

### Terminated 401(k) Plan

82.     Prepetition, FBI offered certain eligible Employees a 401(k) retirement plan pursuant to a plan sponsored by its former affiliate, Schottenstein Stores Corp. (the "401(k) Plan"). The 401(k) plan was discontinued with respect to the Employees prior to the Petition Date. However, although the 401(k) Plan was discontinued, FBI will, for the time being and in its sole discretion, permit the repayment

38

of loans taken by Employees against existing 401(k) balances through such Employees' payroll withholding amounts.

## Vacation and Sick Pay

83.     FBI provides eligible Employees with vacation pay and sick pay. Vacation benefits are provided for all full-time Employees. Vacation pay does not begin to accrue until a full time Employee has completed one year of employment. Vacation pay is accrued on a monthly basis commencing on June 1st based upon length of service for Employees who work at least 35 hours per week (the "Vacation Pay"). Unused vacation days are not paid out upon year-end and are not carried over without prior management approval. Unused vacation accrued by Employees at the time of termination of Employees are paid to such Employees upon their separation from employment. In addition, FBI offers all full-time Employees up to two personal days per year and provides additional time off for bereavement leave.

84.     Eligible full-time Hourly Employees with between 1 and 2 years of service may accrue up to 40 hours of paid vacation per year. Full-time Hourly Employees with between 2 and 5 years of service may accrue up to 80 hours of paid vacation per year. Full-time Hourly Employees with 6, 7, 8 and 9 years of service may accrue up to 88, 96, 104 and 112 hours of paid vacation per year, respectively. Full-time Hourly Employees with between 10 and 14 years of service may accrue up to 120 hours of paid vacation per year while eligible Hourly Employees with more than 15 years of service may accrue up to 160 hours of paid vacation per year.

85.     Salaried Employees with less than 3 years of service earn up to 10 days of vacation per year. Salaried Employees with between 3 and 5 years of service earn up to 13 days vacation. Salaried Employees with between 5 and 10 years of service earn up to 15 vacation days while Salaried Employees with between 10 and 15 years of service earn up to 18 days of vacation time. Finally, Salaried Employees with over 15 years of service earn up to 20 days of vacation time.

86.     FBI provides sick pay to full-time Hourly and Salaried Employees (the "Sick Pay"). Salaried Employees employed for fewer than six months receive up to five days of Sick Pay. Salaried Employees employed for at least six months are eligible to receive up to a maximum of 12 weeks of their salary in Sick Pay. Hourly Employees who work at least 35 hours per week and who have been employed for at least six months can earn 2/3 of the Hourly Employee's average scheduled hours over a period of the prior 90 days multiplied by the Hourly Employees' hourly pay rate, subject to maximum cap of $440 for Hourly Employees, effective on the fourth consecutive day of absence. Hourly Employees employed between one year and eight years are eligible to receive Sick Pay effective on the third consecutive day of absence while Hourly Employees employed between eight and fifteen years receive Sick Pay effective on the second consecutive day of absence. Hourly Employees employed over fifteen years or Hourly Employees who are hospitalized overnight received Sick Pay on the first day of absence. The maximum

40

Sick Pay payable to an eligible Hourly Employee after the aforementioned waiting period is a maximum of twelve weeks over a rolling twelve month period.[10]

87.     The Debtors seek authority to honor their existing vacation and sick leave policies and, in the ordinary course of business and in accordance with their existing policies, to permit continuing Employees to use accrued prepetition vacation time, and to pay an unused, but accrued prepetition Vacation Pay earned by Employees who become separated from FBI postpetition, provided, however, that the aggregate amount paid to any single Employee in respect of Unpaid Wages and prepetition Vacation Pay shall not exceed the $10,950 cap set forth in section 507(a)(4) of the Bankruptcy Code and would not exceed $415,000 in the aggregate. The Debtors also request authority in their discretion to honor similar vacation and sick leave policies postpetition and in the ordinary course of the Debtors' business.

### Workers' Compensation Insurance

88.     As required by statute, FBI provides a workers' compensation benefit programs for income protection, medical services, and rehabilitation services to employees with job-related injuries and illnesses in the various jurisdictions in which FBI maintains business operations (the "Workers' Compensation Insurance"). Hartford Casualty ("Hartford") provides Workers' Compensation Insurance to FBI in all states in which FBI operates except in New York and Ohio (the "Hartford Policy"). The Hartford Policy is a premium-based insurance policy pursuant with a zero-deductible. Hartford is

---

[10] Sick Pay may be less for Employees employed in New York and New Jersey based on those state's applicable disability laws.

responsible for the payment and administration of workers' compensation claims under the Hartford Policy. The annual cost of the Hartford Policy is $233,120 and the policy runs through April 21, 2010. As of the Petition Date, no premium amounts were owed to Hartford with respect to the Hartford Policy.[11]

89.     FBI also maintains Workers' Compensation Insurance through policies issued by the New York State Insurance Fund (the "New York Insurance Fund Policy") and by the Ohio State Insurance Fund (the "Ohio Insurance Fund Policy", and together with the New York Insurance Fund Policy and the Hartford Policy, the "Workers' Compensation Insurance Policies") with respect to its Employees in New York and Ohio, respectively. The New York State Insurance Fund is a premium financed policy financed by the New York Insurance Fund. Both the New York Insurance Fund Policy and Ohio Insurance Fund Policy are zero-deductible premium policies that administer and pay allowed workers' compensation claims up to the applicable statutory limits in those jurisdictions. The term of the New York State Insurance Fund Policy runs through April 17, 2010 while the Ohio State Insurance Fund Policy runs through July 1, 2009, and will automatically renew for a six (6) month term on such date. FBI pays premium amounts in such installments determined under the New York Insurance Fund Policy and the Ohio State Insurance Fund Policy, respectively, in a yearly-annualized

---

[11] The premium amounts owed under Hartford Policy, along with premium amounts payable under several other insurance policies maintained by FBI, are financed by Premium Assignment Corporation ("PAC") pursuant to a premium finance agreement between PAC and FBI dated as of April 21, 2009 (the "Premium Financing Agreement"). FBI has filed its *Motion for Authority to (1) Make Payments Pursuant to Existing Insurance Premium Financing Agreements, and (2) Enter Into New Premium Financing Agreements* concurrently herewith to seek authority to, *inter alia*, continue to finance the premiums under the insurance policies covered by the Premium Financing Agreement.

amount of approximately $95,000 under the New York State Insurance Fund Policy and $69,000 under the Ohio State Insurance Fund Policy. These premium amounts are adjusted from time to time depending on the dollar amount of wages paid by FBI to its Employees. As of the Petition Date, no amounts were owed under either the New York Insurance Fund Policy or the Ohio Insurance Fund Policy.

90.     In addition to the current Workers' Compensation Insurance Policies discussed above, FBI has approximately 35 open claims (the "Prepetition Workers' Compensation Claims") from a previous self-insured Workers' Compensation Insurance policy issued by Travelers (the "Travelers' Policy"). Pursuant to the terms of the TSA, DSW will continue postpetition to administer and process the Prepetition Workers' Compensation Claims under the Travelers' Policy. Travelers' is the beneficiary of a letter of credit collateralized by $1,416,806 of funds deposited by FBI in order to secure payment of workers' compensation claims under the Traveler's Policy (the "Letter of Credit"). FBI believes that the aggregate amount of the Prepetition Workers' Compensation Claims is substantially less than the collateral securing the Letter of Credit. In order to prevent Travelers from potentially drawing down on the Letter of Credit if the Prepetition Workers' Compensation Claims are not paid postpetition, FBI requests authority, in its discretion to continue to pay the Prepetition Workers' Compensation Claims in accordance with the terms of the TSA.

91.     Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in

order to continue to pay their daily living expenses. Employees will be exposed to significant financial problems if the Debtors are not permitted to pay the Prepetition Employee Obligations. The Debtors submit that failure to pay Unpaid Wages and to make other payments and honor the programs contemplated by the Motion will be extremely detrimental to Employee morale during this critical period.

92. Moreover, the Withholding Obligations do not constitute property of the Debtors' estates and principally represent employee earnings that governments (in the case of taxes), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from the paychecks of Employees. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtors expect inquiries from garnishors regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property, but rather, have been withheld from Employee pay. Moreover, if the Debtors cannot remit these amounts, the Debtor's Employees may face legal action due to the Debtors' failure to submit these payments.

93. The Debtors submit that, with respect to the wage related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estates, given that the relevant taxing authorities would have priority claims in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, are not property of the Debtors' estates. Similarly, Unpaid Wages and vacation accrued within

44

180 days prior to the Petition Date would give rise to priority claims up to $10,950 per Employee.

94.    In addition to payment of the Unpaid Wages, the Debtors seek to continue the Employee Programs described in this Motion and to pay all expenses incurred in connection therewith as set forth in the Motion. The Employee Programs provide benefits that are crucial to the Employees, especially with respect to the medical and dental benefits, and other forms of insurance provided to the Employees. The Debtors believe that the continuance of these benefits is critical to maintaining the Employee morale and work ethic necessary during this critical period of time.

**E.    Motion of the Debtors for an Order (I) Authorizing the Debtors to Pay Prepetition Sales and Use and Similar Taxes and Regulatory Fees in the Ordinary Course of Business; and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks And Transfers Related Thereto**

95.    By this Motion, the Debtors seek authority to pay, in the Debtors' sole discretion, certain prepetition sales, use and franchise taxes and certain other governmental taxes (the "Taxes") owed to the Taxing Authorities (as defined below), including, without limitation, Taxes subsequently determined upon audit to be owed for periods prior to the Petition Date. The Debtors request authority to make such payments in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date) not to exceed $2,032,000, which is the aggregate maximum sum that the Debtors currently believe may be due on account of prepetition Taxes and

45

certain prepetition regulatory and business license fees (the "Regulatory Fees") incurred in the period immediately preceding the Petition Date.

96.    In addition, to the extent any check issued or electronic transfer initiated prior to the Petition Date to satisfy any prepetition obligation on account of Taxes or Regulatory Fees has not cleared the applicable banks or financial institutions (the "Banks") as of the Petition Date, the Debtors, by the Motion, request the Court to authorize the applicable Banks, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay such checks or electronic transfers initiated prior to the Petition Date, provided that there are sufficient funds available in the applicable accounts to make such payments. The Debtors also seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing Authorities, to the extent necessary to pay such Taxes outstanding and owing for periods prior to the Petition Date.

97.    In connection with the normal operations of their business, the Debtors collect and incur various Taxes, which the Debtors remit to various federal, state, and local taxing authorities (collectively, the "Taxing Authorities"). The Debtors incur sales and use tax obligations in the states of Florida, Georgia, Illinois, Maryland, Massachusetts, New Jersey, New York, Ohio, and the District of Columbia. The Debtors collect and withhold sales taxes in the states in which they operate in connection with their retail sale operations which are then turned over to the applicable taxing authorities on a monthly, bi-monthly, quarterly, or annual basis depending on the jurisdiction. The Debtors also incur use taxes imposed by certain states in which they operate for certain

46

inventory and equipment that the Debtors consume in the operation of their business.
Finally, the Debtors incur franchise taxes, business license and regulatory fees from the
state and local jurisdictions in the states and towns in which the Debtors operate their
retail stores.

98.    Because of the timing of these collections and the associated
payments, the Debtors believe that they have not turned over the total amount of Taxes
collected on behalf of the Taxing Authorities. As of the Petition Date, the Debtors
believe that they may owe up to $2,031,000 in Taxes, broken down as $1,250,000 in
unremitted prepetition sales taxes, $475,000 in unremitted prepetition use taxes and
$4,200 in unpaid franchise taxes. As of the Petition Date, the Debtors believe that they
may owe up to $12,000 in prepetition Regulatory Fees.

99.    Any amounts that are actually due, but have not yet been paid to
the Taxing Authorities because of this case, represent a small fraction of the Debtors'
total assets. Further, some, if not all, of the Taxing Authorities may cause the Debtors to
be audited if the Taxes are not paid immediately or may attempt to take action against the
Debtors' officers and directors. Such audits will unnecessarily divert the Debtors'
attention away from their efforts in these Chapter 11 cases. If the Debtors do not pay
such amounts in a timely manner, the Taxing Authorities may attempt to suspend the
Debtors' operations, file liens, and seek to lift the stay or pursue other remedies that will
harm the estates. In addition, certain regulatory agencies may attempt to collect on
unpaid prepetition Regulatory Fees on the basis that such collection is not prohibited

47

under the automatic stay. While the Debtors dispute this proposition, they nonetheless believe that payment of the relatively de minimis amount of prepetition Regulatory Fees, in their discretion, will avoid unnecessary fights with regulatory agencies and will avoid disruption of the Debtors' operation of their stores and preempt any precipitous action on the part of any regulatory authorities.

**F.      Debtors' Motion for an Order Authorizing,
But Not Directing, Debtors to Pay Prepetition Claims
of Shippers and Warehousemen and Granting Related Relief**

100.    By the Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in their business judgment, to pay prepetition obligations owed to common carriers for ground transportation, air freight, ocean freight, and similar charges and freight forwarding charges (which freight forwarding charges may include in the amount payable to the freight forwarder for charges for customs duties and dock facilities) incurred by the Debtors, including those that give rise (or legitimately may give rise) to any statutory or common-law possessory liens on account of unpaid charges owing from the Debtors to such Shippers (collectively, "Shipping Obligations"), as further described in this Motion. The Debtors also seek authority to pay, in the exercise of their business judgment, warehousing and port facility charges (the "Warehousing Obligations") to any third party Warehousemen as further described in this Motion. The Debtors propose to pay such claims, when, in the Debtors' sole discretion, the Shippers' and Warehousemen's exercise of contractual or statutory self-help remedies would

48

unduly disrupt the Debtors' businesses. The Debtors request the authority, but not the direction, to pay up to $150,000 on account of such claims, as described further below.

101. The Debtors operate a fashion retailer carrying men's and women's apparel, accessories, jewelry, shoes, and home fashions, with fine jewelry, shoes, and cosmetics operating as leased departments. The Debtors currently operate 26 stores (the "Stores"), which are located primarily in the metropolitan markets of Boston, New York, Baltimore/Washington, Chicago, Atlanta, Cleveland, Columbus, and Miami. The Debtors also operate a leased 457,000 sq. ft. distribution center (the "Distribution Center") in Auburn, Massachusetts. In addition, while the Debtors operate a web site (www.filenesbasement.com), they do not presently sell any merchandise via that site.

102. In order to make maximum benefit of volume discounts, the Debtors operate by purchasing large quantities of high-end designer and famous-brand-name merchandise through a centralized operation. Merchandise selected by the Debtors' buyers is typically shipped by the vendors to the Distribution Center. In some cases, however, the Debtors' coordinate the shipping of inbound merchandise and select the shipping company for the delivery of the merchandise to the Distribution Center. There are no existing contracts with any shipper for inbound merchandise, and all shipments are received pursuant to individual purchase orders.

103. After arrival at the Distribution Center, the Debtors' apparel sorters and ticketing agents allocate the merchandise among the Stores and select a shipper to deliver the merchandise to the Stores. In New York and Massachusetts, all deliveries

49

between the Distribution Center and the Stores are handled pursuant to an existing contract with shipper National Retail Transportation, Inc. For their deliveries to Stores outside of New York and Massachusetts, the Debtors select an appropriate shipper through an open bidding process. Typically 80% of merchandise is shipped immediately from the Distribution Center through to the Stores, while 20% is held back at the Distribution Center to ship later based on sell-through data.

104.    The Debtors' businesses therefore depend on two separate and equally important transportation processes: (a) the constant delivery of merchandise to their Distribution Center from wholesale suppliers and (b) the frequent, sometimes daily, delivery of the merchandise to their Stores. The Debtors contract with shippers including, without limitation, the railroads, truckers, and short-distance delivery personnel (the "Shippers"), to ship, transport, store, and deliver merchandise from the Debtors' Distribution Center to the Store locations. In some cases, the Debtors also contract with Shippers to deliver merchandise from their suppliers to the Distribution Center.

105.    Because the Debtors lease a large Distribution Center to store merchandise prior to delivery to the Stores, the Debtors do not contract directly with any third party warehousemen. However, when necessary, the Shippers may utilize certain warehousemen (the "Warehousemen") to store merchandise while in transit. Such warehousing of merchandise is controlled and paid directly by the Shippers, with the cost passed along to the Debtors.

50

106. For some of their shipments, the Debtors employ third-party logistics coordinators (the "Logistics Coordinators") for the inbound and inter-facility transport of merchandise including Spinning Wheels, Shared Transport, Acacia Logistic Solutions and TABS. The Logistics Coordinators manage the logistics of the Debtors' supply and delivery system, including the Shippers by, among other things, auditing the Shippers' invoices and then billing the Debtors for their services. Generally, the Debtors pay the Logistics Coordinators first, and they, in turn, pay the Shippers. Typically, the Logistics Coordinators will advance funds to the Shippers and then invoice the Debtors. The Logistics Coordinators exact a percentage fee from all transport transactions managed for the Debtors.

107. The Debtors expect that, as of the Petition Date, certain Shippers, Warehousemen (when used by the Shippers) and Logistics Coordinators may have outstanding invoices for merchandise delivered to the Debtors prior to the Petition Date or stored for the Debtors on the Petition Date (collectively, including amounts owed to Logistics Coordinators, the "Shipping and Warehousing Charges").[12] Shipping charges constitute the majority of these amounts, since the Debtors do not directly warehouse merchandise with third parties. Some of the Debtors' Shippers also act as Warehousemen, to the extent a particular Shipper warehouses the Debtors' products in their trucks or at their facilities.

---

[12]Included within the Shipping and Warehousing Charges are certain amounts owed relating to customs brokers and customs fees. The Debtors employ a third-party broker to pay such fees, and expect the amounts owed to such broker to be de minimis.

51

108.     Usually, as long as the Logistics Coordinators' invoices remain unpaid, the Shippers and Warehousemen will not be paid for future shipments. In such an event, the Shippers and Warehousemen likely will argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed. Moreover, the Debtors' distribution system is an integrated network which is dependent upon the continued use of their existing Logistics Coordinators and Shippers. Because the Debtors' businesses depend on the constant supply of merchandise to their retail Stores, even minor disruptions to the Debtors' delivery of merchandise to theirs stores could be disastrous for the going concern value of the Debtors' businesses.

109.     The Debtors ship the vast majority of materials and finished goods within the United States. However, the Debtors receive a small amount of merchandise from international sources (the "International Shipments"). While such International Shipments are typically paid for by the Debtors' international vendors, the Debtors may be subject to storage and demurrage charges to various custom facilities in connection with the offloading and/or storage of International Shipments. According to the arrangements made by the Logistics Coordinators that govern the Debtors' International Shipments, the international Shippers and Warehousers may assert a lien on the goods in their possession to secure the expenses incurred in connection with the offloading and storage of the goods.

110.     The Debtors anticipate that some Shippers and Warehousemen will demand immediate payment from the Debtors or the Logistics Coordinators. Even absent a valid lien, a Shipper's or Warehouseman's mere possession (and retention) of the Debtors' merchandise could severely disrupt, and potentially cripple, the Debtors' operations because of the Debtors' policy of limiting goods stored in their Distribution Center and the time-sensitive nature of the fashions supplied to their customers.

111.     Accordingly, by the Motion, the Debtors seek to prevent the breakdown of their merchandise delivery network by requesting authority to pay certain prepetition claims relating to the Shippers and Warehousemen (directly or through the Logistics Coordinators, which payments shall include the Logistics Coordinators' fee) that the Debtors determine are necessary or appropriate to (a) obtain release of critical or valuable merchandise that may be subject to liens, (b) maintain a reliable, efficient and smooth distribution system, and (c) induce critical Shippers and Warehousemen to continue to carry merchandise and make timely delivery. Notably, the Debtors only seek authority, not direction, to make such payments.

112.     The Debtors seek the authority to make payments to the Logistics Coordinators, Shippers and/or Warehousemen, as appropriate, relating to undisputed prepetition Shipping and Warehousing Charges that it, in their business judgment, (a) determines are necessary or appropriate and (b) believes the benefits to their estates and creditors from making such payments will exceed the costs that their estates would incur by bringing an action to compel the turnover of such goods, and the delays

53

associated with such actions.[13]  The Debtors do not expect such payments to exceed $150,000.

113.     The Debtors further request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all electronic payment requests made by the Debtors related to the prepetition obligations described herein, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date.  The Debtors further request that all such banks and financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

114.     The Debtors submit that the total proposed amount to be paid to the Shippers, Warehousemen and Logistics Coordinators is minimal compared to the importance of and necessity for the Shippers, Warehousemen and Logistics Coordinators and the losses the Debtors may suffer if their operations are disrupted.  Moreover, in most cases, the Debtors do not believe that there are viable timely alternatives to the Shippers, Warehousemen and Logistics Coordinators.

115.     The Debtors believe that failure to pay these Shipping Obligations will result in certain Shippers discontinuing shipments of merchandise, thereby adversely affecting Debtors' distribution system and retail operations.  The Debtors believe that

---

[13]The value of the goods in the possession of the Shippers and Warehousemen and the potential injury to the Debtors if the goods are not released is likely to greatly exceed the amount of such Shipping and Warehousing Charges.

54

certain Shippers may withhold essential merchandise in their possession pending payment. Payment of some or all of these charges will prevent the disruption to the Debtors' businesses that will result from such actions. Moreover, the Debtors believe that some of these Shippers may contend that they are entitled to possessory liens in any goods and/or publications they hold as of the Petition Date, pursuant to state or other applicable law, and will refuse to deliver or release such goods and/or publications until their claims have been satisfied and their liens redeemed. The Debtors' payment, on the exercise of their business judgment and in their discretion, of the amounts owing to Shippers as requested in the Motion, will eliminate the need to provide any adequate protection and reduce the amount of potential secured claims against the Debtors' estates, which would take priority over any general unsecured claims.

116. In addition, the value of the goods in the possession of the Shippers, together with the potential injury to the Debtors from disruption of their businesses if the goods and/or publications are not released, far exceeds the amount of unpaid Shipping Obligations that the Debtors seek to pay by the Motion. The Debtors therefore believe that it is necessary and important to their continued business operations and to their successful reorganization that they be able to pay these Shipping Charges.

117. Moreover, if the Debtors are not able to make payments sought in the Motion to those Shippers whose services the Debtors utilized prepetition, it is likely that many of such Shippers will cease to do business with the Debtors, forcing the Debtors to obtain substitute merchandise carriers with little or no warning. Such an

55

arrangement would almost certainly obligate the Debtors to pay premium charges to the replacement carriers in order to obtain timely delivery of their inventory and other goods essential to their operations, and would in any event severely disrupt the Debtors' operations.

118. The Debtors further believes that a failure to pay the prepetition Warehousing Obligations will result in delayed delivery of merchandise to the Stores, causing significant damage to the Debtors' operations, sales and revenues. Moreover, payment of such amounts also does not prejudice the Debtors' unsecured creditors, to the extent that the Warehousemen would be able to credibly assert a possessory lien for any unpaid amounts for their services. Accordingly, the Debtors submit that payment of prepetition amounts owing to the Warehousemen subject to the Debtors' exercise of their business judgment and in the Debtors' discretion is warranted to the extent sought in the Motion.

**G.     Motion for Entry of an Order Pursuant to Sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to Honor Prepetition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the Ordinary Course of Business**

119. Prior to the Petition Date and in the ordinary course of their business, the Debtors engaged in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace. These practices include, but are not limited to, the following: (a) gift card program ("Gift Card Program"), (b) a product exchange and returns program ("Product Returns Program"), and (c) advertising and promotional coupon programs ("Advertising

56

and Promotional Program" and, together with the Gift Card Program, and the Advertising and Promotional Program, the "Customer Programs"). The Customer Programs create incentives for continuing and increased sales to the Debtors' customers. The Customer Programs, which are commonplace among retailers similar to the Debtors, are described in detail below. The common goals of the Customer Programs are to meet competitive pressures, ensure customer satisfaction, and generate brand loyalty and goodwill for the Debtors, thereby retaining current customers, attracting new ones, and ultimately enhancing net revenue and the going concern value of the business.

120. The Debtors need to continue those Customer Programs post-petition that have been cost-effective and beneficial to their business and, in connection therewith, seek authority to honor their prepetition obligations with respect to such Customer Programs. Such relief is necessary to preserve the Debtors' critical customer relationships and goodwill for the benefit of their estates, and it is in the best interest of the Debtors, their estates and creditors, to honor, in the Debtors' discretion, the Debtors' prepetition obligations in connection with the Customer Programs and to continue the Customer Programs in the ordinary course of business.

121. Pursuant to the Gift Card Program, the Debtors issue prepaid gift cards (the "Gift Cards") that are redeemable by customers at any of the Debtors' stores in return for merchandise. Gift Cards may be purchased for use by the purchaser or a third party. The Gift Cards are typically for amounts between $20 and $100. The Gift Cards do not have expiration dates. As of the Petition Date, the Debtors estimate that there

57

were approximately $550,000 in outstanding Gift Cards issued under the Gift Card Program.

122. Programs such as the Gift Card Program are common in the marketplace and are an essential component of a retailer's competitive customer services. Customer confidence and goodwill, and the Debtors' ability to remain competitive and preserve assets, will be severely harmed and the Debtors' revenues will decline if the Debtors are prevented from honoring the prepetition Gift Cards after the Petition Date. Moreover, the Debtors believe that honoring the Gift Card Program will also contribute to additional sales as customers often purchase in excess of the face amount of the Gift Card when they are redeemed.

123. The Debtors seek authority, in the exercise of their business judgment and in its sole their discretion, to honor prepetition obligations related to the Gift Card Program up to the maximum aggregate amount of $550,000 and to continue to implement the Gift Card Program on a postpetition basis and honor postpetition obligations related to the Gift Card Program in the ordinary course of business and in their sole discretion.

124. Pursuant to the Advertising and Promotion Program, the Debtors issue discount coupons for certain products that are redeemable in the Debtors' stores by the holder of the coupon during each week of the upcoming month. The coupons are generally valid for one week. The Debtors mail the coupons to certain customers in the Debtors' database by U.S. mail and electronic mail. In addition, the Debtors sometimes

58

place advertisements in newspapers and other periodicals whereby they offer discount coupons on merchandise, which coupons are redeemable for a period of time at the Debtors' stores. The Debtors estimate that discount coupons with an estimated value of approximately $100,000 are outstanding as of the Petition Date.

125. Like the Gift Card Program, the Advertising and Promotion Program is common in the Debtors' industry and is an essential component of the retail business. The Debtors' ability to remain competitive will be harmed and the Debtors' revenues will decline if the Debtors are prevented from honoring existing coupons and discounts under the Advertising and Promotion Program after the Petition Date. The Debtors seek authority, in the exercise of their business judgment and in their discretion, to honor prepetition obligations related to the discount coupons and to continue to honor postpetition obligations related to the Advertising and Promotion Program in the ordinary course of business.

126. Pursuant to the Product Returns Program, cash and debit card purchases that are returned are refunded in cash, to the credit card used for the purchase, or to a store credit, depending upon when the purchase transaction occurred, the form of payment that was used, and whether the customer presents a sales receipt with the returned item. If the customer does not have a receipt, then the merchandise may only be exchanged for store credit.

127. The policies reflected in the Product Returns Program are common in the Debtors' marketplace and, like the other Customer Programs, are an essential

component of the Debtors' business. The Product Returns Program is an integral part of the Debtors' business strategy and is designed to ensure customer confidence in the Debtors' merchandise. Customer loyalty would be impacted if the Debtors are not able to continue to honor the return of merchandise sold prepetition. In addition, the Debtors believe that sales will be negatively impacted if customers do not believe that they can return purchased merchandise for store credit.

128. The Debtors estimate that the amount owed as of the Petition Date under the Product Returns Program is up to $1,800,000. The Debtors seek authority, in the exercise of their business judgment and in their discretion, to continue to implement the Products Return Policy consistent with this Motion on a postpetition basis and honor postpetition obligations related to the Product Returns Program in the ordinary course of business.

129. The loyalty and continued patronage of the Debtors' customers is critical to the Debtors' goal of maximizing the value of their estates. The Debtors submit that the relief requested in the Motion represents a sound exercise of the Debtors' business judgment. If the Debtors are prohibited from honoring their prepetition Customer Program obligations and maintaining those Customer Programs consistent with past business practices, customers will likely lose confidence in the Debtors, thereby impeding the Debtors' ability to maintain and enhance their business operations for the benefit of their creditors. The Debtors' failure to honor the Customer Programs would significantly disadvantage the Debtors in the highly competitive marketplace in which

such programs are commonplace, and there is no reason to think that the Debtors' loyal customers would stay loyal if the Debtors did not honor or continue their Customer Program obligations. Ultimately, the damage from refusing to honor these obligations or continue these programs far exceeds the cost associated with honoring prepetition obligations and continuing the Customer Programs. At this critical early state, the Debtors simply cannot risk any loss of customer confidence as a result of their failure to honor prepetition obligations to customers or discontinuing their Customer Programs. The relief requested herein will protect the Debtors' goodwill during this critical time and enhance the Debtors' ability to generate revenue. Consequently, the Debtors' estates and creditors will benefit if the requested relief is granted. The Debtors shall use their discretion to maintain the programs only where, in their business judgment, doing so will continue to inure to the benefit of the estates.

130. Any delay in the relief sought herein, even being forced to advise customers that further judicial relief is necessary, could result in the loss of a substantial portion of the Debtors' customer base, diminish the value of the Debtors' assets, and severely harm the Debtors' prospects for a successful sale of their assets.

**H. Motion of the Debtors tor Entry of Interim and Final Orders Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment**

131. In the normal course of business, the Debtors have relationships with various utility companies and other providers (each a "Utility Provider" and,

61

collectively, the "Utility Providers") for the provision of telephone, gas, electricity and related services (the "Utility Services"). The Utility Providers include, without limitation, the entities set forth on the list attached to the Motion as Exhibit A. The Debtors estimate that their average monthly payments to the Utility Providers aggregate approximately $770,590.

132.    The Debtors, by the Motion, seek the entry of interim and final orders: (a) prohibiting the Utility Providers from altering, refusing or discontinuing services; (b) deeming Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of future payment.

133.    In order to provide adequate assurance of payment for future services to the Utility Providers, the Debtors propose to make a deposit (a "Utility Deposit") equal to 50% of the Debtors' estimated cost of their monthly utility consumption to each Utility that the Debtors intend to continue to utilize during the course of the Chapter 11 cases. The Debtors estimate that the Utility Deposits, in the aggregate, will total approximately $385,295. The Debtors propose to make Utility Deposits to each of the Utility Providers specified on Exhibit A to the Motion within ten days after the entry of an interim order granting the Motion, pending further order of the Court, for the purpose of providing each Utility Provider with adequate assurance of payment of its postpetition date services to the Debtors.

134.    In addition, the Debtors seek to establish reasonable procedures (the "Procedures"), as described more fully in the Motion, by which a Utility Provider

62

may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its Utility Deposit does not provide it with satisfactory adequate assurance.

135. The Debtors propose to make Utility Deposits in order to provide adequate assurance to their Utility Providers. Under the circumstances of these cases, the Debtors believe that the proposed Utility Deposits constitute adequate assurance of payment. Moreover, the Debtors propose to protect the Utility Providers further by establishing the Procedures provided for in the Motion, whereby any Utility Provider can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing postpetition services to the Debtors that would merit greater protection.

136. The Debtors cannot continue to operate without continued Utility Services. If any of the Utility Providers alter, refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted. In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition utility charges. It is therefore critical that Utility Services continue uninterrupted.

## I. Debtors' Motion for Authority to (1) Make Payments Pursuant to Existing Insurance Premium Financing Agreements, and (2) Enter Into New Premium Financing Agreements

137. This Motion seeks entry of an order authorizing the Debtors to continue to finance certain of their insurance premiums pursuant to that certain *Premium*

*Finance Agreement* by and between Premium Finance Corporation and Filene's

Basement, Inc., effective as of April 21, 2009 (the "PFA") and attached to the Motion as

Exhibit A, and, in the Debtors' business judgment, to enter into new insurance premium

finance agreements in the ordinary course of business and to pay related brokerage fees.

138.   The Debtors seek the authority to continue to make all payments

due under the existing prepetition PFA, to enter into new premium financing agreements

as the Debtors deem necessary or beneficial in the exercise of their business judgment, to

pay the corresponding brokerage fees, and to grant a security interest in the unearned

premiums paid on any current or future underlying policy to the lender supplying the

premium financing.

139.   In the ordinary course of business, the Debtors maintain a number

of insurance policies with respect to, *inter alia*, property, general liability, umbrella,

management liability, casualty, workers compensation (collectively, the "Insurance

Policies").

140.   Prepetition, the Debtors determined, in their business judgment,

that entry into the PFA was in the best interest of their business because it allows them to

finance their Insurance Policies by making monthly payments in lieu of a lump sum cash

expenditure to cover the premium costs for the various Insurance Policies.

141.   Currently, the Debtors are a party to one such agreement, the PFA,

with the Premium Assignment Corporation attached as Exhibit A to the Motion.

Pursuant to the PFA, the Debtors owed a total premium on the underlying policies of

$904,359.76, toward which the Debtors paid $232,839.95 prior to the Petition Date. The Debtors will pay the remaining $671,519.81 pursuant to the terms of the PFA, which call for nine monthly payments of $75,655.53 each.

142. The Debtors believe that approval of this Motion is in the best interest of creditor and the Debtors' estates. Absent such relief, the Debtors do not believe that the PFA lenders would be willing to continue providing the credit necessary for these arrangements and would more than likely cancel the policies that are currently being financed.

143. Anything that precludes premium financing will undoubtedly harm the Debtors' prospects, both now and in the future. The Debtors would be left trying to obtain replacement insurance on an expedited basis, which is an extremely costly proposition, and would thereafter have to make a lump sum payment to secure it – assuming, of course, that they could afford to. The inability to continue to perform under the PFA would detrimentally harm the Debtors.

144. The Debtors have filed this Motion out of an abundance of caution solely to the extent that the monthly payments required under the prepetition PFA required Court approval. Prepetition, the PFA lender was granted a security interest in the unearned premiums of the associated policies.

145. Because the relief sought is designed to facilitate the Debtors' continued core business operations, the Debtors believe that entry into the PFA or any similar arrangement falls squarely within the ordinary course of their business.

Accordingly, to reduce the administrative burden of these cases, as well as the expense of operating as debtors in possession and the risk associated with a loss of liquidity, the Debtors seek, out of an abundance of caution, authority to continue to honor the terms of the PFA and make the required payments thereunder and to enter into new premium financing agreements (and make the corresponding brokerage payments) in the Debtors' discretion.

146.    Finally, by the Motion, the Debtors propose to pay any prepetition premiums related to the Insurance Policies or to the PFA to the extent that the Debtors determine in their discretion that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits or proceeds provided under any Insurance Policy.[14]  For the reasons state above, the Debtors have concluded that such cancellation would be financially disadvantageous to the creditors and potentially disastrous to the business as a going concern.

**J.      Motion (A) for Authorization to (I) Utilize Cash
        Collateral Pursuant to 11 U.S.C. § 363; and
        (II) Provide Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363
        and (B) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001**

147.    By the Motion, the Debtors request the Court's entry of the interim order attached thereto (the "Interim Order") on an expedited basis, the scheduling of the final hearing on this the (the "Final Hearing"), and the entry of a final order on the

---

[14]  Although the Debtors are not currently aware of any amount that is due and payable under the PFAs as of the Petition Date, it could be determined that some portion of the amount due at the next payment date accrued prior to the Petition Date.  Therefore, the Debtors seek this authority out of an abundance of caution, in recognition of the critical necessity of keeping their insurance policies in current effect, and out of concern that if the necessity for such a payment arises in the future, the passage of time while the Debtors seek and obtain the Court's authority for such a payment may have irreversible adverse consequences for the Debtors' coverage under the Insurance Policies.

Motion (the "Final Order"), seeking authorization for the Debtor's use of "cash collateral" and related relief.

148.    Prior to the commencement of the Chapter 11 Cases, the Debtors were party to that certain Second Amended and Restated Loan and Agreement dated as of January 23, 2008 (as may be amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Agreement"), among the Filene's Basement, National City Business Credit, Inc., as Administrative Agent, Collateral Agent, L/C Issuer and Lender (the "Prepetition Agent"), National City Bank, as L/C Issuer and Lead Arranger, Wells Fargo Retail Finance, LLC, and Wachovia Capital Finance Corporation (Central), as Co-Documentation Agents and the lenders that are parties thereto from time to time (collectively, together with the Prepetition Agent, the "Prepetition Lenders"), pursuant to which the Prepetition Lenders provided credit and letter of credit facilities to the Debtors and provided other financial accommodations to or for the benefit of the Debtor (collectively, the "Prepetition Revolver Facility"). The Prepetition Revolver Agreement and all other loan and security documents executed in connection therewith, are occasionally referred to as the "Prepetition Documents."

149.    The Prepetition Revolver Facility provided the Debtors with up to $100,000,000 in aggregate maximum principal amount of revolving commitments, including letter of credit and swingline loan commitments, with a sublimit for letters of credit and bankers' acceptances of $25,000,000.

150. Pursuant to that certain Last Out Participation Agreement dated as of February 11, 2009 (as may be amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Participation Agreement"), among the Prepetition Agent, as Agent, and Retail Ventures, Inc. (the "Prepetition Junior Participant"), the Prepetition Junior Participant purchased a junior last out participation in the Prepetition Revolver Facility in the aggregate principal amount of $7,500,000.00.

151. The Prepetition Lenders allege that, and the Debtor stipulates that, pursuant to the Prepetition Financing Agreements, subject to and without prejudice the challenge rights set forth in ¶19 of the Interim Order, and to be set forth in the Final Order:

a. **Prepetition Obligation.** As of the Petition Date, the outstanding principal amount of all loans, including the Prepetition Participation Obligations (as defined below) under the Prepetition Agreement was $16,981,631, which amount includes $1,746,807 face amount of issued and outstanding letters of credit and banker's acceptances (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Revolver Documents, principal, accrued and unpaid interest, any fees, including the early termination fee, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, the "Prepetition Obligations"). The Prepetition Obligations are guaranteed by certain non-

68

debtors. As of the Petition Date, the outstanding principal amount of all loans under the Prepetition Participation Agreement was $7,500,000.00 (together with any amounts paid, incurred, or accrued prior to the Petition Date in accordance with the Prepetition Participation Agreement, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, the "Prepetition Participation Obligations").

      **b.**    **Prepetition Liens and Prepetition Collateral**. As more fully set forth in the Prepetition Documents, prior to the Petition Date, the Debtors granted security interests in and liens on, among other things, substantially all assets of the Debtors (collectively, the "Prepetition Collateral") to the Prepetition Agent, for themselves and the Prepetition Lenders (the "Prepetition Liens").

      c.    **Validity, Perfection and Priority of Prepetition Liens and Prepetition Obligations.** The Debtors (for themselves and their estates), acknowledge and agree that: (a) as of the Petition Date, the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected; (b) as of the Petition Date, the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Documents (to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the

"Permitted Prior Liens");[15] (c) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or chose in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the Prepetition Agent or the Prepetition Lenders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the respective loans to the Debtors; (f) as of the Petition Date, the value of the Prepetition Collateral securing the Prepetition Obligations exceeded the amount of those obligations, and accordingly the Prepetition Obligations are allowed secured claims within the meaning of Section 506 of the Bankruptcy Code, in a principal amount of not less than $16,981,631, together with accrued and unpaid interest, fees (including, without limitation, the early termination fee) and costs (including without limitation attorneys' fees and related expenses), and any and all other charges of whatever nature owing in respect of such

---

[15] Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Liens are valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited, to the Debtor, the Prepetition Agent, the Prepetition Lender, and any Statutory Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Permitted Prior Lien and/or security interest.

70

Prepetition Obligations; and (g) any payments made on account of the Prepetition Obligations to or for the benefit of the Prepetition Agent or the Prepetition Lenders prior to the Petition Date were on account of amounts in respect of which the Prepetition Agent and the Prepetition Lenders were oversecured, were payments out of the Prepetition Collateral, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

    **d.**    **Cash Collateral.** The Debtors represent that all of the Debtors' cash, including the cash in its deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes the Cash Collateral of the Prepetition Agent and the Prepetition Lenders and the Prepetition Junior Participant.

    **e.**    **Default by the Debtors**. The Debtors acknowledge and stipulate that the Debtors are in default of their debts and obligations under the Prepetition Documents.

<strong>Need for the DIP Facility and Use of Cash Collateral</strong>

    152.    The Debtors have an immediate and critical need to use Cash Collateral in order to continue their operations, pay their employees, suppliers and service providers and other accounts payable, preserve the going concern value of their business and conduct and orderly sale of their assets. The Debtors' access to sufficient use of Cash Collateral is vital to the Debtors' operating their business as a going concern and the Debtors' maximizing the value of their assets and estates. Without the use of Cash Collateral, the Debtors could not continue to operate, the going concern value of their

71

business would be diminished or lost entirely, and the Debtors and their estates would suffer immediate and irreparable harm.

153. The Prepetition Agent, the Prepetition Lenders and the Prepetition Junior Participant have consented to the Debtors' use of Cash Collateral in which they assert and interest, but solely on the terms and conditions set forth in the Interim Order and the Budget. The Debtors, after considering all of their alternatives, have concluded, in an exercise of their sound business judgment, that the use of Cash Collateral on such terms and conditions, represents the best terms for funding presently available to the Debtors.

154. The Debtors have negotiated the use of Cash Collateral in good faith and at arm's-length basis with the Prepetition Agent. The Debtors believe that the terms of the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

155. Without the use of Cash Collateral, the Debtors will not be able to operate their business or turn assets into cash in an orderly, effective, and efficient manner to maximize the value of those assets for the benefit of their creditors. The Debtors' use of Cash Collateral will allow the Debtors to maximize the recoveries for all creditors.

156. The Debtors have an urgent and immediate need for cash to continue to operate. Absent immediate authority to use the Cash Collateral, the Debtors

72

will not have sufficient funds with which to operate their business, pay the other administrative expenses incurred in connection with its Chapter 11 Cases, and turn their assets into cash in an orderly, effective, and efficient manner. The value of the Debtors' estates would decline immediately and dramatically in the absence of the relief requested herein. Accordingly, entry of the emergency Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates and, therefore, is appropriate under the circumstances. Absent authorization from the Court to use the Cash Collateral, as requested, on an interim basis pending the Final Hearing on this Motion, the Debtors will be immediately and irreparably harmed. Accordingly, the interim relief requested is critical to preserving and maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed this _____ 4|th day of May 2009, at 12 : 05 , a. m. .

March Shulman
President and Chairman of the Board of Directors
of Filene's Basement, Inc.; Manager of FB Services
LLC; Manager of FB Leasing Services LLC