IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FILENE'S BASEMENT, INC., et al., [1] | ) | Case No. 09-11525 (___) |
| | ) | |
| DEBTORS. | ) | |

## MOTION OF THE DEBTORS PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A), 363 AND 507(A) FOR AN ORDER AUTHORIZING THE DEBTORS TO: (I) PAY PREPETITION WAGES AND SALARIES; (II) REMIT WITHHOLDING OBLIGATIONS; (III) MAINTAIN CERTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS; AND (IV) AUTHORIZE APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO RECEIVE, PROCESS, HONOR AND PAY CERTAIN CHECKS PRESENTED FOR PAYMENT AND HONOR CERTAIN FUND TRANSFER REQUESTS

Filene's Basement, FB Services LLC and FB Leasing Services LLC, the above-captioned debtors and debtors in possession (the "Debtors") hereby file this motion (the "Motion") for entry of an order, under sections 105(a), 363, and 507(a) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing, but not requiring, the Debtors, in their sole discretion and as more thoroughly described below, to: (i) pay and/or reimburse certain unpaid prepetition wages and salaries, business expense reimbursements, and to pay associated prepetition administrative and processing fees and costs in connection therewith; (ii) remit withholding obligations to applicable third parties; and (iii) maintain and honor certain employee benefits programs and pay certain related prepetition obligations as set forth in the Motion. The

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Filene's Basement, Inc. (8237); FB Services LLC (7224); and FB Leasing Services LLC (7228). The address for all Debtors is 25 Corporate Drive, Suite 400, Burlington, MA 01803.

Debtors also request such order authorize their banks and other financial institutions receive, process, honor and pay certain checks presented for payment and honor certain fund transfer requests related to the foregoing, as provided by this Motion. In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) (A) (M) and (O). Venue of this case and Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363, and 507 of the Bankruptcy Code.

## Background

3.      On the date hereof (the "Petition Date"), each of the Debtors commenced its respective case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filing, are set forth in detail in the *Declaration of Mark Shulman, President of Filene's Basement, Inc., in Support of First Day Motions* (the "Shulman Declaration") filed concurrently herewith and fully incorporated herein by reference.[2]

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Shulman Declaration.

5.     The Debtors continue in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     No request has been made for the appointment of a trustee or an examiner in this case, and no official committee has yet been appointed by the Office of the United States Trustee (the "U.S. Trustee").

7.     Filene's Basement, Inc. ("FBI") currently employs 1,894 full and part-time U.S. employees in hourly, salaried, supervisory, management, sales, retail, and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' business (collectively, the "Employees"). FBI employs both salaried and hourly Employees. 1,648 Employees are paid hourly and 246 Employees are salaried. 933 Employees are employed full-time and 961 Employees work part time.[3]

8.     To minimize the personal hardships that the Employees will suffer if their prepetition employee-related obligations are not paid, and to maintain the morale of the Employees during this critical time, the Debtors, by this Motion, seek authority, in their sole discretion, to: (i) pay unpaid prepetition claims for wages and salaries to the Employees (the "Wages"); (ii) remit applicable withholding obligations to the proper third parties; (iii) honor certain benefits (as more fully set forth below) offered by FBI (the "Benefits"); (iv) reimburse

---

[3]  FBI is a party to a collective bargaining agreement by and between FBI and United Food and Commercial Workers Union Local 1445, AFL-C10, dated as of February 4, 2007 (the "CBA") with respect to FBI's prior store at Downtown Crossing, Boston, Massachusetts (the "Downtown Crossing Store"). Prepetition, FBI closed the Downtown Crossing Store and terminated the employment of all former employees who were previously the subject of the CBA. Therefore, FBI does not have any Employees who are the subject of the CBA or any other collective bargaining agreement with any union.

certain unpaid business expenses incurred prepetition by the Employees (the "Reimbursement Obligations"); and (v) pay all costs incident to the foregoing as set forth in detail below. The amounts requested herein have been budgeted in the Debtors' proposed cash collateral budget and, if approved by the Court, will be paid in conformity therewith.

## A.    The Shared Services Agreement.

9.    FBI receives, among other things, general corporate and financial services support from its former affiliate, DSW Inc. ("DSW"). Prior to the Petition Date, and under the terms of that certain *Amended and Restated Shared Services Agreement*, dated as of October 26, 2008, as amended (the "SSA"), by and between DSW and FBI's former parent, Retail Ventures, Inc. ("RVI"), DSW provided, among other things, corporate administrative services to FBI, including intellectual technology services, payroll administration and processing services, payroll financial reporting services, accounts payable, sales audit, tax, and human resources services (collectively, the "Shared Services"). Prepetition, FBI paid approximately $475,000 per month to DSW in consideration of the Shared Services.

10.    FBI and DSW entered into that certain *Transitional Services Agreement* \ (the "TSA"), dated as of April 21, 2009 (the "TSA Effective Date"), pursuant to which DSW will continue to provide the Shared Services previously provided under the SSA (at a substantially reduced cost) for a period of ninety (90) days from the TSA Effective Date. Under the TSA, effective May 1, 2009, FBI will pay DSW $133,333.33 per month in consideration of

the Shared Services provided under the TSA.[4]  Some of the Shared Services under the TSA

relate to the processing, administration and calculation of the FBI's payroll, as discussed below.

**B.**     **Wages, Salary and Other Compensation**

11.     Wages and Salaries.   Employees are paid on either a bi-weekly or weekly

basis, depending on whether they are salaried or hourly Employees.  246 salaried Employees are

paid on a bi-weekly basis (the "Salaried Employees") every other Friday and are brought current

on unpaid wages on the date on which they are paid (the "Salaried Employees Pay Date").  Thus,

Salaried Employees are not owed any unpaid Wages upon payment of their Wages on the

Salaried Employees Pay Date.  The last pay date on which Salaried Employees were paid was

April 24, 2009.  FBI's aggregate gross payroll to Salaried Employees was approximately

$750,000 per bi-weekly period ending as of the last Salaried Employees Pay Date.

12.     1,648 full and part time Employees are paid hourly and are paid one week

in arrears on a weekly basis every Friday (the "Hourly Employees").  Thus, Hourly Employees

are still owed one week of unpaid Wages after they are paid on the Hourly Employees Pay Date.

The last pay date on which the Hourly Employees were paid was also May 1, 2009 (the "Hourly

Employees Pay Date").  FBI's aggregate gross payroll to Hourly Employees was approximately

$400,000 per weekly pay period ending as of the Last Hourly Employees Pay Date.

13.     For each of the last two pay periods prior to the Petition Date, FBI funded

the amounts required to make payroll for Hourly and Salaried Employees on the Wednesday

---

[4] TSA fees payable on July 1, 2009 shall be prorated and paid as of July 1, 2009 through the date on which the TSA
Agreement terminates.  To the extent that FBI still requires any Shared Services following the termination of the
TSA Agreement, the parties will negotiate such additional required Shared Services and the consideration to be
provided in connection therewith.

prior to the applicable Hourly Employees Pay Date and Salaried Employees Pay Date to an account maintained by one of FBI's former affiliates, Retail Ventures Services, Inc. ("RVSI"), which account was used to fund and make payroll disbursements. RVSI then issued checks drawn from its own account to Employees paid via live check, and transmitted electronic payments to Employees who are paid via direct deposit.[5] Effective May 1, 2009, FBI directly remits Withholding Obligations to applicable third parties and makes payroll distributions through direct deposit or live checks to Employees on the applicable pay date from FBI's concentration account in lieu of prefunding such distributions to RVSI.[6]

14. As of the Petition Date, FBI owes an estimated $833,000 for the gross amount of earned but unpaid Wages broken down as follows: $375,000 in unpaid Wages owed to Salaried Employees and $458,000 in unpaid Wages owed to Hourly Employees (together, the "Unpaid Wages").[7] No single Employee is owed more than $10,950 in Unpaid Wages earned

---

[5] In connection with remitting prepetition withholding obligations DSW used third party payroll processors (the "Third Party Administrators") to issue checks from RVSI's account to pay and administer Employee withholding obligations to taxing authorities and other third parties. Effective May 1, 2009, FBI may, in its discretion, continue to use the Third Party Administrators to process and remit payments to applicable taxing authorities and third parties and pay such Third Party Administrators directly in accordance with the proposed terms of the *Motion of the Debtors Pursuant to Sections 105(a),327, 328 and 330 of the Bankruptcy Code for an Order Authorizing the Debtors to Retain, Employ and Compensate Certain Professionals Utilized by The Debtors in the Ordinary Course of Business*, filed concurrently with this Motion.

[6] Prepetition, Withholding Obligations (as defined below) were funded by FBI to RVSI and remitted by RVSI to applicable third parties. As of May 1, 2009, Employees are paid directly by FBI and Withholding Obligations are directly remitted by FBI to applicable third parties. Notwithstanding the foregoing, DSW will continue to provide the same Shared Services with respect to the administration of FBI's payroll and Withholding Obligations under the terms of TSA.

[7] Not included in these amounts are Wages and vacation pay paid to former Employees of FBI terminated prior to the Petition Date who were paid by live check and who may, for whatever reason, not have cashed their final checks as of the Petition Date (the "Terminated Employees"). None of the Terminated Employees were owed more than $10,950 with respect to their unpaid wages and accrued vacation time. FBI seeks authority to honor checks issued to the former Employees to the extent that they are presented for payment postpetition.

within 180 days prior to the Petition Date. The Debtors therefore seek authority to pay the Unpaid Wages up to a total and aggregate amount of $950,000.

15.     In addition to the Unpaid Wages, FBI estimates that as of the Petition Date, approximately $116,000 of FBI's contributions to tax and insurance withholdings were incurred and unpaid in connection with the Unpaid Wages (the "Employer Tax Obligations"). The Debtors also request authority to pay the Employer Tax Obligations, up to $140,000 in connection with the payment of the Unpaid Wages.

## C.     Withholding Obligations

16.     In the ordinary course of business, FBI routinely withholds from Employees certain amounts of their wages or salaries that FBI is required to transmit to third parties for purposes such as Social Security and Medicare, federal and state or local income taxes, contributions to FBI's health and welfare benefits plans included in Employee Medical Plan Contributions (as defined and described below), contributions to flexible spending accounts, garnishment, child support, (and other similar obligations pursuant to court order), and certain other withheld amounts (collectively, the "Withholding Obligations"). As discussed above, DSW processes and administers the FBI's tax Withholding Obligations under the TSA while all other Withholding Obligations are administered by RVSI. The Withholding Obligations for income and trust fund taxes are generally transferred to the appropriate recipients by the applicable date when such withholding obligations are required to be received by such recipients. The Debtors believe that the above-noted withheld funds, to the extent that they remain in the Debtors' possession, are not property of the Debtors' estates. Including amounts due on account

of the Unpaid Wages described above, the Debtors' total Withholding Obligations are included in the Unpaid Wages amounts and are estimated to be $116,000. Accordingly, the Debtors seek authority to transfer any and all Withholding Obligations and amounts that may still be in their possession to the appropriate third party recipients in the ordinary course of business.

**D.    Business Expense Reimbursements**

17.    FBI customarily reimburses Employees who incur business expenses in the ordinary course of performing their duties on behalf of FBI pursuant to FBI's expense reimbursement policy. Such expenses typically include, but are not limited to, business-related travel expenses, including hotel and meal charges, airplane travel, car rental expenses, and business telephone calls (including cell phone charges) and other expenses (collectively, the "Reimbursement Obligations"). It is difficult for FBI to determine the exact amounts of Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of FBI throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing. FBI anticipates that, as of the Petition Date, it owed approximately $102,000 in prepetition Reimbursement Obligations to Employees. The Debtors seek authority to pay the Prepetition Reimbursement Obligations up to $115,000 and to continue to pay Postpetition Reimbursement Obligations in the ordinary course of business.

E.     **Health and Welfare Benefits**

    (i)     The Medical Plan and Medical Plan Contributions

       18.     Prepetition, FBI's former parent, RVI, sponsored a benefit plan that provided certain health and related benefit plans to the FBI's Employees, including medical insurance, prescription drug coverage, and vision insurance (collectively, the "Medical Plan"). The Medical Plan provides Employees with three separate PPO plans, each administered by Anthem, Blue Cross and Blue Shield ("Anthem"). Included in the benefits provided under the Medical Plan, FBI provides eligible employees with a prescription drug plan administered by CareMark/CVS (the "Prescription Drug Plan") and vision benefits provided under a plan administered by Vision Service Plan Insurance company ("VSP"). Under the Prescription Drug Plan, Employees can purchase generic, preferred, or name brand prescription drugs at discounted rates. Employees pay additional drug costs to the extent they select a name brand drug when a generic version of the drug is available. Under the Vision Plan, Employees may choose between an in-network and out-of-network plan and are responsible for all co-payments, in addition to the Employee's portion of Medical Plan contributions. RVSI maintains stop-loss coverage for medical claims in excess of $250,000 over the lifetime per covered individual under the Medical Plan. Claim amounts in excess of the $250,000 stop loss amount are paid by Anthem.

       19.     Postpetition, and pursuant to that certain letter dated April 21, 2009, by and between RVI and FBI (the "Health Services Agreement"), RVI will continue to provide the benefits under the Medical Plan to Employees employed as of April 21, 2009, until the earlier to occur of (i) the commencement of employment of an Employee employed as of April 21, 2009,

by or in connection with a third party purchasing leaseholds and/or continuing store operations from FBI following the termination of such Employee's employment with FBI, or (ii) July 31, 2009 (the "Benefits Transition Period").

20.     Under the Medical Plan, FBI makes fixed monthly premium contributions to a voluntary employee benefit associate trust (the "VEBA Trust") which premium amounts constitute approximately 65% of medical claims incurred and paid under the Medical Plan (the "FBI Medical Plan Contributions"). Prior to the Petition Date, FBI paid the FBI Medical Plan Contribution amounts through April 30, 2009. The Health Benefits Agreement requires FBI to prefund the FBI Medical Plan Contributions under the Medical Plan to RVI on the fifth day of each calendar month, which contributions will be promptly deposited by RVI into the VEBA Trust. Postpetition, FBI will remit the Employee Medical Plan Contributions that are withheld from Employees' pay checks on the respective Hourly or Salaried Employees Pay Date to RVI, who will promptly deposit such contributions.

21.     Actual claims under the Medical Plan are paid by Anthem from funds on deposit in the VEBA Trust. The actual amount of the FBI Medical Plan Contributions varies from month to month depending on the number of Employees participating under the Medical Plan at a given time. In general, the monthly FBI Medical Plan Contributions range between approximately $210 and $241 per month for Employee alone, $354 and $409 per month for Employee and children, $426 and $493 per month for Employee and spouse, and $609 and $704 per month for family coverage. For the month prior to the Petition Date, the FBI Medical Plan

Contributions totaled approximately $205,000. As noted above, as of the Petition Date, no FBI Medical Plan Contributions were due or outstanding.

22. Employees participating under the Medical Plan make premium contributions through deductions made from their Wages as Withholding Obligations each applicable pay period (the "Employee Medical Plan Contributions" and together with the FBI Medical Plan Contributions, the "Medical Plan Contributions"). Employee Medical Plan Contributions are fixed and, depending on the PPO coverage selected by the Employee, vary between approximately $77 and $103 per month for Employee alone, $162 and $210 per month for Employee and children, $178 and $232 per month for Employee and spouse, and $255 and $332 per month for family coverage. Each pay period, Employees pay their share of contributions to the Medical Plan for themselves and their eligible dependents depending upon which option they select through payroll withholdings. The aggregate amount of the Employee Medical Plan Contributions depend on the total number of Employees participating in the Medical Plan during a given pay period and roughly constitute 35% of the Medical Plan Contributions. Prepetition, the Employee Medical Plan Contributions totaled approximately $89,000 for the month of April 2009. As of the Petition Date, up to approximately $10,000 of the expected May Employee Medical Plan Contributions may have accrued, but have not been paid because such contributions are withheld and remitted on the actual Salaried Employees and Hourly Employees Pay Date. The Debtors seek authority to remit any prepetition Employee Medical Contributions up to a maximum amount of $12,000 and to continue to remit Employee Medical Plan Contributions postpetition in the ordinary course of business.

23. As noted above, the FBI Medical Plan Contributions will be deposited in advance on a monthly basis into the VEBA Trust and the Employee Medical Plan Contributions will be deposited into the VEBA Trust after they are deducted from the Employees' pay checks following the applicable Hourly or Salaried Employees Pay Date. Each week, the various administrators of FBI's medical benefits under the Medical Plan (i.e., Anthem, CareMark/CVS, VSP and CIGNA) will pay incurred and processed medical claims directly from funds on deposit in the VEBA Trust.

(ii)     Dental Plan

24. Prepetition, and separate from the Medical Plan, FBI also provided eligible Employees with a single dental insurance under a PPO plan administered by CIGNA Dental ("Cigna") in two tiers, an in-network and out-of-network plan(the "Dental Plan"). Employee contributions to the Dental Plan premiums are fixed as follows: $18.50 per month for Employee alone, $38.00 per month for Employee and child, $42.99 per month for Employee and spouse, and $69.98 per month for family coverage. All premium costs under the Dental Plan are paid by participating Employees. Each month, Employees make contributions through payroll withholdings to the Dental Plan for themselves and their eligible dependents depending upon which option they select, and contributions are remitted to the VEBA Trust (the "Dental Plan Contributions"). Claims payable under the Dental Plan are then paid by CIGNA, who debits the required amounts to pay such claims from the VEBA Trust. Because the costs associated with the Dental Plan are paid entirely by Employees, the Debtors believe that any such unpaid Dental Plan Contributions are Withholding Obligations and are not estate property. Out of an

abundance of caution, however, the Debtors seek authority to remit any accrued, but unremitted, Dental Plan Contributions to the VEBA Trust and to continue to remit Dental Plan Contributions incurred postpetition in the ordinary course of business. For the pay periods ending April 24, 2009 for Salaried Employees and May 1, 2009 for Hourly Employees, total unremitted Dental Plan Contributions will be approximately $16,000. FBI seeks authority to remit accrued but unremitted Dental Plan Contributions for the period commencing on April 24, 2009 for Salaried Employees and May 1, 2009 for Hourly Employees will be payable on the next Hourly and Salaried Employee Pay Dates, respectively, up to a maximum amount of $20,000 (the "Prepetition Dental Plan Contributions"), and to continue to remit postpetition Dental Plan Contributions in the ordinary course of business.

**F.     Terminated FSA Accounts**

25.     Prepetition, FBI also offered their Employees access to flexible spending accounts ("FSAs") pursuant to a plan administered by Employee Benefits Corporation ("EBC") to set aside pre-tax dollars to pay for eligible medical and dependent care costs. An eligible Employee's FSA deduction was taken out of his or her paycheck each pay period and put in an account to be used for eligible expenses throughout the plan year, which ended on April 30, 2009. The FSAs for the prior year have already been remitted to EBC by May 1, 2009, and the FSAs will not be offered for the current plan year which commenced on May 1, 2009. However, the Debtors request authority to pay any administration fees owed for the plan year ending on April 30, 2009 (the "FSA Administration Fees") up to a maximum amount of $1,000.

## G. Terminated Life, Disability Insurance and Accidental Death and Dismemberment Policies

26. Prepetition, FBI provided eligible Employees with life insurance, long-term disability insurance and accidental death and dismemberment insurance, all through the Hartford Life Insurance Company. As of Petition Date, FBI no longer offers any life insurance, long-term disability insurance and accidental death and dismemberment insurance and, consequently, does not at this time intend to offer these programs postpetition.

### (iii) Terminated 401(k) Plan

27. Prepetition, FBI offered certain eligible Employees a 401(k) retirement plan pursuant to a plan sponsored by its former affiliate, Schottenstein Stores Corp. (the "401(k) Plan"). The 401(k) plan was discontinued with respect to the Employees prior to the Petition Date. However, although the 401(k) Plan was discontinued, FBI will, for the time being and in its sole discretion, permit the repayment of loans taken by Employees against existing 401(k) balances through such Employees' payroll withholding amounts.

## H. Vacation and Sick Pay

28. FBI provides eligible Employees with vacation pay and sick pay. Vacation benefits are provided for all full-time Employees. Vacation pay does not begin to accrue until a full time Employee has completed one year of employment. Vacation pay is accrued on a monthly basis commencing on June 1st based upon length of service for Employees who work at least 35 hours per week (the "Vacation Pay"). Unused vacation days are not paid out upon year-end and are not carried over without prior management approval. Unused vacation accrued by Employees at the time of termination of Employees are paid to such Employees upon

their separation from employment. In addition, FBI offers all full-time Employees up to two personal days per year and provides additional time off for bereavement leave.

29.    Eligible full-time Hourly Employees with between 1 and 2 years of service may accrue up to 40 hours of paid vacation per year. Full-time Hourly Employees with between 2 and 5 years of service may accrue up to 80 hours of paid vacation per year. Full-time Hourly Employees with 6, 7, 8 and 9 years of service may accrue up to 88, 96, 104 and 112 hours of paid vacation per year, respectively. Full-time Hourly Employees with between 10 and 14 years of service may accrue up to 120 hours of paid vacation per year while eligible Hourly Employees with more than 15 years of service may accrue up to 160 hours of paid vacation per year.

30.    Salaried Employees with less than 3 years of service earn up to 10 days of vacation per year. Salaried Employees with between 3 and 5 years of service earn up to 13 days vacation. Salaried Employees with between 5 and 10 years of service earn up to 15 vacation days while Salaried Employees with between 10 and 15 years of service earn up to 18 days of vacation time. Finally, Salaried Employees with over 15 years of service earn up to 20 days of vacation time.

31.    FBI provides sick pay to full-time Hourly and Salaried Employees (the "Sick Pay"). Salaried Employees employed for fewer than six months receive up to five days of Sick Pay. Salaried Employees employed for at least six months are eligible to receive up to a maximum of 12 weeks of their salary in Sick Pay. Hourly Employees who work at least 35 hours per week and who have been employed for at least six months can earn 2/3 of the Hourly

Employee's average scheduled hours over a period of the prior 90 days multiplied by the Hourly Employees' hourly pay rate, subject to maximum cap of $440 for Hourly Employees, effective on the fourth consecutive day of absence. Hourly Employees employed between one year and eight years are eligible to receive Sick Pay effective on the third consecutive day of absence while Hourly Employees employed between eight and fifteen years receive Sick Pay effective on the second consecutive day of absence. Hourly Employees employed over fifteen years or Hourly Employees who are hospitalized overnight received Sick Pay on the first day of absence. The maximum Sick Pay payable to an eligible Hourly Employee after the aforementioned waiting period is a maximum of twelve weeks over a rolling twelve month period.[8]

32.     The Debtors seek authority to honor their existing vacation and sick leave policies and, in the ordinary course of business and in accordance with their existing policies, to permit continuing Employees to use accrued prepetition vacation time, and to pay an unused, but accrued prepetition Vacation Pay earned by Employees who become separated from FBI postpetition, provided however, that the aggregate amount paid to any single Employee in respect of Unpaid Wages and prepetition Vacation Pay shall not exceed the $10,950 cap set forth in section 507(a)(4) of the Bankruptcy Code and would not exceed $415,000 in the aggregate. The Debtors also request authority in their discretion to honor similar vacation and sick leave policies postpetition and in the ordinary course of the Debtors' business.

---

[8] Sick Pay may be less for Employees employed in New York and New Jersey based on those state's applicable disability laws.

# I.    **Workers' Compensation Insurance**

33.    As required by statute, FBI provides a workers' compensation benefit

programs for income protection, medical services, and rehabilitation services to employees with

job-related injuries and illnesses in the various jurisdictions in which FBI maintains business

operations (the "Workers' Compensation Insurance"). Hartford Casualty ("Hartford") provides

Workers' Compensation Insurance to FBI in all states in which FBI operates except in New York

and Ohio (the "Hartford Policy"). The Hartford Policy is a premium-based insurance policy

pursuant with a zero-deductible. Hartford is responsible for the payment and administration of

workers' compensation claims under the Hartford Policy. The annual cost of the Hartford Policy

is $233,120 and the policy runs through April 21, 2010. As of the Petition Date, no premium

amounts were owed to Hartford with respect to the Hartford Policy.[9]

34.    FBI also maintains Workers' Compensation Insurance through policies

issued by the New York State Insurance Fund (the "New York Insurance Fund Policy") and by

the Ohio State Insurance Fund (the "Ohio Insurance Fund Policy", and together with the New

York Insurance Fund Policy and the Hartford Policy, the "Workers' Compensation Insurance

Policies") with respect to its Employees in New York and Ohio, respectively. The New York

State Insurance Fund is a premium financed policy financed by the New York Insurance Fund.

Both the New York Insurance Fund Policy and Ohio Insurance Fund Policy are zero-deductible

---

[9] The premium amounts owed under Hartford Policy, along with premium amounts payable under several other insurance policies maintained by FBI, are financed by Premium Assignment Corporation ("PAC") pursuant to a premium finance agreement between PAC and FBI dated as of April 21, 2009 (the "Premium Financing Agreement"). FBI has filed its *Motion for Authority to (1) Make Payments Pursuant to Existing Insurance Premium Financing Agreements, and (2) Enter Into New Premium Financing Agreements* concurrently herewith to seek authority to, *inter alia*, continue to finance the premiums under the insurance policies covered by the Premium Financing Agreement.

premium policies that administer and pay allowed workers' compensation claims up to the applicable statutory limits in those jurisdictions. The term of the New York State Insurance Fund Policy runs through April 17, 2010 while the Ohio State Insurance Fund Policy runs through July 1, 2009 and will automatically renew for a six (6) month term on such date. FBI pays premium amounts in such installments determined under the New York Insurance Fund Policy and the Ohio State Insurance Fund Policy, respectively, in a yearly-annualized amount of approximately $95,000 under the New York State Insurance Fund Policy and $69,000 under the Ohio State Insurance Fund Policy. These premium amounts are adjusted from time to time depending on the dollar amount of wages paid by FBI to its Employees. As of the Petition Date, no amounts were owed under either the New York Insurance Fund Policy or the Ohio Insurance Fund Policy.

35. In addition to the current Workers' Compensation Insurance Policies discussed above, FBI has approximately 35 open claims (the "Prepetition Workers' Compensation Claims") from a previous self-insured Workers' Compensation Insurance policy issued by Travelers (the "Travelers' Policy"). Pursuant to the terms of the TSA, DSW will continue postpetition to administer and process the Prepetition Workers' Compensation Claims under the Travelers' Policy. Travelers' is the beneficiary of a letter of credit collateralized by $1,416,806 of funds deposited by FBI in order to secure payment of workers' compensation claims under the Traveler's Policy (the "Letter of Credit"). FBI believes that the aggregate amount of the Prepetition Workers' Compensation Claims is substantially less than the collateral securing the Letter of Credit. In order to prevent Travelers from potentially drawing down on

the Letter of Credit if the Prepetition Workers' Compensation Claims are not paid postpetition,

FBI requests authority, in its discretion to continue to pay the Prepetition Workers'

Compensation Claims in accordance with the terms of the TSA.

## **Requested Relief**[10]

36.     Pursuant to sections 105(a), and 363(b)(1) and (c)(1) of the Bankruptcy

Code and the "necessity of payment" doctrine, the Debtors seek authority to pay or honor, in its

sole discretion:

      a.    the Unpaid Wages, including any associated payroll processing obligations;

      b.    any Withholding Obligations attributable to the period prior to the Petition Date and to remit the same to applicable taxing authorities or other appropriate third-parties;

      c.    the prepetition Employer Tax Obligations;

      d.    the Reimbursement Obligations;

      e.    Prepetition Employee Medical Plan Contributions

      f.    the Prepetition Dental Plan Contributions;

      g.    honor prepetition vacation time and pay the prepetition Vacation Pay and to honor, but not pay, any prepetition Sick Pay;

      h.    to pay or otherwise satisfy any other prepetition claims or obligations described in this Motion for which such authority is specifically requested herein; and

      i.    Prepetition Workers' Compensation Claims;

---

[10] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

j.        (with each of the foregoing referred to collectively as the "Prepetition Employee Obligations.")

37.     the Debtors also seek authority to continue, in their sole discretion, on a postpetition basis:

          a.        the Medical Plan;

          b.        the Dental Plan

          c.        the Workers' Compensation Insurance Policies;

          d.        vacation and sick leave policies pursuant to the terms of the Debtors' applicable policies and this Motion; and

          e.        any other benefit program described in this Motion for which authority is specifically requested herein (with each of the foregoing referred to collectively as the "Employee Programs.").

### Authority for the Requested Relief

38.     Pursuant sections 363(b), 363(c), 507 and 105(a) of the Bankruptcy Code, and the "necessity of payment" doctrine (discussed below), the Debtors seek authority to pay or honor the obligations described in this Motion. Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing. Section 363(c) of the Bankruptcy Code authorizes a debtor in possession to enter into transactions in the ordinary course of business without notice and a hearing. Section 105(a) of the Bankruptcy Code further provides, in pertinent part, that a court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

39.     The relief requested in this Motion is supported by the well-established "necessity of payment" doctrine.[11] The "necessity of payment" doctrine, which has been accepted by the Third Circuit, "teaches no more than, if payment of a claim that arose prior to reorganization is essential to the continued operation of the [business] during the reorganization, payment may be authorized even if it is made out of corpus." *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3rd Cir. 1981). *See also Pension Benefit Guarantee Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 159 B.R. 730, 736 (Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New England Ry. Co.* with approval). Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Id.* at 176. In that case, the court permitted Eastern Air Lines, Inc. to pay its current employees' prepetition wages, salaries, medical benefits and business expense claims. Judge Lifland relied on his equitable powers under Bankruptcy Code § 105(a) and, in particular, the "necessity of payment" doctrine, to authorize such payments, recognizing that the debtor had to make the payments in order to retain its current employees and maintain positive employee morale – two factors which he deemed critical to the rehabilitation of an operating debtor. *Id.* (*citing* H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)). Other courts also have found that the "necessity of payment" doctrine applies to the

---

[11] The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport, C. & S.W. R. Co.*, 106 U.S. 286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (airline).

payment of prepetition employee compensation and benefits. *See In re Chateaugay Corp.*, 80

B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the "necessity of payment" doctrine, bankruptcy

court should defer to the debtor's business judgment in permitting payment of certain workers'

compensation claims); *In re R.H. Macy & Co., Inc.*, 92 B 40477 (BRL) (Bankr. S.D.N.Y. 1992);

*In re McCrory Corporation*, 92 B 41133 (CB) (Bankr. S.D.N.Y. 1992).

      40.    This Court similarly has approved the payment of prepetition claims of

employees for wages, salaries, independent contractor obligations, expenses, and benefits on the

grounds that the payment of such claims was necessary to effectuate a successful reorganization

or liquidation. *See, e.g., In re Sun-Times Media Group, Inc.,* Case No. 09-11092 (CSS) (Bankr.

D. Del. Apr. 1, 2009); *In re Muzak Holdings LLC,* Case No. 09-10422 (KJC) (Bankr. D. Del.

Feb. 12, 2009; *In Pierre Foods, Inc.,* Case No. 08-11480 (KG) (Bankr. D. Del. July 16, 2008); *In

re ACG Holdings, Inc.,* Case No. 08-11467 (CSS) (Bankr. D. Del. July 16, 2008); *In re

Tropicana Entm't Group, Inc.,* Case No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); *In re

NetEffect, Inc.*, Case No. 08-12008 (Bankr. D. Del. August 28, 2008) (KJC); *In re Proxymed

Transaction Services*, Case No. 08-11551 (BLS) (July 24, 2008); *In re Western Nonwovens, Inc.*,

Case No. 08-11435 (PJW) (Bankr. D. Del. July 15, 2008); *In re Answer Financial Inc.*, Case No.

08-10140 (MFW) (Bankr. D. Del. Jan. 23, 2008); *In re Aegis Mortgage Corporation*, Case No.

07-11119 (BLS) (Bankr. D. Del. August 15, 2007); *In re Mortgage Lenders Network USA, Inc.*,

Case No. 07-10146 (Bankr. D. Del. Feb. 7, 2007) (PJW); *In re Global Home Products LLC, et

al.*, Case No. 06-10340 (Bankr. D. Del. April 11, 2006)(KG).

41. The "necessity of payment" doctrine authorizes the Debtors to pay the amounts they seek authority to pay pursuant to this Motion because the Employees are critical assets necessary to the Debtors' operations.

42. Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. Employees will be exposed to significant financial problems if the Debtors are not permitted to pay the Prepetition Employee Obligations. The Debtors submit that failure to pay Unpaid Wages and to make other payments and honor the programs contemplated by this Motion will be extremely detrimental to Employee morale during this critical period.

43. Moreover, and as noted above, the Withholding Obligations do not constitute property of the Debtors' estates and principally represent employee earnings that governments (in the case of taxes), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from the paychecks of Employees. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtors expect inquiries from garnishors regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property, but rather, have been withheld from Employee pay. Moreover, if the Debtors cannot remit these amounts, the Debtors' Employees may face legal action due to the Debtors' failure to submit these payments.

44. The Debtors submit that, with respect to the wage related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the

23

Debtors' estates, given that the relevant taxing authorities would have priority claims under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, are not property of the Debtors' estates. Similarly, Unpaid Wages and vacation accrued within 180 days prior to the Petition Date would have priority claims up to $10,950 per Employee under section 507(a)(4) of the Bankruptcy Code.

45.    In addition to payment of the Unpaid Wages, the Debtors seek to continue the Employee Programs described in this Motion and to pay all expenses incurred in connection therewith as set forth in the Motion. The Employee Programs provide benefits that are crucial to the Employees, especially with respect to the medical and dental benefits, and other forms of insurance provided to the Employees. The Debtors believe that the continuance of these benefits is critical to maintaining the Employee morale and work ethic necessary during this critical period of time.

### Request For Authority For Banks and Other Financial Institutions to Honor Checks Issued to Pay Wages and Benefits, to Honor All Fund Transfer Requests Relating to Foregoing, and to Pay All Processing Fees Associated Therewith

46.    The Debtors request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related to the Prepetition Employee Obligations, regardless of whether such transfer requests were submitted prior to, on, or after the Petition Date. The Debtors represent that they have (or will have) sufficient cash and/or postpetition funding to pay promptly all Prepetition Employee Obligations to the extent

described herein, on an ongoing basis and in the ordinary course of business. Nothing contained in this Motion, however, shall constitute a request for authority to assume any agreements, policies or procedures relating to such Prepetition Employee Obligations. Further, the Debtors seek to retain the discretion to decide which Prepetition Employee Obligations to pay and honor, and nothing in this Motion shall be deemed an admission by the Debtors that any Prepetition Remaining Employee Obligations will in fact be honored or paid.

47.     Finally, the Debtors request authority to pay the processing fees associated with payment of the Prepetition Employee Obligations and Employee Programs including, but not limited to, any fees owed to any third party administrators, as described in the Motion.

48.     Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described herein and as supported by the Shulman Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

### Notice

49.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtors' prepetition and postpetition secured lenders; and (iii) the Debtors' prepetition *ad hoc* committee of unsecured creditors. As the Motion is seeking "first day" relief, within two business days of

the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

50. No prior motion for relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order approving the relief set forth above, and granting such other and further relief as is just and proper.

Dated: May 4, 2009

PACHULSKI STANG ZIEHL JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Michael R. Seidl (Bar No. 3889)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:     ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            mseidl@pszjlaw.com
            jfried@pszjlaw.com
            tcairns@pszjlaw.com

[Proposed] Counsel for the Debtors and
Debtors in Possession