IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FILENE'S BASEMENT, INC., et al.,[1] | ) | Case No. 09-11525 (___) |
| | ) | |
| Debtors. | ) | |

**MOTION OF DEBTORS FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 1107, AND 1108 AUTHORIZING (I) MAINTENANCE OF CERTAIN EXISTING BANK ACCOUNTS, (II) CONTINUED USE OF EXISTING BUSINESS FORMS, (III) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, AND (IV) WAIVER OF SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move the Court for entry of an order under 11 U.S.C. §§ 105, 363, 1107, and 1108 authorizing (i) the maintenance of certain existing bank accounts including the authority to pay routine prepetition banking fees owed to financial institutions, (ii) the continued use of existing business forms, (iii) the continued use of the existing cash management system of the Debtors, and (iv) a limited waiver of 11 U.S.C. § 345(b) deposit and investment guidelines (the "Motion"). In support of the Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1. This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M),

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Filene's Basement, Inc. (8237); FB Services LLC (7224); and FB Leasing Services LLC (7228). The address for all Debtors is 25 Corporate Drive, Burlington, MA 01803.

and (O). Venue of these proceedings and the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a), 345(b), 363, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

## Background

3. On the date hereof (the "Petition Date"), the Debtors commenced these cases by each filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

4. The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. No trustee, examiner, or committee has been appointed in the Chapter 11 Cases.

6. The factual background relating to the Debtors' commencement of the Chapter 11 Cases is set forth in detail in the *Declaration of Mark Shulman, President of Filene's Basement, Inc., in Support of First Day Motions* (the "Shulman Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

## Relief Requested

7. By this Motion, the Debtors seek authorization (a) to maintain their existing bank accounts as described on Exhibit A hereto (the "Accounts") and to pay any prepetition routine banking fees imposed by the financial institutions of the Accounts, (b) to

continue to use their existing check stock and business forms until existing check stocks are exhausted and until business forms can be modified, (c) to continue to use their existing cash management system, and (d) for a limited waiver of the deposit and investment guidelines imposed under section 345(b) of the Bankruptcy Code.

## The Cash Management System

8. The Debtors' principal financing is provided by a revolving credit line under the Second Amended and Restated Loan and Security Agreement, dated January 23, 2008 (the "Credit Agreement"), pursuant to which with Filene's Basement, Inc., is borrower and National City Business Credit, Inc., is agent (the "Agent"). The Debtors' cash management system (the "Cash Management System") is a network of bank accounts that facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' business. Because of the nature of the Debtors' business and the disruption to the business that would result if they were forced to close the Accounts, it is critical that the Cash Management System remain in place.

9. The Cash Management System consists of an integrated network of bank accounts maintained at National City Bank ("National"), Bank of America ("B of A"), Citizens Bank ("Citizens"), M&T Bank ("M&T"), Wells Fargo ("Wells"), and PNC Bank ("PNC") (collectively, the "Banks"). Due to the Debtors' extensive retail operations, the Accounts include both the individual store bank accounts (the "Store Bank Accounts") shown on Exhibit A, which are depository accounts associated with each of the Debtors' twenty-five operating retail locations, and the corporate accounts (the "Corporate Bank Accounts") also shown on Exhibit A, through

which other collections and all disbursements are made. A diagram summarizing the role of each of the Accounts in the Cash Management System is attached hereto as Exhibit B.

**Collections and Deposits**

10. The Debtors derive substantially all of their revenue from the sale of goods to their customers. Revenues associated with the Debtors' twenty-five retail locations, other than credit-card payments, are directly deposited into the Store Bank Accounts and then swept daily into the Debtors' master depository account at National (the "Master Depository Account"). Similarly, credit-card payments from Certegy, Discover, and American Express[2] are swept from the applicable Corporate Bank Accounts at National and into the Master Depository Account; MasterCard and Visa payments are received directly into the Master Depository Account. Funds from the Master Depository Account then flow through a cash collateral account (the "Cash Collateral Account")[3] and into a business credit concentration account (the "Business Credit Account.") also at National.

11. The Agent sweeps the Business Credit Account daily to reduce the outstanding revolver balance in accordance with the Credit Agreement. Additionally, once daily cash needs are determined, the Debtors make a request and the Agent deposits proceeds of the Debtors' daily borrowing under the Credit Agreement into a separate concentration account (the "Concentration Account") for use for operating purposes in accordance with the disbursement mechanisms described below. In addition, *de minimis* corporate deposits, including

---

[2] A "Private Label" account remains open at National, but the Debtor has discontinued its acceptance of those credit cards, and no funds currently flow through that account.
[3] The Cash Collateral Account is maintained for control purposes only by National and is not otherwise an operational account of the Debtor.

miscellaneous reimbursements, credit checks from any vendors, and tenant allowance money from any landlords flow directly into the Concentration Account.

## The Operating and Disbursement Accounts

12. The Debtors' main operating account is the Concentration Account. The balance of the Concentration Account fluctuates and, most recently, was approximately $200,000. The Debtors use the Concentration Account to fund operating items such as product and inventory purchases and payroll from disbursement accounts that draw upon the Concentration Account, as shown in <u>Exhibit B</u>. In particular, the Concentration Account funds:

    a. a zero-balance general liability account, from which disbursements are made on account of general liability claims to be satisfied;

    b. a zero-balance workers' compensation account, from which disbursements are made on account of allowed workers' compensation claims;

    c. zero-balance accounts payable expense check and wire accounts, from which the Debtors satisfy accounts payable by check or wire, as applicable;

    d. a zero-balance payroll account;

    e. zero-balance merchandise expense check and wire accounts, from which the Debtors satisfy expenses associated with the purchase of merchandise by check or wire, as applicable;

    f. a zero-balance account for disbursements related to expenses incurred in connection with imports, to the extent that the Debtors handle those directly; and

g. a zero-balance dedicated account with respect to disbursements on account of returns made upon Certegy credit-card purchases.

13. In addition, the Debtors maintain or have maintained certain other accounts that remain in existence, including (a) an account at Citizens from which the Debtors receive and makes charitable contributions, which presently contains minimal amounts arising from disbursements by check that may not have cleared as of the Petition Date, (b) a business savings account at Wells Fargo that is effectively inactive at this time, with no further deposits being made, which contains minimal deposits of approximately $6,000, (c) an inactive "operating" account at National that was closed in early April 2009, and (d) an inactive overnight investment account at National.

### The Court Should Authorize the Debtors to Maintain the Accounts

14. The United States Trustee for the District of Delaware has established certain operating guidelines for debtors in possession. One such provision requires a Chapter 11 debtor in possession to open new bank accounts and close all existing accounts. The United States Trustee Guidelines also require that the new bank accounts only be opened in certain financial institutions designated as authorized depositories by the United States Trustee. This requirement, designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, helps to protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

15. The Debtors seek a waiver of the United States Trustee's requirement that the Accounts be closed and new postpetition bank accounts be opened at depositories authorized

by the United States Trustee. If strictly enforced in these cases, the United States Trustee's requirement would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under Chapter 11. Additionally, the Debtors presently intend to expeditiously pursue a sale of assets for the benefit of creditors. Therefore, this relief may only be required for a relatively short time with respect to certain of the Accounts.

16. Maintenance of the Accounts will greatly facilitate the Debtors' operations in Chapter 11. As noted on <u>Exhibit B</u> hereto, principally all payments from the Debtors' customers are deposited into the Master Depository Account, either from the twenty-five Store Accounts or the accounts associated with credit-card transactions, which deposits are then swept by National to satisfy loan amounts. If the Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for each of their retail locations and with customers and vendors, which would completely disrupt the flow of the Debtors' receipt of sales revenues and the Debtors' payment of debts incurred after the Petition Date. In addition, closing the Accounts would require the Debtors to cancel and reinstitute wire transfer instructions for various entities, all of which would be difficult to modify under these exigent circumstances. These disruptions would severely impact and could irreparably harm the Debtors' ability to operate their business and effectuate a sale of their assets for the benefit of creditors.

17. To avoid disruptions and delays in the operation of the Debtors' business, the Debtors should be permitted to continue to maintain the Accounts and, if necessary, to open

new accounts or close unnecessary existing accounts; the Debtors will promptly advise the United States Trustee of any Accounts that are closed or new accounts that are opened.

18. To guard against improper transfers resulting from the honoring after the Petition Date of checks issued before the Petition Date, the Debtors propose that the Banks may not honor checks drawn on the Accounts before the Petition Date, except upon limited Court-approved exceptions. Subject to a prohibition against honoring checks or offsets arising prior to the Petition Date without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of the Accounts in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period.

19. If the relief requested herein is granted, the Debtors will not pay, and each of the Banks where the Accounts are maintained will be instructed not to pay, any debts incurred before the Petition Date, other than as specifically authorized by this Court.

## The Court Should Authorize the Debtors to Continue their Existing Cash Management System

20. The Debtors hereby seek authority to continue to use the Cash Management System, as such system may be modified pursuant to the requirements of any Court-approved cash collateral usage, and related order of this Court.

21. For the reasons set forth above, the Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment. The use of the Cash Management System,

moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) allow a mechanism for deposits from sales revenues; (c) ensure cash availability; (d) control and monitor corporate funds; and (e) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System will facilitate and enhance the Debtors' efforts to continue to operate postpetition. Moreover, the Debtors submit that the relief requested is consistent with the relief provided to debtors in numerous other cases pending in this District.

### The Court Should Grant the Debtors Authority to Use Existing Business Forms and Checks to the Limited Extent Requested Below

22. To minimize expense to their estate, the Debtors also request authority (i) to continue to use all correspondence and business forms (including, but not limited to letterhead, purchase orders, invoices, etc.) until such time as the Debtors can effectuate the necessary changes to such forms in order to add the "debtor in possession" label, and (ii) to continue using their existing check stock without reference to the "debtor in possession" status until such time as the Debtors can effectuate the necessary changes to such forms in order to add the "debtor in possession" label. While the Debtors' checks and business and correspondence forms are not pre-printed, the Debtors estimate that it may take some time to insure that new forms are properly generated with the "debtor in possession" label. The Debtors will require approximately one week to make the changes to checks and most forms, and the Debtors will

require approximately three weeks to replace all hard-copy purchase orders that the Debtors' buyers travel with in the market.

**Payment of Outstanding Routine Prepetition Expenses
Relating to the Operation of the Cash Management System**

23. In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System. The Debtors seek authority, in their sole discretion, to pay any such routine prepetition banking fees owed to the Banks in an amount not to exceed $20,000.

**The Court Should Grant a Limited Waiver of 11 U.S.C. § 345(b) on an Interim Basis**

24. The Debtors seek an interim waiver of section 11 U.S.C. § 345(b) of the Bankruptcy Code subject to final approval. The waiver would permit the Debtors to maintain the Accounts without posting a bond or other security, as would otherwise be required under section 345(b) whenever the funds on deposit exceed the amount permitted under section 345(b). As explained above, under the Cash Management System, funds deposited are swept daily for the benefit of National. Similarly, prior to the Petition Date, the Debtors' requests for financing to National were based on the goal of meeting daily disbursement requirements. From and after the Petition Date, the Debtors have reached an agreement with National for the use of cash collateral pursuant to an agreed budget.

25. Daily deposits at many of the Store Bank Accounts do not exceed FDIC coverage, and accounts in which balances are currently held (the Concentration Account, the balance of which averages approximately $200,000, the account at Citizens from which the

Debtors make and receives charitable contributions that presently contains minimal deposits, and the business savings account at Wells Fargo that contains minimal deposits of approximately $6,000) do not exceed FDIC coverage. Moreover, while daily deposits in certain other accounts—specifically, the Store Bank Accounts at B of A, the depository account into which American Express credit card purchase are made, the Master Depository Account, and the Concentration Account—may temporarily exceed FDIC coverage, those accounts are swept daily for the benefit of National. In this case, therefore, because most of the Accounts do not hold a substantial amount for an extended period, the risk of loss, which section 345 protects against, is minimal. Finally, all of the Accounts are maintained at the Banks, all of which are federally insured institutions.

### Authority for the Requested Relief

**A. The Continued Use of the Debtors' Routine Cash Management System, Bank Accounts, and Business Forms is Essential to the Debtors' Operations, and Approval to Maintain the Status Quo is Routinely Granted Under the Bankruptcy Code Sections 363 and 105**

26. Bankruptcy courts routinely grant Chapter 11 debtors authority to continue utilizing existing cash management systems and treat requests for such authority as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). This is particularly true where, as here, the Chapter 11 case involves entities with complex financial affairs. In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, the bankruptcy court entered an order authorizing the debtor and forty-three (43) of its subsidiaries "to continue to consolidate the management of its cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors."

*Id.* at 620. The Eleventh Circuit Court of Appeals then affirmed a subsequent district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtor to utilize its prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. *Id.* at 621.

27. Likewise, in another context, the bankruptcy court in the *Columbia Gas* Chapter 11 case explained that a centralized cash management system "allows efficient utilization of cash resources and recognizes the impracticabilities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1993), *aff'd in part* and *rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 114 S. Ct. 1050 (1994). The Third Circuit agreed, emphasizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061. *See also In re Southmark Corp.*, 49 F.3d 111, 114 (5th Cir. 1995) (cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets"); *In re UNR Indus., Inc.*, 46 B.R. 25, 27 (Bankr. N.D. Ill. 1984).

28. Section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without undue oversight by creditors or the court. *In re Lavigne*, 114 F.3d

379, 384 (2nd Cir. 1997). Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *In re Amdura Corp.*, 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtors seek authority under section 363(c)(1) of the Bankruptcy Code to continue the collection, concentration, and disbursement of cash pursuant to the Cash Management System as described above.

29. Additionally, the Court may exercise its equitable powers to grant the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Continuing the Debtors' Cash Management System without interruption is vital to the success of the Chapter 11 Cases. The Cash Management System is an important mechanism whereby the Debtors are able to transfer their revenues—collected at multiple retail locations—toward the payment of their obligations, without which the Debtors' organization would fail.

30. In other cases in this District, this Court has granted relief similar to that requested in this Motion. *See, e.g., In re eToys Direct 1, LLC, et al.*, Case No. 08-13412(BLS) (Bankr. D. Del. Dec. 30, 2008); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del. Aug. 28, 2008); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del. July 15, 2008); *In re Global Motorsport Group, Inc., et al.*, Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 1, 2008); *In re Aegis Mortgage Corp.*, Case No 07-11119 (BLS) (Bank. D. Del. Aug. 16, 2007); *In re Mortgage Lenders Network, USA, Inc.*, Case No. 07-10146 (PJW) (Bank. D. Del. Feb. 5, 2007); *In re Global Home Products, LLC et al.*, Case No. 06-10340 (Bankr. D. Del.

April 11, 2006); *In re Maxide Acquisition, Inc.*, Case No. 05-10429 (Bankr. D. Del. Feb. 15, 2005); *In re Cable and Wireless USA, Inc., et al.*, Case No. 03-13711 (Bankr. D. Del. Dec. 10, 2003); *In re Redback Networks Inc.*, Case No. 03-13359 (Bankr. D. Del. Nov. 5, 2003); *In re Chi-Chi's, Inc.*, Case No. 03-13063 (Bankr. D. Del. Oct. 9, 2003).

31. It is well within the Court's equitable power under section 105(a) to approve the continued use of the Cash Management System and to authorize the Debtors' continued use of their existing business forms, including, but not limited to, purchase orders, letterhead, envelopes, promotional materials, checks and business forms, without reference to the Debtors' debtor-in-possession status, substantially in the forms existing immediately before the Petition Date.

B. **An Interim Waiver of Section 345(b) to Allow the Debtors to Continue to Use their Accounts Without the Need for Posting a Bond or Providing Other Security is Appropriate in this Case**

32. The Debtors seek an interim waiver of the requirements of Bankruptcy Code section 345, subject to final approval by this Court. Bankruptcy Code section 345(a) authorizes deposits or investments of money "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." Section 345(b) provides:

> Except with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, the trustee shall require from an entity with which such money is deposited or invested --
>
> 1) a bond –
>
>     A. in favor of the United States;

  B. secured by the undertaking of a corporate surety approved by the United States trustee for the district in which the case is pending; and

  C. conditioned on --

   i) a proper accounting of all money so deposited or invested and for any return on such money;

   ii) prompt repayment of such money and return; and

   iii) faithful performance of duties as a depository; or

 2) the deposit of securities of the kind specified in section 9303 of title 31 unless the court for cause orders otherwise.

33. The Court's ability to excuse strict performance of the deposit and investment requirements of section 345(b) "for cause" arises from the 1994 amendments to the Bankruptcy Code. The legislative history of that amendment provides:

> Section 345 of the Code governs investments of funds of bankruptcy estates. The purposes (sic) is to make sure that funds of a bankrupt that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of smaller Debtor with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated Debtors. This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling *In re Columbia Gas Systems, Inc.*, 33 F.3d 294 (3d Cir. 1994).

*In re Service Merchandise Company, Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994)).

34. In determining whether the "for cause" standard has been met, the Court should consider a "totality of the circumstances," utilizing the following factors:

    a. The sophistication of the debtor's business;

    b. The size of the debtor's business operations;

    c. The amount of the investments involved;

    d. The bank ratings (Moody's and Standard and Poor) of the financial institutions where the debtor in possession funds are held;

    e. The complexity of the case;

    f. The safeguards in place within the debtor's own business of insuring the safety of the funds;

    g. The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

    h. The benefit to the debtor;

    i. The harm, if any, to the estate; and

    j. The reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*Id.*

35. Because of the nature of their operating business, the Debtors may, at certain times, have funds accumulated in the Accounts that exceed the limits provided in section 345, and therefore necessitate a waiver of section 345(b). Unless the Debtors are granted a waiver from Bankruptcy Code section 345(b), the Debtors' business and their ability to

effectuate the sale of their assets will be prejudiced for the reasons discussed above. Moreover, as described above, the relief requested herein is expected to be only for a short period of time in order to allow the Debtors to effectuate the sale of their assets for the benefit of creditors. The Debtors will also present a form of collateralization agreement to National, to the extent one has not already been executed, and to such other of the Banks where deposits may exceed federally insured amounts. The Debtors submit that their funds will not be sufficiently at risk to necessitate strict adherence to the requirements of section 345(b) of the Bankruptcy Code.

36. In other Chapter 11 cases, courts have liberally construed the requirement of section 345(b) that a debtor in possession obtain a bond from any entity with which its money is deposited or invested. In those instances, courts, including many within this district, have waived the requirements of section 345(b) and replaced them with alternative procedures. *See e.g., In re eToys Direct 1, LLC, et al.*, Case No. 08-13412(BLS) (Bankr. D. Del. Dec. 30, 2008); *In re Global Motorsport Group, et al.* Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 1, 2008); *In re Aegis Mortgage Corp.*, Case No 07-11119 (BLS) (Bankr. D. Del. Aug. 16, 2007); *In re Mortgage Lenders Network, USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del. Feb. 5, 2007); *In re Breuners Home Furnishings Corp.*, Case No. 04-12030(PJW) (Bankr. D. Del. July 16, 2004); *In re Redback Networks, Inc.*, Case No. 03-13359 (CGC) (Bankr. D. Del. Nov. 5, 2003); *In re Focal Communications Corporation*, Case No. 02-13709 (KJC) (Bankr. D. Del. Dec. 20, 2002); *In re Integrated Health Services, Inc.*, Case No. 00-389 (MFW) (Bankr. D. Del. Feb. 2, 2000).

37. For the foregoing reasons, it is critical that the Debtors utilize the Cash Management System and continue to use their existing business forms as set forth herein, without disruption. Accordingly, it is appropriate and entirely consistent with applicable provisions of the Bankruptcy Code and case law for the Court to approve the Debtors' centralized Cash Management System and grant a waiver of the requirements of section 345(b) of the Bankruptcy Code on an interim basis pending a final hearing.

38. Finally, pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described more fully above and as supported by the Shulman Declaration, and to the extent that the relief requested herein implicates Rule 6003(b), the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

## Notice

39. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Debtors' prepetition and postpetition secured lenders; and (c) the Debtors' prepetition *ad hoc* committee of unsecured creditors. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered

respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

40. No prior motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto, (i) authorizing the Debtors to maintain the Accounts, subject to the Debtors' ability, in their discretion, to close any unnecessary Accounts throughout this Chapter 11 Cases; (ii) authorizing the Debtors to continue to use their existing business forms and checks without reference to the debtor-in-possession status, as provided herein; (iii) authorizing the Debtors to continue to employ the Cash Management System; (iv) granting a limited waiver of the investment and deposit guidelines set forth in Bankruptcy Code

Section 345(b) on an interim basis pending a final hearing; and (v) granting such other and further relief as the Court deems appropriate.

Dated: May 4, 2009

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Laura Davis Jones
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Michael R. Seidl (Bar No. 3889)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail: ljones@pszjlaw.com
dbertenthal@pszjlaw.com
mseidl@pszjlaw.com
jfried@pszjlaw.com
tcairns@pszjlaw.com

[Proposed] Counsel to Debtors and Debtors in Possession