IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FILENE'S BASEMENT, INC., et al.,[1] | ) | Case No. 09-11525 (___) |
| | ) | |
| Debtors. | ) | |

## DEBTORS' MOTION FOR AN ORDER AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY PREPETITION CLAIMS OF SHIPPERS AND WAREHOUSEMEN AND GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move this Court for entry of an order authorizing but not directing, payment of certain prepetition shipping charges, warehousing charges, custom charges and other charges related to possessory liens that may be asserted from the Debtors' shippers, warehouseman and supporting agents (the "Motion"). In support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of the Debtors's chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Filene's Basement, Inc. (8237); FB Services LLC (7224); and FB Leasing Services LLC (7228). The address for all Debtors is 25 Corporate Drive, Suite 400, Burlington, MA 01803.

28189-001\DOCS_DE:146711.3

2. The statutory predicates for the relief sought herein are sections 105(a) and 363 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure.

### Background

3. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

4. The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of Mark Shulman, Chief Executive Officer of the Debtors, in Support of First Day Motions* (the "Shulman Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

### Relief Requested

5. By this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in their business judgment, to pay prepetition obligations owed to common carriers for ground transportation, air freight, ocean freight, and similar charges and freight forwarding charges (which freight forwarding charges may include in the amount payable to the freight forwarder for charges for customs duties and dock facilities) incurred by the Debtors, including those that give rise (or legitimately may give rise) to any statutory or common-law possessory liens on account of unpaid charges owing from the Debtors to such

Shippers (collectively, "Shipping Obligations"), as further described in this Motion. The Debtors also seeks authority to pay, in the exercise of their business judgment, warehousing and port facility charges (the "Warehousing Obligations") to any third party Warehousemen as further described in this Motion. The Debtors propose to pay such claims, when, in the Debtors' sole discretion, the Shippers' and Warehousemen's exercise of contractual or statutory self-help remedies would unduly disrupt the Debtors' businesses. The Debtors request the authority, but not the direction, to pay up to $150,000 on account of such claims, as described further herein.

### The Debtors' Shipping and Warehousing Operations

6. The Debtors operates a fashion retailer carrying men's and women's apparel, accessories, jewelry, shoes, and home fashions, with fine jewelry, shoes, and cosmetics operating as leased departments. The Debtors currently operate 25 stores (the "Stores"), which are located primarily in the metropolitan markets of Boston, New York, Baltimore/Washington, Chicago, Atlanta, Cleveland, Columbus, and Miami. The Debtors also operate a leased 457,000 sq. ft. distribution center (the "Distribution Center") in Auburn, Massachusetts. In addition, while the Debtors operate a web site (www.filenesbasement.com), they do not presently sell any merchandise via that site.

7. In order to make maximum benefit of volume discounts, the Debtors operate by purchasing large quantities of high-end designer and famous-brand-name merchandise through a centralized operation. Merchandise selected by the Debtors' buyers is typically shipped by the vendors to the Distribution Center. In some cases, however, the Debtors' coordinate the shipping of inbound merchandise and select the shipping company for the delivery of the merchandise to the Distribution Center. There are no existing contracts with

any shipper for inbound merchandise, and all shipments are received pursuant to individual purchase orders.

8. After arrival at the Distribution Center, the Debtors' apparel sorters and ticketing agents allocate the merchandise among the Stores and select a shipper to deliver the merchandise to the Stores. In New York and Massachusetts, all deliveries between the Distribution Center and the Stores are handled pursuant to an existing contract with shipper National Retail Transportation, Inc. For their deliveries to Stores outside of New York and Massachusetts, the Debtors select an appropriate shipper through an open bidding process. Typically 80% of merchandise is shipped immediately from the Distribution Center through to the Stores, while 20% is held back at the Distribution Center to ship later based on sell-through data.

9. The Debtors' businesses therefore depend on two separate and equally important transportation processes: (a) the constant delivery of merchandise to their Distribution Center from wholesale suppliers and (b) the frequent, sometimes daily, delivery of the merchandise to their Stores. The Debtors contract with shippers including, without limitation, the railroads, truckers, and short-distance delivery personnel (the "Shippers"), to ship, transport, store, and deliver merchandise from the Debtors' Distribution Center to the Store locations. In some cases, the Debtors also contract with Shippers to deliver merchandise from their suppliers to the Distribution Center.

10. Because the Debtors lease a large Distribution Center to store merchandise prior to delivery to the Stores, the Debtors do not contract directly with any third party warehousemen. However, when necessary, the Shippers may utilize certain warehousemen (the

"Warehousemen") to store merchandise while in transit. Such warehousing of merchandise is controlled and paid directly by the Shippers, with the cost passed along to the Debtors.

11. For some of their shipments, the Debtors employ third-party logistics coordinators (the "Logistics Coordinators") for the inbound and inter-facility transport of merchandise including Spinning Wheels, Shared Transport, Acacia Logistic Solutions and TABS. The Logistics Coordinators manage the logistics of the Debtors' supply and delivery system, including the Shippers by, among other things, auditing the Shippers' invoices and then billing the Debtors for their services. Generally, the Debtors pay the Logistics Coordinators first, and they, in turn, pay the Shippers. Typically, the Logistics Coordinators will advance funds to the Shippers and then invoice the Debtors. The Logistics Coordinators exact a percentage fee from all transport transactions managed for the Debtors.

12. Under some non-bankruptcy laws, a Shipper or Warehouseman may have a lien on the goods in its possession, which secures the charges or expenses incurred in connection with the transportation or storage of the goods.[2]

13. The Debtors expect that, as of the Petition Date, certain Shippers, Warehousemen (when used by the Shippers) and Logistics Coordinators may have outstanding invoices for merchandise delivered to the Debtors prior to the Petition Date or stored for the Debtors on the Petition Date (collectively, including amounts owed to Logistics Coordinators,

---

[2] For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to [law]." See U.C.C. § 7-307(1) (2003).

the "Shipping and Warehousing Charges").[3] Shipping charges constitute the majority of these amounts, since the Debtors do not directly warehouse merchandise with third parties. Some of the Debtors' Shippers also act as Warehousemen, to the extent a particular Shipper warehouses the Debtors' products in their trucks or at their facilities.

14. Usually, as long as the Logistics Coordinators' invoices remain unpaid, the Shippers and Warehousemen will not be paid for future shipments. In such an event, the Shippers and Warehousemen likely will argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed. Moreover, the Debtors' distribution system is an integrated network which is dependent upon the continued use of their existing Logistics Coordinators and Shippers. Because the Debtors' businesses depend on the constant supply of merchandise to their retail Stores, even minor disruptions to the Debtors' delivery of merchandise to theirs stores could be disastrous for the going concern value of the Debtors' businesses.

15. The Debtors ship the vast majority of materials and finished goods within the United States. However, the Debtors receive a small amount of merchandise from international sources (the "International Shipments"). While such International Shipments are typically paid for by the Debtors' international vendors, the Debtors may be subject to storage and demurrage charges to various custom facilities in connection with the offloading and/or storage of International Shipments. According to the arrangements made by the Logistics

---

[3] Included within the Shipping and Warehousing Charges are certain amounts owed relating to customs brokers and customs fees. The Debtors employ a third-party broker to pay such fees, and expect the amounts owed to such broker to be de minimis.

Coordinators that govern the Debtors' International Shipments, the international Shippers and Warehousers may assert a lien on the goods in their possession to secure the expenses incurred in connection with the offloading and storage of the goods.

16. The Debtors anticipate that some Shippers and Warehousemen will demand immediate payment from the Debtors or the Logistics Coordinators. Even absent a valid lien, a Shipper's or Warehouseman's mere possession (and retention) of the Debtors' merchandise could severely disrupt, and potentially cripple, the Debtors' operations because of the Debtors' policy of limiting goods stored in their Distribution Center and the time-sensitive nature of the fashions supplied to their customers.

17. Accordingly, by this Motion, the Debtors seek to prevent the breakdown of their merchandise delivery network by requesting authority to pay certain prepetition claims relating to the Shippers and Warehousemen (directly or through the Logistics Coordinators, which payments shall include the Logistics Coordinators' fee) that the Debtors determine are necessary or appropriate to (a) obtain release of critical or valuable merchandise that may be subject to liens, (b) maintain a reliable, efficient and smooth distribution system, and (c) induce critical Shippers and Warehousemen to continue to carry merchandise and make timely delivery. Notably, the Debtors only seek authority, not direction, to make such payments.

18. The Debtors seek the authority to make payments to the Logistics Coordinators, Shippers and/or Warehousemen, as appropriate, relating to undisputed prepetition Shipping and Warehousing Charges that it, in their business judgment, (a) determines are necessary or appropriate and (b) believes the benefits to their estates and creditors from making such payments will exceed the costs that their estates would incur by bringing an action to

compel the turnover of such goods, and the delays associated with such actions.[4] The Debtors do not expect such payments to exceed $150,000.

19. The Debtors further request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all electronic payment requests made by the Debtors related to the prepetition obligations described herein, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date. The Debtors further request that all such banks and financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

## Basis for the Relief Requested

20. The Debtors submit that the total proposed amount to be paid to the Shippers, Warehousemen and Logistics Coordinators is minimal compared to the importance of and necessity for the Shippers, Warehousemen and Logistics Coordinators and the losses the Debtors may suffer if their operations are disrupted. Moreover, in most cases, the Debtors do not believe that there are viable timely alternatives to the Shippers, Warehousemen and Logistics Coordinators.

21. The Debtors believe that failure to pay these Shipping Obligations will result in certain Shippers discontinuing shipments of merchandise, thereby adversely affecting Debtors' distribution system and retail operations. The Debtors believe that certain Shippers may withhold essential merchandise in their possession pending payment. Payment of some or

---

[4] The value of the goods in the possession of the Shippers and Warehousemen and the potential injury to the Debtors if the goods are not released is likely to greatly exceed the amount of such Shipping and Warehousing Charges.

all of these charges will prevent the disruption to the Debtors' businesses that will result from such actions. Moreover, the Debtors believe that some of these Shippers may contend that they are entitled to possessory liens in any goods and/or publications they hold as of the Petition Date, pursuant to state or other applicable law, and will refuse to deliver or release such goods and/or publications until their claims have been satisfied and their liens redeemed. Pursuant to section 363(e) of the Bankruptcy Code, a Shipper might be entitled to adequate protection of such lien, increasing the cost and administrative burden to the Debtors of administering these chapter 11 cases. The Debtors' payment, on the exercise of their business judgment and in their discretion, of the amounts owing to Shippers as requested herein, will eliminate the need to provide such adequate protection and reduce the amount of potential secured claims against the Debtors' estates, which would take priority over any general unsecured claims.

22. In addition, the value of the goods in the possession of the Shippers, together with the potential injury to the Debtors from disruption of their businesses if the goods and/or publications are not released, far exceeds the amount of unpaid Shipping Obligations that the Debtors seek to pay by this Motion. The Debtors therefore believe that it is necessary and important to their continued business operations and to their successful reorganization that they be able to pay these Shipping Charges.

23. Moreover, if the Debtors are not able to make payments sought herein to those Shippers whose services the Debtors utilized prepetition, it is likely that many of such Shippers will cease to do business with the Debtors, forcing the Debtors to obtain substitute merchandise carriers with little or no warning. Such an arrangement would almost certainly obligate the Debtors to pay premium charges to the replacement carriers in order to obtain timely

delivery of their inventory and other goods essential to their operations, and would in any event severely disrupt the Debtors' operations.

24. The Debtors further believes that a failure to pay the prepetition Warehousing Obligations will result in delayed delivery of merchandise to the Stores, causing significant damage to the Debtors' operations, sales and revenues. Moreover, payment of such amounts also does not prejudice the Debtors' unsecured creditors, to the extent that the Warehousemen would be able to credibly assert a possessory lien for any unpaid amounts for their services. Accordingly, the Debtors submit that payment of prepetition amounts owing to the Warehousemen subject to the Debtors' exercise of their business judgment and in the Debtors' discretion is warranted to the extent sought in this Motion.

## Applicable Authority

25. This Court may grant the relief requested herein under section 105(a) of the Bankruptcy Code. That section grants broad authority to bankruptcy courts to enforce the provisions of the Bankruptcy Code under equitable common law doctrines, providing that:

> The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to prevent the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers under section 105(a) to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtors is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. 174,

175 (Bankr. S.D.N.Y. 1989) (citing Miltenberger v. Logansport, C. & S.W.R. Co., 106 U.S. 286 (1882)); accord In re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999).

26. The Debtors believe that the relief requested herein will ensure a continued supply of merchandise that are vital to the Debtors' continued operations and essential to the Chapter 11 cases. Absent the relief requested in the Motion, the Debtors will be required to expend substantial time and resources (i) convincing those parties holding goods that they should not assert a lien on or hold goods in transit, (ii) attempting to persuade Shippers, Warehouses and Logistics Coordinators to release goods held and/or not detain future shipments, (iii) locate replacement Shippers for those that cease doing business with the Debtors, and (iv) convincing Shippers of the Debtors' authority and ability to make certain payments. The attendant disruption in the continuous flow of merchandise to the Stores likely will result in shortages of inventory and other goods necessary to the Debtors' retail sales and operations and the Debtors' businesses will rapidly deteriorate and their opportunity to achieve a successful reorganization will be seriously jeopardized.

27. Numerous courts have used their powers under section 105(a) and the "doctrine of necessity" to authorize payment of a debtors in possession's prepetition obligations where, as here, such payment is an essential element of the preservation of the debtors-in-possession's potential for rehabilitation. See, e.g., In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (doctrine of necessity permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid."); Ionosphere Clubs, 98 B.R. at 176. The doctrine of necessity "recognizes the existence of the judicial power to authorize a

debtors ... to pay prepetition claims where such payment is essential to the continued operation of the debtors." Id.

28. In recognition of these factors, relief similar to that requested herein has been granted in other large chapter 11 cases in the district and elsewhere. See, e.g., In re ACG Holdings, Inc., Case No. 08-11467 (CSS) (Bankr. D. Del. July 15, 2008) (authorizing payment of prepetition shipping and warehousing charges as well as other liens); Progressive Molded Prods., Inc., Case No 08-11253 (KJC) (Bankr. D. Del. June 24, 2008); Dura Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. Nov. 20, 2006); In re Radnor Holdings Corp., Case No. 06-10894 (PJW) (Bank. D. Del. August 23, 2006); In re Werner Holdings Co. (DE), Inc., Case No. 06-10578 (KJC) (Bank. D. Del. June 13, 2006); In re Global Home Prods., Case No. 06-10340 (KG) (Bankr. D. Del. April 11, 2006); In re J.L. French Auto. Castings, Case No. 06-10119 (MFW) (Bankr. D. Del. February 14, 2006); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. January 4, 2006); In re Meridian Auto. Sys. – Composite Operations, Inc., Case No. 05-11168 (MFW) (Bankr. D. Del. April 27, 2005).

29. The goods in transit include the Debtors' retail merchandise that are essential to the Debtors' continued operations. The critical nature of this merchandise amply justifies granting the relief sought herein. The Debtors have demonstrated that the prompt payment of the Shipping Obligations and Warehousing Obligations, as may be necessary or advisable to obtain delivery of these goods, is crucial to the orderly and efficient operation of the Debtors' businesses. Unless the Debtors receives the authority to pay these essential providers, the Debtors' businesses likely will suffer irreparable harm. The Debtors further submit that the total amount to be paid in satisfaction of the items identified herein, estimated at up to

approximately $150,000 (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date), is *de minimis* compared with the importance and necessity of the merchandise in question, the maintenance of uninterrupted avenues of supply, and the additional losses that may be suffered by the Debtors if their businesses and operations are adversely affected by merchandise shortages.

30. Finally, pursuant to Bankruptcy Rule 6003(b), "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described herein and as supported by the Durbin Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## Notice

31. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtors' prepetition and postpetition secured lenders; and (iii) the Debtors' prepetition *ad hoc* committee of unsecured creditors. As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submits that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

32. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully requests that the Court enter an order granting the Motion, substantially in the form annexed hereto, and grant such other and further relief as is just and proper.

Dated: May 4, 2009

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Laura Davis Jones

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Michael R. Seidl (Bar No. 3889)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail: ljones@pszjlaw.com
dbertenthal@pszjlaw.com
mseidl@pszjlaw.com
jfried@pszjlaw.com
tcairns@pszjlaw.com

[Proposed] Counsel to Debtors and Debtors in Possession