IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FILENE'S BASEMENT, INC., et al., [1] | ) | Case No. 09-11525 (MFW) |
| | ) | |
| Debtors. | ) | |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF CERTAIN OF THE DEBTORS' ASSETS; (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE AND APPROVE THE FORM AND MANNER OF NOTICE RELATED THERETO; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; AND (D) GRANTING RELATED RELIEF

The captioned debtors and debtors in possession (the "Debtors") hereby move this

Court for the entry of an order: (a) approving bid procedures and certain overbid protections,

including a break-up fee, in connection with the sale of certain of the Debtors' assets (described

more fully below); (b) scheduling an auction and hearing to consider the sale of and approve the

form and manner of notices related thereto; (c) establishing procedures for the assumption and

assignment of certain contracts and/or leases that will be assumed and assigned as part of the

sale; and (d) granting related relief (this "Motion"). In support of this Motion, the Debtors

respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Filene's Basement, Inc. (8237); FB Services LLC (7224); and FB Leasing Services LLC (7228). The address for all Debtors is 25 Corporate Drive, Suite 400, Burlington, MA 01803.

## Jurisdiction and Venue

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b) and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

4.      On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

6.      The general factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of Mark Shulman, President of Filene's Basement, Inc., in Support of First Day Motions* (the "Shulman Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

2

7.     In order to maximize the value of their businesses and assets, the Debtors have determined to market and sell substantially all of their assets, including certain assets (the "Assets") proposed to be sold to Crown FB LLC (the "Purchaser"), to the highest or otherwise best bidder(s) during the bankruptcy cases, for the benefit of the estates and their creditors.

## The Sale Process

8.     The proposed asset purchase agreement with the Purchaser is the culmination of a process, during which process the Debtors' assets were marketed for sale or other disposition. Moreover, the procedures proposed pursuant to this Motion will allow that process to continue for a period of time postpetition in insures the greatest value is being obtained for the assets in light of the Debtor's circumstances and time available.

9.     Commencing in March of 2009, Retail Ventures, Inc. ("RVI"), Debtor Filene's Basement Inc.'s parent sought to sell Filene's Basement, Inc. with the assistance of its advisor, Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan") sought to identify a possible purchaser for the Debtors' assets. Commencing on or about March 19, 2009, Houlihan contacted approximately thirteen (13) potential strategic and financial buyers through telephone calls, emails and/or other correspondence. The Debtors are also informed and believe that the list of potential buyers was compiled by Houlihan using Houlihan's internal database and based on discussions with the Debtors and RVI.

10.     Of the approximately thirteen (13) parties contacted by Houlihan, six (6) parties signed and returned confidentiality agreements and were provided varying levels of additional information, including a detailed confidential information memorandum.

3

11.     Of the six (6) parties that signed and returned confidentiality agreements, one (1) party expressed definite interest and engaged in more extensive due diligence.

12.     One additional party, the Purchaser, also learned of the availability of the Debtors' assets and expressed interest.

13.     The Debtors' advisors worked with each of these interested parties and, as a result, at the conclusion of the initial effort, the Debtors had two competing bids for various groups of the Debtors' assets (the "Competing Bids").

14.     During the approximately two weeks immediately prior to the Petition Date, the Debtors and their advisors worked with the potential purchasers to develop the Competing Bids.

15.     An informal committee of certain unsecured creditors (the "Ad Hoc Committee") formed and was briefed by the Debtors and their professionals on the sale process to date and the terms of the Competing Bids.

16.     With the advice and assistance of their advisors, and after reviewing and negotiating with the potential purchasers, the Debtors determined in late April 2009 that a combination of the proposed acquisition of the Assets by the Purchaser, together, with continuing to examine other avenues of disposing of the Debtors' remaining assets (the "Remaining Assets") were the best options for the Debtors in order to maximize the value of their assets and business.

17.     On May 1, 2009, after extensive negotiations, the Debtors entered into an Asset Purchase Agreement (the "Agreement" or the "APA") with the Purchaser, for the sale and purchase of the Assets. Pursuant to the terms of the Agreement, the Seller, subject to an auction

4

and sale process, intend to sell the Assets to the Purchaser (or a designated affiliate) and in connection therewith, assign to the Purchaser certain leases pursuant to section 365 of the Bankruptcy Code, with such sale to be free and clear of all liens, claims and encumbrances pursuant to Bankruptcy Code section 363(f).

18.     During the same time that the Debtors were negotiating the Competing Bids with the potential purchasers, the Debtors continued in their marketing efforts for the Assets and the Remaining Assets, and will continue in these efforts postpetition. Specifically, the Debtors expanded on Houlihan's prepetition marketing efforts and will continue to market their assets postpetition. Immediately prior to the Petition Date, Abacus Advisors Group LLC ("Abacus"), which is assisting the Debtors with their restructuring, distributed a cover memo to over 280 parties in an effort to solicit interest in a possible sale of the Assets and the Remaining Assets. Parties who expressed an interest were asked to sign and return a confidentiality agreement.

19.     Abacus sent the cover memo out to two specifically targeted groups using contact information they have from their experience in the retail industry: strategic retailers and financial buyers.

20.     Abacus has also planned a postpetition solicitation which will include mailings retail to landlords, liquidation firms and an assortment of retail companies who have historically expressed interest in similar sales.

21.     Abacus also solicited input from the Ad Hoc Committee in putting together the mailing list for these solicitations.

22. The Debtors, with Abacus' assistance have also established a data room which will be made available to interested parties who return signed confidentiality agreements for purposed of conducting due diligence.

23. Between the prepetition marketing efforts and, with Abacus' assistance, pospetition marketing of the Assets and the Remaining Assets[2], the Debtors believe that the Assets will be adequately marketed so as to maximize value for the Debtors' estates and their creditors.

24. The Debtors, by this Motion seek approval of the Bid Procedures, under which the Purchaser is the stalking-horse bidder for the Assets. The Debtors believe that, in light of the marketing efforts undertaken prepetition and the postpetition marketing efforts anticipated, the sale process and time period contemplated by the Bid Procedures will result in the highest or otherwise best price for the Assets.

## Relief Requested

25. By this Motion, the Debtors seek approval of the Bid Procedures (hereinafter defined), under which the Purchaser is the stalking horse bidder for the Assets. The terms of the Purchaser's stalking horse bid are summarized below.

## The Agreement with the Purchaser

26. A copy of the Agreement with the Purchaser, with schedules and exhibits, is attached hereto as Exhibit A.[3,4] Pursuant to the terms of the Agreement, the Purchaser, subject

---

[2] The Remaining Assets are the subject of a separate bid procedures motion and sale motion which the Debtors expect to file shortly.
[3] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.
[4] Certain Schedules to the Agreement have not been completed as of the date of the Motion and will be supplied upon completion.

6

to a Court approved auction and sale process, approval of which is sought by this Motion, and the submission of higher and better offers, will purchase the Assets, including, through assignment by the Debtors, certain contracts and leases.[5]

27.     The Debtors, subject to a Court approved auction and sale process and higher and better offers, intend to sell (the "Sale" or the "Transaction") the Assets to the Purchaser pursuant to the Agreement or to a higher and better bidder.  The Debtors have filed a motion for approval of the Sale of the Assets to the Purchaser, subject to higher and better offers (the "Sale Motion"), contemporaneously with the filing of this Motion.

28.     The terms of the Purchaser's offer to purchase the Assets are set forth in the Agreement, and are summarized below.  The description below only summarizes certain provisions of the Agreement, and the terms of the Agreement control in the event of any inconsistency.

1.      **Purchase Price**.  Twenty Two Million Dollars ($22,000,000.00), plus (ii) the Security Deposits; Agreement Section. 1.4

2.      **Good Faith Deposit**.  An amount equal to $5,000,000 to be funded in the amount of $1,000,000.00 upon execution of the Agreement and $4,000,000.00 on the date that the Bankruptcy Court issues the Bid Procedures Order containing approval of the Break-Up Fee. Agreement Section. 1.4

3.      **Assets**.  The Debtors' assets including certain (a) Assumed Leases which include leases for sixteen of the Debtors' store locations, (b) Assumed Contracts, (c) Intellectual Property, (d) Fixed Assets and Equipment, (e) Customer Information, (f) Security Deposits, (g) Books and Records, (h)

---

[5]     Pursuant to the Agreement, the Purchaser may assign its rights to purchase some or all of the Assets to a designated affiliate.

Permits and certain other Assets all as identified in Section 1.1 of the Agreement

4. **Excluded Assets**. All of the Debtors' assets other than those identified in Section 1.1 of the Agreement as the Assets; Agreement Section 1.2

5. **Assumed Liabilities**. Those Liabilities arising with respect to the performance after the Closing Date of the Assumed Contracts, excluding any Liability resulting from any breach there of by the Seller on or prior to the Closing Date; Agreement Section 1.3

6. **Break-Up Fee/Expense Reimbursement**. Break-Up Fee of $660,000.00 and an Expense Reimbursement of up to $150,000.00; Agreement Section 7.2

7. **Closing**. Two Business Days following satisfaction or waiver of all conditions to the obligations of the parties set for in Sections 5 and 6 of the Agreement with an outside closing date of July 31, 2009; Agreement Section 1.5

8. **Representations and Warranties**. Representations and Warranties of the Seller as set forth in Section 2 of the Agreement; Representations and Warranties of the Purchaser as set forth in Section 3 of the Agreement.

9. **Termination Rights.** Termination Rights as set forth in Section 7 of the Agreement

29.     The Debtors believe that the sale of the Assets as a going concern to the

Purchaser or a higher and better bidder determined in accordance with the Bid Procedures is far

preferable to a piecemeal liquidation of such Assets, including because it will result in a higher

price for those assets and, to the extent that the Debtors' employees are rehired by the Purchaser,

will preserve jobs. The Debtors further believe that their obtaining the Purchaser as a stalking

horse bidder, further marketing the Assets with the assistance the Debtors' professionals over the

time period contemplated by the Bid Procedures, which period the Debtors further submit is

8

reasonable and consistent with the marketing periods approved by this Court in similar cases under similar circumstances, and holding the Auction of such Assets on the date specified by the Court will result in the highest or otherwise best price for the Assets. The Debtors have examined the alternatives to a going concern sale of the Assets and has determined that, in light of their financial situation and liquidity needs, a viable alternative to such a sale is not available.

30.     For the reasons stated above, and in light of the obvious benefits to the estates, the Debtors' board of directors has determined, in the exercise of their business judgment, to consummate the proposal submitted by the Purchaser under the Agreement or, if applicable, another bidder in the event that the Debtors receive a higher and better bid for the Assets to the one proposed by the Purchaser.

31.     Accordingly, the Debtors request that the Court, among other things:

a.      approve the Purchaser's status as the stalking horse purchaser pursuant to the terms of the Agreement;

b.      approve the proposed bid procedures (the "Bid Procedures"), including the overbid provisions and provisions related to the Debtors' payment of a break-up fee and expense reimbursement for the Purchaser in certain circumstances, attached hereto as Exhibit B;

c.      approve the procedures set forth herein for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "Cure Procedures");

d.      establish a date for holding the auction (the "Auction") and approve certain procedures in connection therewith;

9

e.    schedule the hearing to approve any sale transaction(s) to the Purchaser or to such other party that makes the higher and best offer for the Assets (the "Successful Bidder") and establishing deadlines for objections and responses to the relief requested in the Sale Motion; and

f.    approve the form and manner of notice to be served upon certain parties, including: (i) the form of notice, substantially in the form attached hereto as <u>Exhibit C</u>, to be served on the Sale and Bid Procedures Notice Parties (defined below); (ii) the form of notice, substantially in the form attached hereto as <u>Exhibit D</u>, to be served on all known creditors of the Debtors (the "Creditor Notice"); and (iii) the form of notice to non-debtor parties to all Assumed Executory Contracts in conjunction with the proposed Sale, in substantially the form attached hereto as <u>Exhibit E</u> (the "Cure Notice").

## Bid Procedures

32.    The Bid Procedures are attached hereto as <u>Exhibit B</u>. The Bid Procedures are as follows:

### Assets for Sale or Disposition

The Debtors are offering for sale in one or more transactions the Assets of the Debtors as set forth in Section 1.1 of the APA. The assets for sale do not include the Excluded Assets as defined and described in Section 1.2 of the APA.

### Participation Requirements

In order to participate in the bidding process and to or otherwise be considered for any purpose hereunder, a person interested in all or portions of the Assets (a "<u>Potential Bidder</u>")

10

must first deliver (unless previously delivered) to the Debtors and their counsel, not later than a date certain, the following (the "Participation Requirements"):

1. Confidentiality Agreement. An executed confidentiality agreement in form and substance acceptable to the Debtors and their counsel (a "Confidentiality Agreement"); and

2. Proof of Ability to Perform. Prior to or at the time of presentation of a Bid, written evidence that the Debtors reasonably conclude demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts and leases to be assumed in such contemplated transaction. Such information may include, in the Debtors' discretion, *inter alia*, the following:

   a. the Potential Bidder's current financial statements (audited if they exist);

   b. contact names and numbers for verification of financing sources;

   c. evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that is needed to close the contemplated transaction;

   d. any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated transaction; provided, however, that the Debtors shall determine, in their reasonable discretion, in consultation with the Debtors' advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications;

   e. information regarding the proposed use of the premises with regard to the leases to be assumed in the contemplated transaction;

   f. information regarding the Potential Bidder's prior experience in the retail industry, if any; and

   g. other such documentation as the Debtors may reasonably request.

**Designation as Qualified Bidder**

A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the Assets of the Debtors do not overlap and who shall also be referred to herein

as a single Qualified Bidder) that complies with the requirements of the Participation Requirements and that the Debtors, in their discretion and with assistance from their advisors, and in consultation with the Committee and the Prepetition Agent on behalf of the Prepetition Lenders, determine is reasonably likely to submit a *bona fide* offer that would result in greater value being received for the benefit of the Debtors' creditors than under the APA and to be able to consummate a sale if selected as a Successful Bidder (defined below).

Upon the receipt from a Potential Bidder of the information required under subparagraph 1 and requested by the Debtors under the Participation Requirements, the Debtors, as soon as is practicable, shall determine in their discretion, and upon consultation with the Committee and the Prepetition Agent on behalf of the Prepetition Lenders, and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

The Purchaser (together with any assigns) is a Qualified Bidder and is deemed to satisfy all Bid Requirements (hereinafter defined).

**Access to Due Diligence Materials**

Only Potential Bidders that execute and deliver a Confidentiality Agreement are eligible to receive due diligence access or additional non-public information. If the Debtors determine, in their discretion and upon consultation with the Committee and the Prepetition Agent on behalf of the Prepetition Lenders, that a Potential Bidder that has otherwise satisfied the Participation Requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due diligence access or additional non-public information shall terminate. The Debtors will designate an employee or other representative to coordinate all

12

reasonable requests for additional information and due diligence access from such Qualified Bidders. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as hereinafter defined). The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets.

**Due Diligence From Bidders**

Each Potential Bidder and Qualified Bidder (collectively, a "Bidder") shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction ("Bidder Related Information"). Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with such requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid. Unless the applicable Bidder consents to the Bidder Related Information being provided to other parties in interest, only the Debtors and their counsel and advisors will be provided with the Bidder Related Information.

The Purchaser (together with any assigns) is a Qualified Bidder and is deemed to have satisfied all requests for Bidder Related Information.

## Bidding Process

The Debtors and their advisors shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting its due diligence investigations, as permitted by the provisions above; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Assets (collectively, the "Bidding Process"). The Debtors, in their discretion shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein) that will better promote the goals of the Bidding Process and that is not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

## Bid Deadline

**The deadline for submitting bids by a Qualified Bidder (the "Bid Deadline") shall be set by the Court.**

Prior to the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation or proposal (a "Bid") shall deliver written copies of its Bid by electronic mail to: (i) the Debtors, c/o Abacus Advisors, 10 Reuten Drive, Closter, NJ 07624;, Attn: Alan Cohen with a copy to counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, DE 19801, Attn: Laura Davis Jones; (ii) the Purchaser, c/o Morris Missry, Wachtel & Masyr, LLP, 110 East 59th Street, New York, NY 10022 ; provided, however, that any confidential financial information may be delivered to the Debtors, their advisors, and their counsel only ("Bidder Confidential Information").

14

**Bid Requirements**

To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Debtors to satisfy each of the following conditions (the "Bid Requirements"):

Good Faith Deposit. Each Bid, other than a Bid submitted by the Purchaser, must be accompanied by a deposit (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of the Debtors in an amount equal to 20% of the Purchase Price under the Bid up to a maximum amount of $5,000,000.00, provided, however, that a Bid for all the Assets that are the subject of the APA must be accompanied by a $5,000,000 Good Faith Deposit. Such Good Faith Deposits shall be irrevocable until five (5) days after Closing of the transactions contemplated by the Successful Bid.

Minimum Overbid. The consideration proposed by the Bid may include only cash and/or other consideration acceptable to the Debtors in their discretion. The aggregate consideration must equal or exceed the sum of the Purchase Price (and, unless waived in whole or in part by the Debtors, in their sole discretion, must provide for the assumption of Assumed Liabilities) plus the Break-Up Fee and the Expense Reimbursement plus $290,000.00.

Irrevocable. A Bid must be irrevocable until the earlier of (i) the deadline set forth in the Bid, as such date may be modified, or (ii) July 31, 2009.

The Same or Better Terms. The Bid must be on terms that, in the Debtors' business judgment are substantially the same or better than the terms of the APA. A Bid must include an executed agreement pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents"). A Bid shall include a copy of the APA marked to show all changes requested by the Bidder (including those related to the Purchase Price) (the "Marked-Up APA"). The Contemplated Transaction Documents must include a commitment to close promptly after the date on which the Sale Order is entered. A Bid should propose a contemplated transaction involving all or substantially of the Assets, provided, however, that the Debtors in their discretion, and upon consultation with the Committee and the Prepetition Agent on behalf of the Prepetition Lenders, may consider proposals for less (or more) than substantially all the Assets, provided further that the Debtors will evaluate all Bids, in their discretion, and upon consultation with the Committee and the Prepetition Agent on behalf of the Prepetition Lenders, to determine whether such Bid or combination of Bids maximizes the value of the Debtors' estates as a whole. The Bid must expressly identify, as part of the marked-up APA or the

schedule(s) thereto, the leases and/or contracts proposed to be assigned to the Bidder as of the Closing.

Contingencies. A Bid may not be conditioned on obtaining financing or any internal approval or otherwise be subject to contingencies more burdensome than those in the APA, unless the Debtors in their discretion otherwise agree, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties at or before closing or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the APA.

Financing Sources. A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors with appropriate contact information for such financing sources.

No Fees Payable to Qualified Bidder. A Bid may not request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bid Procedures.

A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirement shall constitute a "Qualified Bid," if the Debtors believe, in their discretion, and upon consultation with the Committee and the Prepetition Agent on behalf of the Prepetition Lenders, that such Bid would be consummated if selected as the Successful Bid.

In the event that any Potential Bidder is determined by the Debtors, in their discretion and upon consultation with the Committee and the Prepetition Agent on behalf of the Prepetition Lenders, not to be a Qualified Bidder, the Potential Bidder shall be refunded its Good Faith Deposit with interest thereon, if any has accrued, on or before the date that is five (5) days after Closing of the Sale.

The Debtors, in their discretion, and upon consultation with the Committee and the Prepetition Agent on behalf of the Prepetition Lenders, shall have the right to reject any and

all bids that they believe, in their discretion, do not comply with the Bid Procedures. For purposes hereof, the APA shall constitute a Qualified Bid.

**Auction**

The Debtors will conduct an auction (the "Auction") to determine the highest and best bid with respect to the Assets. The Debtors shall provide the Purchaser and all Qualified Bidders with copies of all Qualified Bids by the business day following the Bid Deadline, which may exclude any confidential financial information, as determined by the Debtors in their reasonable discretion or which has been so designated by the Qualified Bidder. The Debtors will request that the Court set the date and time for the Auction which will take place at the offices of Pachulski, Stang, Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, DE 19801.

Prior to the commencement of the Auction, the Debtors will notify all Qualified Bidders of (i) the highest and best Qualified Bid, as determined by the Debtors in their discretion and upon consultation with the Committee and the Prepetition Agent on behalf of the Prepetition Lenders, (the "Baseline Bid") and (ii) the time and place of the Auction, and provide copies of all submitted bids to all Qualified Bidders (excluding any Bidder Confidential Information).

If no higher and better offer is obtained at the Auction, then the Purchaser will be deemed the Successful Bidder, the APA will be the Successful Bid, and, at the Sale Hearing, the Debtors will seek approval of and authority to consummate the Transaction contemplated by the APA.

The Auction shall be conducted according to the following procedures:

*Participation At The Auction*

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representative of each of the Qualified Bidders, the Debtors, the Lenders, and the any official committee appointed by the Office of the United States Trustee (the "Committee") shall be permitted to attend.

During the Auction, bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least $150,000.00. Except as otherwise set forth herein, the Debtors may conduct the Auction in the manner they determine will result in the highest and best offer for the Debtors' assets available for sale.

*The Debtors Shall Conduct The Auction*

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates including, *inter alia*, the proposed closing date of any transaction proposed by a Qualified Bidder (the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid. The Debtors reserve the right to conduct the auction in the manner designed to maximize value based upon the nature and extent of the Qualified Bids received.

18

*Terms Of Overbids*

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

(a) *Minimum Overbid Increment*

Any Overbid after the Baseline Bid shall be made in increments of at least $150,000.00. Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash and/or other consideration acceptable to the Debtors.

(b) *Remaining Terms Are the Same as for Qualified Bids*

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline and the Initial Minimum Overbid Increment shall not apply. Any Overbid made from time to time by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtors accept a higher Qualified Bid as an Overbid and (ii) such Overbid is not selected as the Back-up Bid (as defined below).

To the extent not previously provided (which shall be determined by the Debtors in their discretion), a Qualified Bidder submitting an Overbid must submit at the Debtors' request, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid. The Purchaser shall be deemed to have satisfied this requirement.

(c) *Announcing Overbids*

The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtors' estates based on, *inter alia*, the Bid Assessment Criteria.

(d)     *Consideration of Overbids*

The Debtors reserve the right to make one or more adjournments in the Auction to, among other things: facilitate discussions with individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their discretion, may require, that the Qualified Bidder (other than the Purchaser) has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

Following the conclusion of the Auction, the Debtors may resume bidding on such procedures determined by the Debtors in their discretion for the sale of discrete assets not sold to the Successful Bidder.

## ADDITIONAL PROCEDURES AND MODIFICATIONS

The Debtors, in their discretion, may adopt additional rules for the Auction at or prior to the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Procedures Order. All such additional rules will be provided to each of the Qualified Bidders at the Auction. Further, at or before the Sale Hearing, the Debtors, in their discretion, may impose such other terms and conditions as the Debtors may determine to be in the best interests of the Debtors' estates, their creditors and other parties in interest; provided, however, that any such terms or conditions may

20

not be materially inconsistent with the terms of these Bidding Procedures. The Bidding

Procedures set forth herein may not be modified except with the express written consent of the

Debtors and the Purchaser or upon Court Order.

**All Bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (_i.e._, the principals submitting the Bid ("Principals")) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.**

**The Debtors may (a) determine, which Qualified Bid, if any, is the highest and best offer and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (iii) contrary to the best interest of the Debtors, their estates and creditors.**

## CONSENT TO JURISDICTION AS CONDITION TO BIDDING

All Qualified Bidders at the Auction shall be deemed to have consented to the

core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with

any disputes relating to the Auction, and the construction and enforcement of each Qualified

Bidder's Contemplated Transaction Documents, as applicable.

### Closing the Auction

Upon conclusion of the bidding, the Auction shall be closed, and the Debtors,

upon consultation with the Committee and the Lenders, shall immediately identify the highest

and best offer for the Assets (which may be an aggregate of bids for less than all of the Assets)

(the "Successful Bid") and the entity submitting such Successful Bid (the "Successful Bidder"),

which highest and best offer will provide the greatest amount of net value to the Debtors, and the

next highest or otherwise best offer after the Successful Bid (the "Back-up Bid") and the entity

21

submitting the Back-up Bid (the "Back-up Bidder"), and advise the Qualified Bidders of such determination. Upon five (5) business days' prior notice by the Debtor, the Back-up Bidder selected by the Debtors must immediately proceed with the closing of the transaction contemplated by the Back-up Bid in the event that the transaction with the Successful Bidder is not consummated for any reason. If the Purchaser's final bid is deemed to be highest and best at the conclusion of the Auction, the Purchaser will be the Successful Bidder, and such bid, the Successful Bid. The Purchaser may elect at its option, but shall not be required to serve as a Backup Bidder.

### Acceptance of a Successful Bid

The Debtors shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of such Qualified Bid. The Debtors will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder (including the assignment of any of such objector's Assumed Leases and/or Potential Assumed Contracts proposed to be assumed by the Debtors and assigned to the Successful Bidder, and the Debtors reserve the right to contest any such objection, including on the ground that the objector lacks standing, provided, however, that any objection to such assignment on the basis of amounts necessary, pursuant to Section 365 of the Bankruptcy Code, to cure all defaults under such objector's Assumed Lease or Potential Assumed Contract proposed to be assumed by

the Debtors and assigned to the Successful Bidder must be made and/or reserved in accordance with the procedures set forth in the order approving these Bid Procedures).

## "AS IS, WHERE IS"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates except to the extent set forth in the APA or the purchase agreement of another Successful Bidder. The Purchaser and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or, (i) as to the Purchaser, the terms of the sale of the Assets shall be set forth in the APA, or (ii) as to another Successful Bidder, the terms of the sale of the Assets shall be set forth in the applicable purchase agreement.

## FREE OF ANY AND ALL INTERESTS

Except as otherwise provided in the APA or another Successful Bidder's purchase agreement and subject to the approval of the Bankruptcy Court, all of Debtors' right, title and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and thereagainst

(collectively, the "Interests"), in accordance with Bankruptcy Code § 363(f), with such Interests to attach to the net proceeds of the sale of the Assets.

## SALE HEARING

The Sale Hearing shall be conducted by the Bankruptcy Court on a day that is one (1) business day following the Auction Date or on such other date as may be established by the Bankruptcy Court.

If the Successful Bidder fails to consummate an approved sale by the date that is the earlier to occur of (i) the deadline set forth in the Successful Bid, as such date may be or may have been modified by the Successful Bidder and the Debtors, or (ii) July 31, 2009 (the "Termination Date"), the Debtors shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Bid without further order of the Bankruptcy Court.

## RETURN OF GOOD FAITH DEPOSIT

Any Good Faith Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at Closing. Unless otherwise agreed by the Debtors in their discretion, Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until five (5) days after Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders with all accumulated interest thereon. If a Successful Bidder (including any Back-up Bidder that has become the Successful Bidder) fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Successful Bidder's Good Faith

24

Deposit as part of their damages resulting from such Successful Bidder's breach or failure to perform. In the event the Court enters an Order approving Competing Transaction and the Purchasers terminates the APA under section 7.1(e) thereof, the Debtors hall refund the Good Faith Deposit to the Purchaser pursuant to the terms of the APA no later than two (2) Business Days after the date of entry of the Order approving the Competing Transaction.

## MODIFICATIONS

The Bid Procedures may not be modified except with the express written consent of the Debtors and the Purchaser.

The Debtors may (a) determine, which Qualified Bid, in any, is the highest and best offer and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale; or (iii) contrary to the best interests of the Debtors, their estates and creditors.

At or before the Sale Hearing, the Debtors may impose such other terms and conditions as the Debtors may determine to be in the best interests of the Debtors' estates, their creditors, and other parties in interest.

### Notice of Sale Hearing

33. The Debtors request that the Court approve the manner of notice of the Sale Motion, the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as Exhibit C (the "Sale and Bid Procedures Notice"), which the Debtors will serve on the following parties: (a) the U.S. Trustee; (b) counsel to the official committee of

25

unsecured creditors (the "Committee"); (c) all parties known to be asserting a lien on any of the Debtors' assets; (d) non-debtor counterparties to the Assumed Leases and Potential Assumed Contracts (as defined herein), if any; (e) all entities known to have expressed an interest in acquiring any of the Assets, and known liquidators of real property leases (which the Debtors and their advisors may reasonably determine may be interested in any of the Assets); (f) the United States Attorney's office; (g) all state attorneys general in states in which the Debtors do business; (h) various known federal and state agencies and authorities asserting jurisdiction over the Assets, including the Internal Revenue Service; (i) the Purchaser and its counsel; and (j) all other parties that have filed a notice of appearance and demand for service of papers in the Debtors' chapter 11 cases under Bankruptcy Rule 2002 as of the date of the Motion (the "Sale and Bid Procedures Notice Parties").

34.     Additionally, the Debtors propose to serve the Creditor Notice substantially in the form attached hereto as Exhibit D to all known creditors of the Debtors.

35.     The Debtors propose to serve the Sale and Bid Procedures Notice and the Creditor Notice within three (3) Business Days from the date of entry of an order granting the Bid Procedures Motion (the "Bid Procedures Order"), by first-class mail, postage prepaid, on the appropriate parties. Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Sale Motion or the Bid Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801) (Attn: Laura Davis Jones, Esquire).

26

## Sale Hearing

36.     At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale of the Assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to Bankruptcy Code section 363(f), to the extent permissible under Bankruptcy Code sections 363 and 365, and except as otherwise provided in the Sale Motion, with all such liens, claims and interests to attach to the proceeds of the Sale, with the same validity and in the same order of priority as they attached to the Assets prior to the Sale, including the assumption by the Debtors and assignment to the Successful Bidder of the Assumed Contracts pursuant to Bankruptcy Code section 365. The Debtors will present additional evidence, as necessary, at the Sale Hearing and submit that the Sale is fair, reasonable and in the best interest of their estates.

## Closing

37.     The closing of the Sale (the "Closing") shall take place in accordance with terms of the Agreement, or in accordance with the terms of such other agreement approved by the Bankruptcy Court at the Sale Hearing.

## Procedures for the Assumption and Assignment of Assumed Agreements

38.     At Closing, the Debtors intend to assume and assign to the Successful Bidder, certain executory contracts and unexpired leases, to be identified on certain schedules to

27

the Agreement (i.e., the "Assumed Contracts").[6] The list of the Assumed Contracts proposed to be assumed by the Seller and assigned to the Purchaser are attached to the Agreement.[7]

39.     The Debtors propose to serve, by no later than five (5) days after entry of the Bid Procedures Order, the proposed Cure Notice, in substantially the form annexed hereto as Exhibit E, upon each counterparty (a "Counterparty") to an Assumed Contract or to any other executory agreement or lease that the Debtors determine may be assumed by a Successful Bidder. Each Counterparty to an Assumed Contract or other executory contract or lease will be required to file and serve any objection to the cure amount set forth in the Cure Notice (the "Cure Amount" or "Cure Costs") and to the assumption and assignment of the applicable Assumed Executory Contract or other executory contract or lease within fifteen days after service of the Cure Notice. Any Counterparty failing to timely file an objection to the Cure Amount set forth in the Cure Notice will be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts against the Debtors, their estates, and/or the Purchaser with respect to the Assumed Executory Contract to which they are a Counterparty, and will be deemed to consent to the Cure Amount as set forth in the Cure Notice. Notwithstanding anything to the contrary, no executory contract or unexpired lease will be assumed unless and until the occurrence of the Closing Date.

---

[6]     The inclusion of any agreement in the list of Assumed Executory Contracts does not constitute an admission by the Debtor that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtor expressly reserves the right to challenge the status of any agreement included in the list of Assumed Agreements up until the time of the Sale Hearing.

[7]     In accordance with the terms of Section 1.8 of the APA, the Purchaser may eliminate any Real Property Lease from the list of Assumed Contracts and may add or eliminate any Contract used in the conduct or related to the Business at any time on or prior to the second Business Day prior to the bid deadline set forth in the Bidding Procedures Order

28

40.     If any Counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract or other executory contract or lease (other than with respect to the Cure Amount, as set forth above), the Counterparty will be required to file and serve any such objection by a deadline to be set by the Court.. Further, any other objections to the relief requested at the Sale Hearing or to the proposed form of order (the "Sale Order") must be filed and served on or before a date to be set by the Court. Except to the extent otherwise provided in the Agreement or the agreement entered into with the Successful Bidder(s), subject to the payment of any Cure Amounts pursuant to the Agreement, the assignee of an Assumed Executory Contract will not be subject to any liability to the assigned contract Counterparty that accrued or arose before the closing date of the sale of the Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

## Approval of the Bid Procedures is Appropriate

41.     The Bid Procedures described herein, including those with respect to the assignment and assumption of the Assumed Executory Contracts, are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values. The Purchaser will be the stalking horse for competitive bids, potentially leading to further competition and establishing a baseline against which higher and otherwise better offers can be measured.

42.     As indicated above, the Debtors hereby request that the Court approve the overbid requirements and Bid Procedures as are customary in similar circumstances, including (a) the minimum overbid amount of the Purchase Price $22,000,000.00 plus the Break-Up Fee,

29

plus $660,000.00 plus the Expense Reimbursement of up to $150,000.00, plus $290,000,00 in respect of an offer for all or substantially all of the Assets; (b) bidding increments of $150,000.00 for all or substantially all of the Assets after the minimum overbid amount; and (c) the other Bid Procedures summarized in this Motion annexed hereto as Exhibit B. The Debtors submit that cause exists to approve such procedures because they are fair and reasonable under the circumstances and will encourage competitive bidding and the highest and best price for the Assets.

43.     The Debtors believe that the establishment of the Bid Procedures and the procedures with respect to the assignment and assumption of the Assumed Executory Contracts are reasonable and necessary to induce a purchaser to enter into the transactions encompassed by the Agreement and thus to enable the Debtors to obtain the highest and best price possible for the Assets.

44.     Historically, bankruptcy courts have approved bidding procedures similar to the Bid Procedures under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). The courts are "directed to rely heavily on the business judgment of a debtor's management in determining whether to grant relief respecting the use, sale or lease of estate property," including approval of bidding procedures. *In re The Bombay Company, Inc.*, 2007 WL 2826071 at 4 (Bankr.N.D.Tex. 2007).

45.     The Bid Procedures are fair procedures reasonably intended to encourage competitive bidding, which is a clear benefit to the Debtors and their estates.

30

46. For the reasons set forth above, the Debtors respectfully request approval of: (a) the Bid Procedures for the conduct of overbidding, the Auction and selection of the Successful Bidder(s); (b) the procedures set forth herein for notice to counterparties under executory contracts and leases proposed to be assumed and assigned in connection with the proposed sale, and the determination and payment of Cure Costs to those counterparties; (c) the scheduling of the Sale Hearing and other matters for which scheduling is requested herein; and (e) the related relief sought hereby.

## Approval of the Break-Up Fee and Expense Reimbursement are Appropriate

47. The Debtors request that the Court approve the Purchaser protections as are customary in similar circumstances, including the Break-Up Fee and the Expense Reimbursement, as well as the minimum overbid amount and bidding increment requirements. The Debtors submit that cause exists to approve such payments and procedures because they are fair and reasonable under the circumstances and will encourage competitive bidding and the highest and best price for the Property.

48. Specifically, the Debtors believe that the payment of the Break-Up Fee and the Expense Reimbursement under the terms of the Agreement are reasonable and necessary to induce a purchaser to enter into the transactions encompassed by the Agreement and thus to enable the Debtors to obtain the highest and best price possible for the Assets.

49. Further, to compensate the Purchaser for serving as the stalking horse bidder whose bid will be subject to higher or better offers, the Debtors seek approval of the Break-Up Fee and the Expense Reimbursement . The Debtors and Purchaser believe that the Break-Up Fee and the Expense Reimbursement are reasonable, given the benefits to the Debtors'

31

estates of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Purchaser and the risk to the Purchaser that a third-party offer may ultimately be accepted, and that approval of the Break-Up Fee and the Expense Reimbursement under the terms of the Agreement are necessary to preserve and enhance the value of the estates.

50.     Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate and perform the necessary due diligence attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee and the Expense Reimbursement under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

51.     The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates. *See id.* at 533.

52.     The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to the estates.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id.* at 537.  Second, where the availability of bidding incentives induces a bidder to research the value of the Debtors and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estates by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*

53.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Break-Up Fee passes muster.  The Agreement and the Debtors' agreement to pay the Break-Up Fee and the Expense Reimbursement pursuant to the terms thereunder are the product of good faith, arm's-length negotiations between the Debtors and Purchaser.  The Break-Up Fee and the Expense Reimbursement are fair and reasonable in amount, and is reasonably intended to compensate for the risk to the Purchaser of being used as a stalking horse bidder.

54.     Further, the Break-Up Fee the Expense Reimbursement have already encouraged competitive bidding in that the Purchaser would not have entered into the Agreement without this provision.  The Break-Up Fee thus has "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited."  *O'Brien*, 181 F.3d at 537.  Similarly, the Purchaser's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Assets will be] sold will reflect [their] true worth."  *Id.*

55.     Finally, the Break-Up Fee and the Expense Reimbursement constitutes fair and reasonable provisions reasonably intended to encourage competitive bidding, and the Break-Up Fee and the Expense Reimbursement will permit the Debtors to insist that competing bids for the Assets submitted in accordance with the Bidding Procedures be materially higher or otherwise better than the Agreement (or competing agreement), which is a clear benefit to the Debtors' estates.

56.     The Break-Up Fee and the Expense Reimbursement, which total 3.68% of the Purchase Price under the Agreement, are within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases. *See e.g., In re Global Motorsport Group, Inc., et al.,* (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (court approved a break up fee of approximately 4 %, or $ 500,000 in connection with sale); *In re Global Home Products,* Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve,* Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (court approved a break-up fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp., et al.,* Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.,* Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re Anchor Container Corp. et, al.,* Case Nos. 96-1434 and 96-1516 (PJW) (Bankr. D. Del. Dec. 20, 1996) (court approved termination fee of 2.43%, or $8,000,000, in connection with $327,900,000 sale of substantially all of debtors' assets); *In re FoxMeyer Corp. et al.,* Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr.

D. Del., Oct. 9, 1996) (court approved termination fee of 7.47%, or $6,500,000, in connection

with $87,000,000 sale of substantially all of debtors' assets); *In re Edison Bros. Stores. Inc. et

al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (court approved termination fee of

3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division).

57.     The Expense Reimbursement consists of an amount in cash equal to the

total amount of fees, costs and expenses incurred by the Purchaser in connection with the

authorization, preparation, negotiation, execution and performance of the Agreement and the

transactions contemplated thereby, including all filing and notification fees, and all fees and

expenses of the Purchaser's Representatives.  The Expense Reimbursement is payable to the

Purchaser in the event that the Agreement is terminated under Section 7.1(c) or (f) of the

Agreement.

58.     For the reasons set forth above, the Debtors believe that the proposed

Break-Up Fee and Expense Reimbursement are necessary to maximize the value of the Debtors'

estates, and approval thereof is in the best interests of the Debtors, their estates, creditors and all

parties in interest.

## No Prior Request

59.     No prior request for the relief sought in this Bid Procedures Motion has

been made to this or any other court.

## Notice

60.     Notice of this Motion either has been or will be given to the following

parties or, in lieu thereof, to their counsel, if known (a) the U.S. Trustee; (b) counsel to the

official committee of unsecured creditors (the "Committee"); (c) all parties known to be

asserting a lien on any of the Debtors' assets; (d) all entities known to have expressed an interest in acquiring any of the Assets, including any known liquidators of real property leases (which the Debtors and their advisors may reasonably determine may be interested in any of the Assets); (e) the United States Attorney's office; (f) all state attorney generals in states in which the Debtors do business; (g) various federal and state taxing agencies, including the Internal Revenue Service; (h) the Purchaser and its counsel; (i) all other parties that have filed a notice of appearance and demand for service of papers in the Debtors' chapter 11 cases under Bankruptcy Rule 2002 as of the date of this Motion.

61.     The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: May 4, 2009

PACHULSKI STANG ZIEHL & JONES LLP

*James E O'Neill*

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Michael R. Seidl (Bar No. 3889)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (DE Bar No. 4228)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail: ljones@pszjlaw.com
       dbertenthal@pszjlaw.com
       mseidl@pszjlaw.com
       jfried@pszjlaw.com
       tcairns@pszjlaw.com
       joneill@pszjlaw.com

[Proposed] Counsel to Debtors and
Debtors in Possession

28189-001\DOCS_DE:147077.10