# EXHIBIT C

# [APA]

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the **"Agreement"**) is made and entered into as of this ___ day of _____, 2009, by and between _____ _____, a _____ (the **"Buyer"**), on the one hand, and between Filene's Basement, Inc., a Delaware corporation, FB Leasing Services LLC, a Delaware Limited Liability Company (the **"FB Subsidiary"**) and wholly owned subsidiary of Filene's Basement Inc. (together with Filene's Basement Inc. **"FB"** or **"Seller"**), Debtors and Debtors in Possession under Case No. _____ (the **"Case"**) in the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**). The Seller, together with Buyer, are together referred to herein as the **"Parties"**)

## RECITALS

A.     Seller is in the business operating a value-price fashion retailer carrying men's and women's apparel, accessories, jewelry, shoes, and home fashions, with fine jewelry, shoes, and cosmetics operating as leased departments (the **"Business"**).

B.     Seller wishes to sell to Buyer, pursuant to Sections 363 of Chapter 11 of Title 11 of the United States Code (the **"Bankruptcy Code"**), the assets of Seller more particularly described below and heretofore used exclusively in connection with or arising out of the operation of the Business, all at the price and on the other terms and conditions specified in detail below, and Buyer wishes to so purchase and acquire such assets from Seller.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  Transfer of Assets.

1.1     Purchase and Sale of Assets. On the Closing Date, as hereinafter defined, in consideration of the covenants, representations and obligations of Buyer hereunder, and subject to the conditions hereinafter set forth, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, the Seller's right, title and interest as of the Closing Date in and to the following (collectively, excluding the Excluded Assets (as defined in Section 1.2 below), the **"Property"**):

1.1.1     Leases and Contracts. Seller's right, title and interest in and to (i) the lessee's interest under those real property leases described on **Schedule 1.1.1-(i)** attached to this Agreement and incorporated herein by this reference (collectively, the **"Real Property Leases"**), (ii) the lessee's interest under those equipment, personal property and intangible property leases, rental agreements, licenses, contracts, agreements and similar arrangements, if any, described on **Schedule 1.1.1-(ii)** attached to this Agreement and incorporated herein by this

reference (collectively, the **"Other Leases"**), and (iii) those other contracts, leases, orders, purchase orders, licenses, agreements and similar arrangements described on **Schedule 1.1.1-(iii)** attached to this Agreement and incorporated herein by this reference (collectively, the **"Other Contracts"** and together with the Real Property Leases and Other Leases, the **"Leases and Contracts"**) [____Buyer and Seller will update any and all schedules listed in this Agreement as of Closing to reflect the actual transaction and with respect to events between the posting of schedules and Closing, including without limitation the effect of continued orders and purchase order and changes to inventory____].

1.1.2  <u>Personal Property</u>. Those items of equipment and tangible personal property owned by Seller and heretofore used exclusively in connection with the Business, including, without limitation, all such furniture, vehicles, machinery, equipment, tools, spare parts, computers, fixtures and furnishings and other items of tangible personal property listed or described in **Schedule 1.1.2** attached to this Agreement and incorporated herein by this reference (collectively, the **"Personal Property"**). As used herein, the Personal Property does not include the Inventory (as defined below). The Personal Property shall also expressly exclude any equipment or other tangible property held by Seller pursuant to a lease, rental agreement, contract, license or similar arrangement (a **"Contract"**) where Buyer does not assume the underlying Contract relating to such personal property at the Closing.

1.1.3  <u>Intangible Property</u>. All intangible personal property owned or held by Seller and heretofore used exclusively in connection with the Business, but in all cases only to the extent of Seller's interest and only to the extent transferable, together with all books, records and like items pertaining to the Business, including, without limitation, the names "_____" and "_____," the goodwill of the Business, patents, processes, trademarks, trade names, service marks, catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone exchange numbers identified with the Business and any right, title and interest of Seller in and to those items described on **Schedule 1.1.3** attached hereto and incorporated herein by this reference (collectively, the **"Intangible Property"**). As used in this Agreement, Intangible Property shall in all events exclude (i) any materials containing privileged communications or information about employees, disclosure of which would violate an employee's reasonable expectation of privacy and any other materials which are subject to attorney-client or any other privilege, and (ii) any software or other item of intangible property held by Seller pursuant to a license or other Contract where Buyer does not assume the underlying Contract relating to such intangible personal property at the Closing [____Buyer and Seller to address any possible overlap of Intangible Property in the event there is Intangible Property sold that implicates more than one Buyer____].

1.1.4  <u>Governmental Permits</u>. To the extent transferable and assignable, all of Seller's interest in all licenses, certificates of occupancy, permits, registrations, certificates of public convenience and necessity, approvals, licenses, easements, authorizations and operating rights issued or granted by any governmental or similar authority having jurisdiction over the Business and relating exclusively to the operation of the Business, as listed and described on **Schedule 1.1.4** attached hereto and incorporated herein by this reference (collectively, the **"Permits and Licenses"**).

1.1.5 <u>Deposits, Etc</u>. All cash deposits and prepaid items relating to or arising exclusively in connection with the operation of the Business that are listed and described on **Schedule 1.1.5** attached hereto and incorporated herein by this reference (collectively, the **"Sellers' Deposits"**).

1.1.6 <u>Inventory</u>. All supplies, goods, materials, work in process, inventory and stock in trade owned and held by Seller for use solely in connection with the operation of the Business that are listed and described on **Schedule 1.1.6** attached hereto and incorporated herein by this reference (collectively, the **"Inventory"**).

1.1.7 <u>Vendor Items</u>. All promotional allowances and vendor rebates and similar items relating exclusively to the operation of the Business that are listed and described on **Schedule 1.1.7** attached hereto and incorporated herein by this reference (collectively, the **"Vendor-Related Assets"**).

1.1.8 <u>Warranties, Etc</u>. All prepayments, warranties, guarantees, refunds, reimbursements, rights of set-off and rights of recoupment relating exclusively to the Property and that are listed and described on **Schedule 1.1.8** attached hereto and incorporated herein by this reference (collectively, the **"Claims"**).

1.2 <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, the Property shall be limited to the items identified or described in Section 1.1 above and shall in any event exclude all of the following (collectively, the **"Excluded Assets"**): (i) those items excluded pursuant to the provisions of Section 1.1 above; (ii) all cash or cash equivalents; (iii) Seller's rights under this Agreement and all cash and non-cash consideration payable or deliverable to Seller pursuant to the terms and provisions hereof; (iv) insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Contract which is not assigned to Buyer at the Closing, or (B) any item of tangible or intangible property not acquired by Buyer at the Closing; (v) any Real Property Lease, Other Lease, or Other Contract to which Seller is a party which is not listed or described on **Schedule 1.1.1-(i), Schedule 1.1.1-(ii), and Schedule 1.1.1-(iii)** and any Real Property Lease, Other Lease, or Other Contract which is not assumable and assignable as a matter of applicable law (including, without limitation, any with respect to which any consent requirement in favor of the counter-party thereto may not be overridden pursuant to Section 365 of the Bankruptcy Code) (collectively, **"Excluded Contracts"**), (vi) all securities, whether capital stock or debt, of Seller or any other entity other than the Affiliate Equity; (vii) all rights and claims in or to any refunds or credits of or with respect to any taxes, assessments or similar charges paid by or on behalf of Seller; (viii) tax records, minute books, stock transfer books and corporate seal of Seller; (ix) any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller and any collateral therefor and other collateral deposits and prepaid items associated with the Property; (x) all rights, claims and causes of action of Seller that are not specified on the **Schedules** hereto, including without limitation all rights, claims and causes of action of Seller against former officers, directors, employees, members, principals, agents, and representatives of Seller, (xi) all preference or avoidance claims and actions of the Seller, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code; (xii) all tax refunds, rebates, credits and similar items to which Seller is or

may be entitled, and (xiii) those additional assets, if any, listed on **Schedule 1.2** attached hereto and incorporated herein by this reference.

        1.3     Instruments of Transfer. The sale, assignment, transfer, conveyance and delivery of the Property to Buyer shall be made by deeds, assignments, bill of sale, and other instruments of assignment, transfer and conveyance provided for in Section 3 below and such other instruments as may reasonably be requested by Buyer to transfer, convey, assign and deliver the Property to Buyer, but in all events only to the extent that the same do not impose any monetary obligations upon Seller or in any other respect increase in any material way the burdens imposed by the other provisions of this Agreement upon Seller.

     2. Consideration.

        2.1     Purchase Price.

        2.1.1.  Subject to the provisions of Section 2.5 below, the cash consideration to be paid by Buyer to Seller for the Property (the **"Purchase Price"**) shall be an amount equal to _____ Dollars ($_____), plus, to the extent not taken into account in the adjustment to be made pursuant to Section 2.5 below, an amount equal to the Sellers' Deposits.

        2.1.2  The Purchase Price shall be paid as follows:

           (a)     Concurrently with the mutual execution and delivery of this Agreement (the date of such mutual execution and delivery is sometimes referred to herein as the **"Execution Date"**), Buyer shall deposit into an escrow (the **"Escrow"**) with an escrow agent (the **"Escrow Holder"**) reasonably designated by Seller an amount equal to $[_____] (the **"Purchase Deposit"**) in immediately available, good funds (funds delivered in this manner are referred to herein as **"Good Funds"**), pursuant to joint escrow instructions to be delivered to the Escrow Holder on or before the Execution Date. In turn, the Escrow Holder shall immediately deposit the Purchase Deposit into an interest-bearing account. The Purchase Deposit shall become nonrefundable upon the termination of the transaction contemplated by this Agreement by reason of Buyer's default of any obligation hereunder (a **"Buyer Default Termination"**), it being agreed that Seller shall not have the right to so terminate this Agreement unless Buyer has failed to cure the applicable default within five (5) days following its receipt of written notice thereof from Seller. At the Closing, the Purchase Deposit (and any interest accrued thereon) shall be credited and applied toward payment of the Purchase Price. In the event the Purchase Deposit becomes nonrefundable by reason of a Buyer Default Termination, Escrow Holder shall immediately disburse the Purchase Deposit and all interest accrued thereon to Seller to be retained by Seller for its own account. If the transactions contemplated herein terminate by reason of (A) Seller's material default under this Agreement, it being agreed that Buyer shall not have the right to so terminate this Agreement unless Seller has failed to cure the applicable default within five (5) days following their receipt of written notice thereof from Buyer, or (B) the failure of a condition to Buyer's obligations hereunder, the Escrow Holder shall return to Buyer the Purchase Deposit (together with all interest accrued thereon), but less Buyer's one-half share of the Escrow Holder's escrow fees and charges.

(b)     On the Closing Date, Buyer shall (A) cause the Escrow Holder to deliver the Purchase Deposit (together with all accrued interest thereon) to Seller, and (B) pay and deliver, in Good Funds, the balance of the Purchase Price to Seller. The Seller shall retain the Purchase Deposit pending calculation of any Receivables Shortfall and/or Inventory Shortfall, and the Purchase Deposit shall be the sole source of payment of any such amounts to the Buyer.

2.2     Assumed Liabilities, Environmental Release and Indemnification.

2.2.1.   Effective as of the Closing Date, Buyer shall assume all the following liabilities and obligations of Seller: (i) all obligations of Seller now existing or hereafter arising or accruing under the Leases and Contracts, (iii) with respect to trade payables of the Business and obligations to customers of Seller for refunds, rebates, returns, discounts and the like and existing as of the Closing Date, (iv) with respect to any product liability or warranty claims,(v) with respect to all environmental liabilities (whether now existing or hereafter arising), if any, under federal, state and local law relating to or arising out of or in connection with the Business (including, without limitation, administrative or civil fines or penalties for violations of environmental laws, or remediation or response costs for contamination), including, without limitation, any liabilities described on **Schedule 2.2.1-(v)** attached hereto and incorporated herein by this reference; (vi) all cure obligations required to be paid pursuant to the Approval Order as a condition to Seller's assumption and assignment of the Leases and Contracts, and (vii) with respect to any such additional liabilities and obligations as may be set forth or described on **Schedule 2.2.1-(vii)** hereto (collectively, the **"Assumed Liabilities"**).

2.2.2.   Buyer and anyone claiming by, through or under Buyer hereby waives any right to recover from and fully and irrevocably releases Seller and its respective employees, officers, directors, representatives, agents, servants, attorneys, affiliates, parent, subsidiaries, successors and assigns, and all persons, firms, corporations and organizations in its behalf (collectively, **"Released Parties"**) of and from any and all claims, responsibility and/or liability that it may now have or hereafter acquire against any of the Released Parties for any costs, loss, liability, damage, expenses, demand, action or cause of action arising from or related to the environmental condition or any environmental matters affecting any real property (or related facility or improvements) that is the subject of any Real Property Lease assumed and assigned to Buyer at the Closing (**"Leased Real Estate"**), including, without limitation, geologic conditions and subsurface soil and water conditions. This release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release to Seller. In this connection and to the extent permitted by law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses relating to the environmental condition of or environmental matters affecting the Leased Real Estate, including, without limitation, geologic conditions and subsurface soil and water conditions, which are presently unknown, unanticipated and unsuspected, and Buyer further agrees, represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends to release, discharge and acquit the Released Parties from any such unknown causes of action, claims, demands, debts,

controversies, damages, costs, losses and expenses relating to or arising in connection with the environmental condition of or environmental matters affecting the Leased Real Estate (including, without limitation, geologic conditions and subsurface soil and water conditions).

2.2.3. In addition to the assumption of liability set forth in Section 2.2.1(v) above and the release in favor of the Seller and other Released Parties set forth in Section 2.2.2 above, from and after the Closing Date, Buyer shall indemnify, defend (with counsel satisfactory to Seller), protect and save and hold the Released Parties harmless of, from and against any and all costs, loss, liability, damages, expenses (including, without limitation, all court costs and reasonable attorneys' fees), claims, demands, fines, penalties, violations, actions, proceedings, liens, or causes of action (**"Losses"**) arising from or in any way relating to the environmental condition of the Leased Real Estate (or any portion thereof) or any Hazardous Substances (as defined below) which are present in, on, at, about, around or under the Leased Real Estate (or any portion thereof) as of the Closing, including, without limitation, any Losses imposed or arising under CERCLA, the RCRA (both as defined below) or any other applicable federal, state, or local law or regulation. For purposes of this Agreement, **"Hazardous Substances"** means any hazardous, toxic or dangerous waste, substance or material, pollutant or contaminant, as defined for purposes of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 6901 et seq.), as amended (**"CERCLA"**), or the Resource Conservation and Recovery Act (42 U.S.C. Sections 6901 et seq.), as amended (**"RCRA"**), or any substance which contains gasoline, diesel fuel or other petroleum hydrocarbons, or polychlorinated biphenyls.

2.3 Purchase Price Allocation. Not later than twenty one (21) days prior to the Closing Date, Buyer shall prepare and deliver to Seller for their review and consideration a schedule (the **"Allocation Schedule"**) allocating the Purchase Price among the various assets comprising the Property in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision. If Seller disagrees with or raise objections to the Allocation Schedule, Buyer and Seller will negotiate in good faith to resolve such objections. If the Parties are able to agree upon the allocation of the Purchase Price, Buyer and Seller shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings). Buyer and Seller shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. If, on the other hand, the Parties are unable mutually to agree upon the manner in which the Purchase Price should be allocated, Buyer and Seller shall be free to make their own respective allocations of the Purchase Price for tax purposes.

2.4 Disposition of Seller L/C's. At or prior to the Closing, as to then outstanding letters of credit or similar financial accommodations issued for Seller's account and held by third parties (collectively, **"Seller L/Cs"**), Buyer shall (i) obtain, at Buyer's sole cost and expense and deliver to the parties holding those Seller L/Cs which are "standby" letters of credit, replacement letters of credit or similar financial accommodations sufficient to cause such parties

6

to release and return to Seller at or prior to the Closing the undrawn originals of the Seller L/Cs and all cash and other collateral therefor, and (ii) with respect to those of the Seller L/Cs that are "documentary" letters of credit, deposit cash in an institution acceptable to Seller in an amount equal to 110% of the aggregate face amount of such Seller L/Cs pursuant to an agreement, in form and content reasonably satisfactory to Seller, which provides, among other things, for Seller's right to draw upon such cash immediately after and in amounts corresponding to such amounts as are drawn under such Seller L/Cs.

      2.5     Purchase Price Adjustment. _____

      2.5.1  Seller and Buyer acknowledge and agree that the Purchase Price has been based on (i) the Property including Inventory valued at $_____ (the **"Inventory Benchmark"**). Within ___ days after the Closing Date, Seller shall prepare and deliver to Buyer a statement of Inventory, prepared in accordance with generally accepted accounting principles, consistently applied, .as of the Closing Date (the **"Closing Statement"**). Buyer's accountant shall be permitted to have reasonable access to the books, records and work papers containing financial information of Seller during the period in which the Closing Statement is being prepared to verify the accuracy and completeness thereof. The fees and expenses of Buyer's accountant shall be borne solely by Buyer, and the fees and expenses of the Auditors shall be borne solely by Seller. The Closing Statement shall be conclusive and binding upon Buyer and Seller unless Buyer objects in writing to any item or items shown on the Closing Statement within fifteen (15) days after delivery of the Closing Statement. Such writing shall assert that the Closing Statement is in error specifying in reasonable detail the amount in dispute and the basis for such dispute. If the parties do not agree within fifteen (15) days thereafter as to the amount in dispute, such amount or amounts shall be submitted to the Bankruptcy Court for resolution and final determination.

      2.5.2  In the event that the value of the Inventory included in the Property transferred to Buyer on the Closing Date, as finally determined in the manner provided herein (x) is less than the Inventory Benchmark (the amount by which such Inventory value is less than the Inventory Benchmark, the **"Inventory Shortfall"**), the Purchase Price shall be decreased, on a dollar-for-dollar basis, by an amount equal to the Inventory Shortfall, or (y) is greater than the Inventory Benchmark (the amount by which such Inventory value is less than the Inventory Benchmark, the **"Inventory Excess"**), the Purchase Price shall be increased, on a dollar-for-dollar basis, by an amount equal to the Inventory Excess. Promptly after the final determination of Inventory value pursuant to this Section 2.5, but in any event no more than five (5) business days after such determination, (x) Seller shall pay to Buyer, in immediately available funds, an amount equal to the Inventory Shortfall, if any, from the Purchase Deposit reserved in accordance with Section 2.1.2.(b), above and (y) Buyer shall pay to Seller, in immediately available funds, an amount equal to the Inventory Excess, if any.

      2.5.4  At the Closing, in addition to paying the Purchase Price and any other amounts payable by Buyer hereunder, in support of Buyer's obligation to adjust for any Excess Receivables and any Inventory Excess in accordance with the provisions of this Section 2.5, Buyer shall deposit $_____ (the **"Adjustment Deposit"**) into escrow with an escrow holder reasonably satisfactory to Buyer and Seller and pursuant to an escrow agreement

reasonably satisfactory to Buyer and Seller. Upon the final resolution of the adjustments contemplated by Sections 2.5.2 and 2.5.3 above and payment in full of any amounts to which Seller may be entitled thereunder, any portion of the Adjustment Deposit not used or needed to effect such adjustments shall promptly be returned to Buyer.

3. Closing Transactions.

3.1     Closing Conference. The Closing of the transactions provided for herein (the **"Closing"**) shall take place at such place or places as the Parties may mutually agree upon.

3.2     Closing Date. Unless otherwise agreed to in writing by the Seller and the Buyer, the Closing shall occur on the date (the "Closing Date") that is the later to occur of (i) satisfaction or waiver, as applicable, of all conditions precedent set forth in Sections 4.2 (setting forth the conditions precedent to Buyer's obligation to close) and 4.1 hereof (setting forth the conditions precedent to Seller's obligation to close), and (ii) two business days following entry of the Approval Order in the Case; provided, however, in no event shall the Closing take place later than July 31, 2009 (unless said date is extended by the Sellers).

3.3     Seller's Deliveries to Buyer at Closing. On the Closing Date, Seller shall make the following deliveries to Buyer:

3.3.1     An Assignment and Assumption of Leases and Contracts substantially in the form and content attached as **Exhibit "A"** hereto, duly executed by Seller pursuant to which Seller shall assign to Buyer Seller's interest, if any, in the Leases and Contracts (the **"Assignment of Leases"**).

3.3.2     A Bill of Sale and Assignment, duly executed by Seller in the form and on the terms of the bill of sale attached hereto as **Exhibit "B,"** pursuant to which Seller transfers and assigns to Buyer Seller's right, title and interest in and to the Personal Property and the Assignment Property (the **"Bill of Sale"**).

3.3.3     A counterpart Assignment of Intangible Property, duly executed by Seller, in the form and content of the assignment of intangible property attached as **Exhibit "C"** hereto, pursuant to which Seller assigns to Buyer Seller's interest, if any, in and to the Intangible Property (the **"Assignment of Intangible Property"**).

3.3.4     Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Seller to Buyer at the Closing.

3.4     Buyer's Deliveries to Seller at Closing. On the Closing Date, Buyer shall make or cause the following deliveries to Seller:

3.4.1     Payment of the Purchase Price.

3.4.2     A counterpart of the Assignment of Leases, duly-executed by Buyer.

3.4.3   An Assumption of Liabilities with respect to the Assumed Liabilities, in the form and content attached as **Exhibit "D"** hereto and incorporated herein by this reference, duly-executed by Buyer (the **"Assumption of Liabilities"**).

3.4.4   Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Buyer to Seller at the Closing.

3.5   Prorations.  Rent, current taxes, prepaid advertising, utilities and other items of expense (including, without limitation, any prepaid insurance, maintenance, tax or common area or like payments under the Real Property Leases or Other Leases and Contracts, or any of them) relating to or attributable to the Business and/or the Property shall be prorated between Sellers and Buyer as of the Closing Date. All liabilities and obligations due in respect of periods prior to or as of the Closing Date shall be paid in full or otherwise satisfied by Seller and all liabilities and obligations due in respect of periods after the Closing Date shall be paid in full or otherwise satisfied by Buyer at Closing, to the extent calculable and, otherwise promptly upon calculation; provided, however, the provisions of this Section 3.5 are subject to Buyer's obligations to assume liabilities and obligations pursuant to Section 2.2, above.. Rent shall be prorated on the basis of a thirty (30) day month.

3.6   Sales, Use and Other Taxes.  Any sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Property is located, or any subdivision of any such state, or under any federal law or the laws or regulations of any federal agency or authority, which may be payable by reason of the sale or transfer of the Property under this Agreement or the transactions contemplated herein shall be borne and paid by Buyer.

3.7   Possession.  Right to possession of the Property shall transfer to Buyer on the Closing Date. Seller shall transfer and deliver to Buyer on the Closing Date such keys, locks and safe combinations and other similar items as Buyer may reasonably require to obtain occupation and control of the Property, and shall also make available to Buyer at their then existing locations the originals of all documents in Seller's actual possession that are required to be transferred to Buyer by this Agreement.

4.  Conditions Precedent to Closing.

4.1   Conditions to Seller's Obligations.  Seller's obligation to make the deliveries required of Seller at the Closing Date and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Seller of each of the following conditions:

4.1.1   All of the representations and warranties of Buyer contained herein shall continue to be true and correct at the Closing in all material respects.

4.1.2   Buyer shall have executed and delivered to Seller the Assignment of Leases and the Assumption of Liabilities.

4.1.3    Buyer shall have delivered, or shall be prepared to deliver to Seller at the Closing, all cash and other documents required of Buyer to be delivered at the Closing.

4.1.4    Buyer shall have delivered to Seller appropriate evidence of all necessary entity action by Buyer in connection with the transactions contemplated hereby, including, without limitation:  (i) certified copies of resolutions duly adopted by Buyer's _____ approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by Buyer of this Agreement; and (ii) a certificate as to the incumbency of those _____ of Buyer executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

4.1.5    No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

4.1.6    Buyer shall have substantially performed or tendered performance of each and every material covenant on Buyer's part to be performed which, by its terms, is required to be performed at or before the Closing.

4.1.7    The Bankruptcy Court shall have entered the Approval Order and Procedures Order in accordance with Sections 8(a) and 8(b) below and the Approval Order shall not have been stayed as of the Closing Date.

4.2    Conditions to Buyer's Obligations.  Buyer's obligation to make the deliveries required of Buyer at the Closing and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

4.2.1    Seller shall have substantially performed or tendered performance of each and every covenant on Seller's part to be performed which, by its terms, is required to be performed or capable of performance at or before the Closing.

4.2.2    All of the representations and warranties of Seller contained herein shall continue to be true and correct at the Closing in all material respects.

4.2.3    Seller shall have executed and be prepared to deliver to Buyer the Assignment of Leases, the Assumption of Liabilities, the Bill of Sale, the Deed(s), the Assignment of Intangible Property, and the FIRPTA Affidavit.

4.2.4    Seller shall have delivered, or shall be prepared to deliver to Buyer at the Closing, all other documents required of Seller to be delivered at the Closing.

4.2.5   Seller shall have delivered to Buyer appropriate evidence of all necessary corporate action by Seller in connection with the transactions contemplated hereby, including, without limitation:  (i) certified copies of resolutions duly adopted by Seller's directors approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by Seller of this Agreement; and (ii) a certificate as to the incumbency of officers of Seller executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

4.2.6   No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

4.2.7   The Bankruptcy Court shall have entered the Approval Order and Procedures Order in accordance with Sections 8(a) and 8(b) below and the Approval Order shall not have been stayed as of the Closing Date.

Any waiver of a condition shall be effective only if such waiver is stated in writing and signed by the waiving Party; provided, however, that the consent of a Party to the Closing shall constitute a waiver by such Party of any conditions to Closing not satisfied as of the Closing Date.

5.  Seller's Representations and Warranties.  Seller hereby makes the following representations and warranties to Buyer:

5.1   Organization, Standing and Power. Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware.  Seller has all requisite entity power and authority to own, lease and, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, operate its properties, to carry on Seller's business as now being conducted. Subject to entry of the Approval Order, Seller has the power and authority to execute, deliver and perform this Agreement and all writings relating hereto.

5.2   Validity and Execution. This Agreement has been duly executed and delivered by Seller and, upon entry of the Approval Order, will constitute the valid and binding obligation of Seller enforceable against it in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or by equitable principles (regardless of whether considered in a proceeding at law or in equity).

5.3   No Conflict. Subject to the entry of the Approval Order, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Seller do not and will not: (i) conflict with or result in a breach of the articles of incorporation or by-laws of Seller; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or

governmental authority, or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a Party or by which Buyer or its assets or properties may be bound.

6. Buyer's Warranties and Representations. In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties to Seller:

6.1 Organization, Standing and Power. Buyer is a corporation duly organized, validly existing and in good standing under the laws of _____. Buyer has all requisite entity power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

6.2 No Conflict. The execution, delivery and performance of this Agreement and all writings relating hereto by Buyer have been duly and validly authorized. The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer do not and will not: (i) conflict with or result in a breach of the articles of incorporation or by-laws of Buyer or, if applicable, other organizational documents or agreements of Buyer; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a Party or by which Buyer or its assets or properties may be bound.

7. "AS IS" Transaction. Buyer hereby acknowledges and agrees that, except only as provided in Section 5 above, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Property (including, without limitation, income to be derived or expenses to be incurred in connection with the Property, the physical condition of the Leased Real Estate, Personal Property or Inventory, the environmental condition or other matter relating to the physical condition of the Leased Real Estate, the zoning of the Leased Real Estate or related improvements, the value of the Property (or any portion thereof), the transferability of the Property or any portion thereof, the terms, amount, validity, collectibility or enforceability of any Assumed Liabilities or Lease or Contract, the merchantability or fitness of the Personal Property, the Inventory or any other portion of the Property for any particular purpose, whether the assignment of any Lease or Contract without the consent of the counterparties thereto or any Lease or Contract would constitute a default or give rise to a right of termination thereunder, or any other matter or thing relating to the Property or any portion thereof). Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Property. Buyer further acknowledges that Buyer has conducted an independent inspection and investigation of the physical condition of all portions the Property and all such other matters relating to or affecting or comprising the Property and/or the Assumed Liabilities (including, without limitation, those matters, if any, disclosed to Buyer pursuant to **Schedule 7** attached hereto and incorporated herein by this reference) as Buyer deemed necessary or appropriate and that in proceeding with its acquisition of the Property, Buyer is doing so based

solely upon such independent inspections and investigations. Accordingly, Buyer will accept the Property at the Closing **"AS IS, "WHERE IS," and "WITH ALL FAULTS."**

       8.      Bankruptcy Court Approvals. On or about May __, 2009, Seller filed a motion (the **"Sale Motion"**) for an order (the **"Approval Order"**) from the Bankruptcy Court which (i) approves the sale of the Property to Buyer on the terms and conditions set forth in this Agreement and authorizes the Seller to proceed with this transaction, (ii) includes a specific finding that Buyer is a good faith Buyer of the Property, (iii) orders Buyer to pay, concurrently with the Closing and as a condition to Seller's assumption and assignment thereof, all cure amounts owing to the counterparties to the Leases and Contracts, and (iv) states that the sale of the Property to Buyer shall be free and clear of all liens, claims, interests and encumbrances whatsoever (other than the lien of current taxes not yet payable with respect to any Property, and those other liens, claims, interests and encumbrances, if any, listed on **Schedule 8(a)(iii)** attached hereto and incorporated herein by this reference). If requested by Seller or the Bankruptcy Court, Buyer shall provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to the Leases and Contracts. Seller shall use reasonable efforts to obtain the Approval Order. Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement which the Buyer and Seller may hereafter enter into shall be conditioned upon the Bankruptcy Court's entry of the Approval Order. If the Bankruptcy Court refuses to issue the Approval Order or to approve any third party Buyer at the hearing on the Sale Motion, then this transaction shall automatically terminate and the Seller and the Buyer shall be relieved of any further liability or obligation hereunder. In the event that a third party (an **"Upset Buyer"** and the underlying agreement between the Upset Buyer and Seller, the **"Upset Agreement"**) is approved by the Bankruptcy Court as the Buyer of the Property at the hearing on the Sale Motion, however, notwithstanding anything to the contrary in this Agreement, this Agreement shall not terminate, but rather shall become a "back-up bid" which shall remain open for acceptance by Seller for a period of _____ (__) days following such hearing, but subject and subordinate in all respects to the rights of the Upset Buyer under the Upset Agreement; provided, however, this Agreement shall automatically terminate if the Approval Order is for any reason whatsoever not entered by the Bankruptcy Court on or before _____, 2009, or the Closing does not occur by the Outside Date. Upon entry of the Approval Order in accordance with the provisions of this Section 8(a) (such entry date being referred to herein as the **"Sale Approval Date"**), the condition set forth in this Section 8(a) shall conclusively be deemed satisfied.

       9. Operation Pending Closing. Except (i) as otherwise expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer, (iii) as prohibited or restricted by the Bankruptcy Code, or (iv) as described on **Schedule "8"** attached hereto and incorporated herein by this reference, from the date hereof until the Closing Date, the Seller shall: maintain the Business in a manner substantially similar to the manner in which the Seller was operating or maintaining the Business immediately prior to the date hereof and consistent with practice since the commencement of its bankruptcy case (including with respect to the payment of accounts payable of Seller), (b) use commercially reasonable efforts to preserve intact the Business in the form in which it existed as of the date hereof, to keep available the services of any current employees and agents and to maintain any relations and goodwill with its suppliers, customers,

distributors and any others with whom or with which it has business relations as of the date hereof, (c) to maintain appropriate levels of Inventory (consistent with practice since the commencement of its bankruptcy case) and (d) not take any action inconsistent with this Agreement or with the consummation of the Closing.

10. Hart-Scott Rodino Act. RESERVED

11. Employee Matters.

11.1 Prior to the Closing, Buyer shall offer to employ, commencing immediately following the Closing, not less than _____ percent (___%) of all employees [__at the purchased location(s), to be determined by Buyer and Seller__] at their salaries, compensation levels and terms and conditions of employment applicable to their employment by Seller immediately prior to the Closing. Such employees who become employees of Buyer shall be collectively referred to as the **"Transferred Employees."**

11.2 Buyer shall give Transferred Employees full credit for purposes of eligibility and vesting and benefit accrual (other than benefit accrual under a defined benefit pension plan) under the employee benefit plans or arrangements maintained by the Buyer in which such Transferred Employees participate for such Transferred Employees' service with the Seller.

11.3 With respect to any welfare benefit plans maintained by Buyer for the benefit of Transferred Employees on and after the Closing Date, Buyer shall (i) cause there to be waived any eligibility requirements or pre-existing condition limitations, and (ii) give effect, in determining any deductible and maximum out-of-pocket limitations, amounts paid by such Transferred Employees with respect to benefit plans maintained by the Seller.

11.5 Seller shall retain and shall be responsible for all liabilities for vacation time, sick leave, personal leave and other compensated time off accrued by Seller's employees, other than the Transferred Employees, as of the Closing Date. Buyer shall assume and shall be responsible for all liabilities for vacation time, sick leave, personal leave and other compensated time off accrued by Transferred Employees as of the Closing Date. [__Note to potential Buyers—assumption of employee liabilities will be considered in determining the highest or best offer__].

11.6 Buyer shall provide group health plan continuation coverage, pursuant to the requirements of COBRA, to all Seller employees, former employees of Seller receiving group health plan continuation coverage from Seller on the Closing Date, and former employees of Seller who are in a COBRA-election period on the Closing Date, each only to the extent that such persons: (i) properly request such coverage; (ii) will not be hired by Buyer; and (C) timely pay for such coverage.

12. Miscellaneous.

12.1 Risk of Loss. Damage and Destruction; Condemnation. Seller shall promptly notify Buyer of the occurrence of any material damage to or destruction of the Property that occurs prior to the Closing Date. In the event of any uninsured damage to or destruction of the Property prior to the Closing Date the cost of which to repair would total $[_____] or less, then such damage or destruction shall have no effect whatsoever on the Purchase Price or Buyer's or Seller's obligation to close. Should any uninsured damage or destruction to the Property occur prior to the Closing Date the cost of which to repair would total more than $[_____] but less than $[_____], then unless Seller causes the same to be repaired and restored in all material respects prior to the Closing Date (in which case the Purchase Price shall be unaffected and the parties shall proceed with the Closing as though such damage, destruction or proceedings had never occurred or been initiated), Buyer's sole remedy shall be to receive a dollar-for-dollar reduction in the Purchase Price in an amount equal to the sum of (i) the cost of such repairs, less (ii) the amount of any insurance proceeds with respect thereto assigned to Buyer at the Closing, and consummate the transaction contemplated herein. If any uninsured damage or destruction to the Property occurs prior to the Closing Date the cost of which to repair would total $[_____] or more, then irrespective of whether the same can be repaired and/or restored prior to the Closing Date, Buyer shall have the right and option to either (i) terminate the transaction contemplated herein, or (ii) elect to receive, as its sole and exclusive remedy by reason of such damage, destruction, a Purchase Price reduction in the amount of $[_____] and consummate the transaction contemplated herein as though the damage or destruction had never occurred or been initiated. In all other events or in the event that Buyer elects to consummate the purchase pursuant to clause (ii) above, (xx) all insurance or condemnation proceeds, including business interruption and rental loss proceeds, collected by or paid to Seller prior to the Closing Date, shall be credited against the Purchase Price on Buyer's account or the Purchase Price shall be adjusted by an amount agreed between Buyer and Seller, and (yy) all entitlement to all other insurance or condemnation proceeds arising out of such damage or destruction or proceedings and not collected prior to the Closing Date shall be assigned to Buyer at the Closing. Notwithstanding anything to the contrary in this Agreement, the risk of loss or damage to the Property shall unconditionally shift to the Buyer on the Closing Date. For avoidance of doubt, Buyer and Seller intend that the provisions of this Section 12.1 shall control over any right or remedy to which the Buyer may otherwise be entitled under this Agreement by reason of the occurrence of any event subject to this Section 12.1.

12.2 Attorneys' Fees. In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

12.3 Reasonable Access to Records and Certain Personnel. In order to facilitate Seller's efforts to administer and close the Case (including, without limitation, the preparation of filings in the Case and state, local and federal tax returns and other filings, reconciliation of claims filed in the Case, removal of corporate and other records and information relating or belonging to entities other than Seller), for a period of _____ (__) years following

the Closing, (i) the Buyer shall permit Seller's counsel and other professionals and counsel for any successor to Seller and its respective professionals (collectively, **"Permitted Access Parties"**) reasonable access to the financial and other books and records relating to the Property or the Business and the systems containing such information, books and records, which access shall include (xx) the right of such Permitted Access Parties to copy or remove, as applicable, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (yy) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Buyer for the reasonable costs and expenses thereof, and (ii) Buyer shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to _____ during regular business hours to assist Seller and the other Permitted Access Parties in their post-Closing activities (including, without limitation, preparation of tax returns), provided that such access does not unreasonably interfere with the Buyer's business operations. Buyer shall not destroy financial an other books and records of the Seller acquired pursuant to this Agreement without first offering the Seller an opportunity to copy, access, and/or obtain such records.

       12.4    <u>Notices</u>. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other may be effected by personal delivery in writing, or by registered or certified mail, postage prepaid, return receipt requested or by facsimile, and shall be deemed communicated as of the date of mailing or facsimile transmission (with answer back confirmation of such transmission). Mailed notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this Section 12.4.

To Seller:            _____
                             _____
                             Attn: _____
                             Facsimile: (___) ____-_____

With a copy to:     Pachulski Stang Ziehl & Jones LLP
                             919 North Market Street, 17th Floor
                             Wilmington, Delaware 19899
                             Attn: Laura Davis Jones, Esq.
                             Facsimile: (302) 652-4400

To Buyer:           _____
                             _____
                             Attn: _____
                             Facsimile: (___) ____-_____

With a copy to:     _____
                             _____
                             Attn: _____
                             Facsimile: (___) ____-_____

To Official Committee of Unsecured Creditors:

_____
_____
Attn: _____
Facsimile: (___) ____-_____

12.5    Entire Agreement. This instrument, that certain Confidentiality Agreement dated _____, 2009, between Seller and Buyer, and the documents to be executed pursuant hereto contain the entire agreement between the Parties relating to the sale of the Property. Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

12.6    Modification. This Agreement may be modified, amended or supple-mented only by a written instrument duly executed by all the Parties hereto.

12.7    Closing Date. All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

12.8    Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

12.9    Captions. All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

12.10   Further Assurances. Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto; provided that nothing herein shall be deemed to require any Party to execute or deliver any such further assurance, document or instrument to the extent that the same could in any material way increase the burdens, obligations or liabilities otherwise imposed upon such Party by this Agreement.

12.11   Waiver. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver.

12.12   Brokerage Obligations. Seller and the Buyer each represent and warrant to the other that, other than _____ (the **"Broker"**), Seller's investment

banker, such Party has incurred no liability to any broker or agent with respect to the payment of any commission or other compensation regarding the consummation of the transaction contemplated hereby. It is agreed that if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Buyer or Seller in connection with this transaction by any party other than the Broker (for whose commission or other compensation Seller shall be solely responsible), all such claims shall be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify, defend (with counsel reasonably satisfactory to the Party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transaction contemplated hereby.

12.13 <u>Payment of Fees and Expenses</u>. Except as provided in Section 12.2 above, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

12.14 <u>Survival</u>. The respective representations and warranties of Buyer and Seller under this Agreement, and any covenants of Seller to be performed prior to the Closing, shall lapse and cease to be of any further force or effect effective upon the Closing. Except as provided in the immediately preceding sentence, the covenants and agreements of Seller and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

12.15 <u>Assignments</u>. This Agreement shall not be assigned by any Party hereto without the prior written consent of the other Party hereto, which consent the Parties may grant or withhold in their sole and absolute discretion.

12.16 <u>Binding Effect</u>. Subject to the provisions of Section 12.15, above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto.

12.17 <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of [                    ]. Each party to this Agreement irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court (or a United States district court in the same district as the Bankruptcy Court), and any appellate court from such court, in any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, or for recognition or enforcement of any judgment resulting from any such suit, action or proceeding, and each party hereby irrevocably and unconditionally agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in the Bankruptcy Court.

12.18 <u>Good Faith</u>. All Parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

12.19  Construction. In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

12.20  Counterparts. This Agreement may be signed in counterparts. The Parties further agree that this Agreement may be executed by the exchange of facsimile signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

12.21  Time is of the Essence. Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

12.22  Interpretation and Rules of Construction. In this Agreement, except to the extent that the context otherwise requires:

12.22.1 when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

12.22.2 the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

12.22.3 whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

12.22.4 the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

12.22.5 all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

12.22.6 the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

12.22.7 any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

12.22.8 references to a person are also to its permitted successors and assigns; and

12.22.9  the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

**In Witness Whereof,** Buyer and Seller have executed this Asset Purchase Agreement as of the day and year first above written.

**BUYER:**

_____, a

_____

By:_____
**Name:** _____
**Its:** _____

**SELLER:**

**Filene's Basement, Inc., a Delaware corporation and Debtor and Debtor in Possession**

By:_____
**Name:** _____
**Its:** _____

## All SCHEDULES

**[To be attached]**

**Exhibit "A"**

## ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS

This Assignment and Assumption of Leases and Contracts (this **"Assignment"**) is entered into as of this ___th day of _____, 2009, between Filene's Basement, Inc., a Delaware corporation and Chapter 11 Debtor and Debtor in Possession under Case No. _____ in the Bankruptcy Court (the **"Assignor"**), on the one hand, and _____, a _____ (the **"Assignee"**), on the other hand, with respect to the following facts and circumstances:

A.    Assignor, as Seller, and Assignee, as Buyer, have heretofore entered into that certain Asset Purchase Agreement dated _____, 2009 (the **"Purchase Agreement"**). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.    Concurrently with the mutual execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Purchase Agreement. Assignor and Assignee are executing and delivering this Assignment in satisfaction of their respective obligations pursuant to Sections 3.3.1 and 3.4.2 of the Purchase Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, Assignor and Assignee hereby agree as follows:

1.    Assignment. Effective as of the Closing Date, Assignor hereby assigns to Assignee all of his right, title and interest in and to the Leases and Contracts (collectively, the **"Assigned Contracts"**).

2.    Assumption. Effective as of the Closing Date, Assignee hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assigned Contracts and to faithfully perform all of Assignor's obligations thereunder to be performed from and after the Closing Date as though Assignee had been the original contracting Party thereunder.

3.    Attorneys' Fees. In the event that either Party hereto brings and action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

4. <u>Amendments</u>. This Assignment may only be amended by a writing signed by both Assignor and Assignee.

5. <u>Execution in Counterparts</u>. This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the Parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature promptly thereafter.

6. <u>Delivery Pursuant to Purchase Agreement</u>. Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7).

7. <u>Governing Law</u>. This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of [_____].

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment as of the day and year first set forth above.

<u>**ASSIGNOR:**</u>

**Filene's Basement, Inc., a Delaware corporation and Debtor and Debtor in Possession**

**By:**_____

**Name:** _____

**Its:** _____

<u>**ASSIGNEE:**</u>

_____, a _____

**By:**_____

**Name:** _____

**Its:** _____

## Exhibit "B"

## BILL OF SALE AND ASSIGNMENT

Pursuant to Section 3.3.2 of that certain Asset Purchase Agreement dated _____, 2009 (the **"Agreement"**), by and between _____, a _____ (**"Buyer"**), on the one hand, and Filene's Basement, Inc., a Delaware corporation and Chapter 11 Debtor and Debtor in Possession under Case No. _____ in the Bankruptcy Court (**"Seller"**), on the other hand, and for good and valuable consideration, the receipt and sufficiency of which Seller hereby expressly acknowledges, Seller hereby sells, transfers, assigns and delivers to Buyer all of his right, title and interest in and to (i) the Personal Property, and (ii) the Assignment Property.

Except for terms specifically defined in this Bill of Sale, all capitalized terms used in herein shall have the same meanings as such terms have when utilized in the Agreement.

Seller covenants and agrees to execute and deliver further instruments of transfer and assignment and take such other action as Buyer may reasonably request to more effectively transfer and assign to and vest in Buyer each of the Personal Property and Assignment Property; provided that nothing herein shall be deemed to require Seller to execute or deliver any such further document or instrument or take any such action to the extent that the same could impose any monetary obligations upon Seller or could in any other respect increase in any material way the burdens, obligations or liabilities otherwise imposed upon Seller by this Agreement.

Notwithstanding anything to the contrary herein, Seller is executing and delivering this Bill of Sale and Assignment in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Agreement).

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale and Assignment to be executed as of the _____ day of _____, 2009.

**SELLER:**

**Filene's Basement, Inc., a Delaware
Corporation and Debtor and Debtor in Possession**

**By:**_____
**Name:** _____
**Its:** _____

## Exhibit "C"

## ASSIGNMENT OF INTANGIBLE PROPERTY

Filene's Basement, Inc., a Delaware corporation and Chapter 11 Debtor and Debtor in Possession under Case No. _____ in the Bankruptcy Court (the **"Assignor"**) is executing this Assignment of Intangible Property (the **"Assignment"**) in favor of _____ (the **"Assignee"**), with respect to the following facts and circumstances:

(A)     Assignor and Assignee have heretofore entered into that certain Asset Purchase Agreement dated _____, 2009 (the **"Agreement"**). Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Agreement.

(B)     Concurrently with the execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Agreement. Pursuant to Section 3.3.3 of the Agreement, Assignor is required to execute and deliver this Assignment at the Closing.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which Assignor hereby expressly acknowledges, Assignor hereby assigns, conveys, transfers and sets over unto Assignee, all of its right, title and interest, if any, in and to all Intangible Property. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Assignor and Assignee.

Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7).

In the event that Assignor or Assignee brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of [_____].

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment as of the ___ day of _____, 2009.

**ASSIGNOR:**

**Filene's Basement, Inc., a Delaware
Corporation and Debtor and Debtor in Possession**

By:_____

Name: _____

Its: _____

**ASSIGNEE:**

_____, a _____

By:_____

Name: _____

Its: _____

Exhibit "D"

## ASSUMPTION AGREEMENT

This Assumption Agreement (this **"Assumption"**) is entered into as of this _____ day of _____, 2009, by _____, a _____ (the **"Buyer"**) in favor of Filene's Basement, Inc., a Delaware corporation and Chapter 11 Debtor and Debtor in Possession under Case No. _____ in the Bankruptcy Court (the **"Seller"**), with respect to the following facts and circumstances:

A.    Seller and Buyer have heretofore entered into that certain Asset Purchase Agreement dated _____, 2009 (the **"Purchase Agreement"**). Except for terms specifically defined herein, the capitalized terms used in this Assumption shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.    Concurrently with the execution and delivery of this Assumption, Buyer and Seller are consummating the transactions contemplated by the Purchase Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which Buyer hereby acknowledges, Buyer hereby agrees as follows:

1.    Assumption.  Effective as of the Closing Date, Buyer hereby assumes and agrees fully and faithfully to perform all of the Assumed Liabilities.

2.    Attorneys' Fees.  In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Assumption, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

3.    Amendments.  This Assumption may only be amended by a writing signed by both Buyer and Seller.

4.    Governing Law.  This Assumption shall be governed by and construed and enforced in accordance with the laws of the State of _____.

5.    Execution in Counterparts.  This Assumption may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assumption bearing their original signature  promptly  thereafter.

IN WITNESS WHEREOF, Buyer has executed this Assumption as of the day and year first set forth above.

BUYER:

_____, a
_____

By: _____
Name: _____
Its: _____